IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PINNACLE ADVISORY GROUP, INC., *Plaintiff*, v. ANDREW J. KRONE, *et al*., *Defendant*. | Civil No. ELH-19-02988 |

**MEMORANDUM OPINION**

Plaintiff Pinnacle Advisory Group Inc. ("Pinnacle" or the "Company"), a private wealth management firm, filed suit against two defendants: its former employee, Andrew Krone, and his current employer, CapitalRock Financial, LLC d/b/a Naples Wealth Planning ("Naples Wealth"). ECF 1 (the "Verified Complaint"). Pinnacle alleges that Mr. Krone, who worked for the Company from October 1, 2009 to August 30, 2019, took confidential information from plaintiff upon his departure from Pinnacle on or about August 30, 2019. According to plaintiff, Mr. Krone is using that information to solicit Pinnacle's clients to his current employer, Naples Wealth, in violation of trade secrets law and in breach of his employment agreement with Pinnacle.

The Verified Complaint contains eight counts: "Declaratory Judgment" (Count One); breach of contract (Count Two); "Breach of The Covenant of Good Faith and Fair Dealing" (Count Three); violation of the Maryland Uniform Trade Secrets Act, Md. Code § 11-1201 *et seq*. of the Commercial Law Article (Count Four); conversion (Count Five); "Tortious Interference with Contract/Economic Advantage" (Count Six); unfair competition (Count Seven); and unjust enrichment (Count Eight). ECF 1 at 8-17. Plaintiff seeks injunctive relief as well as compensatory and punitive damages.

Now pending is Mr. Krone's "Motion To Compel Arbitration And Partially Dismiss Or Stay Action," pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and Fed. R. Civ. P. 12(b)(6). ECF 37 (the "Motion"). The Motion is supported by one exhibit. ECF 27-1. Plaintiff opposes arbitration. ECF 40. Mr. Krone did not reply, and time to do so has expired. *See* Local Rule 105.2(a).

No hearing is necessary to resolve the Motion. Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I. Background

### A. Factual background

Pinnacle is a private wealth management firm that provides "financial planning and investment, asset management, and other financial services." ECF 1, ¶ 10.

Pinnacle hired Mr. Krone on or about October 1, 2009. *Id.* ¶ 11. On or about May 5, 2010, Pinnacle and Mr. Krone executed an Employment Agreement (the "Agreement"). *Id.* ¶ 12; *see* ECF 1-2. By its terms, the Agreement was effective for one year commencing on May 5, 2010. ECF 1-2 at 2. Upon the expiration of the initial term, the Agreement provides that it will "automatically renew for additional consecutive one-year terms." *Id.* According to the Agreement, the "Initial Terms and any Additional Term shall at all times be subject to the provisions of this Agreement." *Id.*

Section 9 of the Agreement, titled "Non-Competition Agreement," provides, in relevant part, ECF 1-2 at 4-5:

9. <u>Non-Competition Agreement</u>.

A. Employee agrees that, for one year following termination from the Company for any reason, the Employee will not, as an individual, stockholder, officer, director, partner, agent, employee, consultant, or representative, act for or on behalf of, or have any interest, direct or indirect, in any business similar to or

2

competitive with the Company's business within a 20-mile radius of the Company's office in Naples, Florida.

B. Employee agrees, during the Initial Term of employment and for any Addition [sic] Term, and for one year following the termination of Employee's employment for any reason, Employee will not perform or render services or attempt to perform or render services, for his own account or on behalf of any person or corporation other than the Company, for any customer or client of Company for which Employee (or employees under his managerial control) has performed any services ("Company Clients"). This restriction does not apply to Pinnacle Advisory Group clients that were served by Andrew prior to his joining Pinnacle Advisory Group.

C. Employee agrees, during the Initial Term of employment and for any Addition [sic] Term, and for one year following the termination of Employee's employment for any reason, that he will not, directly or indirectly, whether on behalf of himself or on behalf of any other person or entity, solicit or hire, attempt to solicit or hire, recommend for employment, any Company Employee to work or perform services for his/her own account or on behalf of any person or corporation other than the Company. Employee also agrees that during that same time period, he will not encourage or induce any Company Employee to terminate his/her employment with the Company. For purposes of this Agreement, a Company Employee shall be any then-current employee of the Company or any individual who was an employee of the Company during the last 12 months of Employee's employment with the Company.

In addition to the restrictive covenant, Section 10 of the Agreement addresses the use of

trade secrets and confidential information. In pertinent part, it states, *id.* at 5-6:

10. <u>Trade Secrets; Confidential Information and Intellectual Property.</u> Employees acknowledges that as a result of his employment with the Company, Employee has, is and will be making use of, acquiring, and adding to information of a special and unique nature and value relating the Company's intellectual property, trade secrets and other confidential information. In that regard, Employee agrees to the following:

A. All files, notes, data, reference items, sketches, drawings, memoranda, records, books, computer programs, and other materials in any way relating to any of the information referred to in the paragraph above or to the Company's business shall belong exclusively to the Company. Employee agrees to turn over to the Company all copies of such materials in Employee's possession or control at the Company's request or upon the termination of Employee's employment. The Employee shall not, at any time during or following his employment with the Company, divulge or disclose, or employ for any purpose whatsoever, except as necessary to accomplish the business objectives of the Company, any of the

Company's trade secrets or other confidential information that have been obtained by or disclosed to the Employee as a result of the Employee's employment with the Company.

B. This section does not apply to trade secrets or confidential information relating to accounts/clients generated by the Employee prior to Employee's term of employment with the company.

Also of import here, the "Miscellaneous" section of the Agreement contains an arbitration provision, which states *id.* at 6-7:

C. If a dispute arises under this Agreement, other than a dispute arising under Sections 9 and/or 10 of this Agreement, such dispute shall be resolved in accordance with arbitration conducted in accordance with the rules of the American Arbitration Association for resolution of employment disputes. Any arbitration proceeding shall take place in Howard County, Maryland. A dispute arising under Sections 9 and/or 10 of this Agreement shall be filed in the county of proper jurisdiction within the State of Maryland.

The Agreement's choice of law provision clarifies that the Agreement "shall be governed by, and enforceable by, the laws of the State of Maryland." *Id.* at 7.

On October 20, 2010, Pinnacle and Krone executed a "Modifications of Employment Agreement" ("Modification"). ECF 1-3. The Company and Mr. Krone modified Section 9(A) of the Agreement, as follows, *id.* at 2:

9. Non-Competition Agreement.
    A. Employee agrees that, for one year following termination from the Company for any reason, the Employee will not, as an individual, stockholder, officer, director, partner, agent, employee, consultant, or representative, act for or on behalf of, or have any interest, direct or indirect, in any business similar to or competitive with the Company's business within a 5-mile radius of the Company's office in Naples, Florida.

The Modification also amended the Agreement's arbitration provision, as follows, *id.*:

13. Miscellaneous.
    C. If a dispute arises under this Agreement, other than a dispute arising under Sections 9 and/or 10 of this Agreement, such dispute shall be resolved in accordance with arbitration conducted in accordance with the rules of the American Arbitration Association for resolution of employment disputes. Any arbitration proceeding shall take place in Howard County, Maryland.

A dispute arising under Sections 9 and/or 10 of this Agreement shall be filed in the county of proper jurisdiction within the State of Maryland. Any court costs, attorneys' fees and expenses incurred by the Company or the Employee to enforce this Agreement due to a dispute shall be borne by the losing party of the dispute.

Without prior notice, Mr. Krone resigned from his position as wealth manager and director of Pinnacle's branch in Naples, Florida on August 30, 2019. ECF 1-4 (8/8/2019 Letter). In a letter addressed to Pinnacle's CEO, dated August 30, 2019, Mr. Krone stated: "I've left behind all items belonging to Pinnacle, including my computer and all records regarding clients." *Id.* Further he said: "There are numerous clients that I brought to Pinnacle from my prior employer that are exempted from certain provisions in our contract. I expect Pinnacle to honor our agreement by refraining to contact those clients, and if contacted by them, to kindly provide them with my contact information above." *Id.*

On August 6, 2019, Pinnacle, through counsel,[1] sent a letter to Naples Wealth, Mr. Krone's new employer. ECF 1, ¶ 31; see ECF 1-5 (9/6/2019 Letter). Naples Wealth is a limited liability company ("LLC") that maintains its principal place of business in Naples, Florida. *Id.* ¶ 4.[2] The letter advised "that Mr. Krone's employment with Pinnacle was governed by an Employment Agreement that prohibits him from directly or indirectly providing any services to a client of Pinnacle's for a period of one (1) year following his termination of employment." ECF 1-5 at 2. The Company stated that "Mr. Krone may well attempt to solicit clients that he worked with at Pinnacle," and that it would consider such conduct "a breach of his Employment Agreement." *Id.*

---

[1] The letter was signed by Matthew A. Mace and printed on letterhead of the law firm Baker Donelson. That firm is not counsel to Pinnacle in this suit.

[2] For the purposes of diversity jurisdiction, the citizenship of a LLC "is determined by the citizenship of all of its members." *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). Plaintiff alleges that the members of Naples Wealth are domiciled in Florida, making Naples Wealth a citizen of Florida. ECF 1, ¶¶ 5-6. Defendants have not challenged this contention.

5

And, Pinnacle warned Naples Wealth that it "intend[ed] to vigorously enforce the terms of the Employment Agreement." *Id.*

According to the Company, it did not receive a response from either Krone or Naples Wealth. ECF 1, ¶ 33. Instead, Pinnacle alleges that it heard from clients that Mr. Krone was contacting them about transferring their accounts from Pinnacle to Naples Wealth. *Id.* ¶ 34. Pinnacle alleges that on or about September 17, 2019, Mr. Krone sent a handwritten note on Naples Wealth letterhead to a Pinnacle client, "advertising Naples Wealth products, criticizing Pinnacle products, and offering a call with other Naples Wealth employees." *Id.* ¶ 35; *see* ECF 1-6 (9/17/2019 Letter). In Pinnacle's view, such notes constitute solicitation of its clients, in violation of the Agreement. ECF 1, ¶ 37.

Pinnacle alleges that the "specific performance data" discussed in the letter makes clear that "Krone took confidential client portfolio reporting information from Pinnacle prior to or at the time of resignation." *Id.* ¶ 39. A review of Mr. Krone's computer records allegedly reveals that he was "running/downloading client portfolio reports during his last few weeks at Pinnacle." *Id.* ¶ 40. Mr. Krone also allegedly "redirected Pinnacle's primary contact at a custodian—with whom Pinnacle participates in a client referral program—from a Pinnacle email address to [his] personal email address." *Id.* ¶ 31.

According to Pinnacle, Mr. Krone has actively solicited other Pinnacle clients. The Company claims that Mr. Krone called three Pinnacle clients and the CPA of another client. *Id.* ¶ 42. And Mr. Krone allegedly met with a Pinnacle client, who later transferred his or her account from Pinnacle to Krone and Naples Wealth. *Id.* ¶ 43.

On September 20, 2019, Pinnacle sent a letter to Mr. Krone with the following subject line: "Cease and Desist: Violations of employment Agreement." *Id.* ¶ 45; ECF 1-7 (9/20/2019 Letter).[3] Attached to the letter was a copy of the handwritten note that Mr. Krone allegedly sent to a Pinnacle client on September 17, 2019. In the letter, Pinnacle stated its belief that Mr. Krone had "solicited clients of Pinnacle in violation of your Agreement. Specifically, since your resignation from Pinnacle, at least ten (10) Pinnacle clients have left Pinnacle." ECF 1-7 at 2. According to Pinnacle, "[t]hat simply cannot be coincidence." *Id.* In addition, the letter stated: "By your actions, Pinnacle also believes that your current employer, [Naples Wealth], is tortuously [sic] interfering with Pinnacle's business relationships with its clients." *Id.* Pinnacle directed Mr. Krone to "cease and desist [his activities]" and threatened legal action if he continued to violate the Agreement. *Id.* at 2-3.

Further, Pinnacle demanded that Krone respond by September 23, 2019. *Id.* at 3. And, Pinnacle demanded that Mr. Krone aver that he had ceased his violation of the Agreement and provide Pinnacle with a list of clients that he believed were exempt from the Agreement. *Id.* at 3.

Mr. Krone sent a letter to Pinnacle's counsel, dated September 24, 2019. ECF 1-8 (9/24/2019 Letter). He said: "I do not believe that the handwritten letter that you attached to your letter referred to above constitutes 'solicitation.'" *Id.* at 2. Rather, Mr. Krone maintained that the note merely "compares and contrasts" the "market performance" of the financial products of Pinnacle and Naples Wealth. *Id.* Nevertheless, Mr. Krone agreed not to send "any similar letters in the future" or "take actions that are not exempt from those allowable under my contract." *Id.* He also submitted a list of "exempt clients" with his letter. Six accounts were listed under the

_____

[3] This letter was also signed by Matthew Mace of Baker Donelson. A copy of the letter was also sent to Naples Wealth. ECF 1-7 at 3.

header "Family Related Accounts" and another three accounts were listed as "Prior Clients." *Id.* at 3.

Despite Mr. Krone's representations in his letter, Pinnacle alleges that "Krone continues to violate the Agreement." ECF 1, ¶ 52. According to Pinnacle, it has lost "approximately" nineteen accounts that were previously managed by Mr. Krone, none of which were accounts that he claimed were exempt, and at least some of which were lost after Mr. Krone's affirmance of the Agreement in his letter of September 24, 2019 letter. *Id.* ¶¶ 53-54. Plaintiff claims that Mr. Krone now manages these nineteen accounts. *Id.* ¶ 55.

## B. Procedural History

Pinnacle initiated suit on October 14, 2019. ECF 1. With its Verified Complaint, plaintiff filed a "Notice of Motion For A Temporary Restraining Order And Preliminary Injunction." ECF 1-13. Plaintiff also filed a "Memorandum of Law In Support of Plaintiff's Motion For a Temporary Restraining Order and Preliminary Injunction." ECF 1-16.[4] In its submission, plaintiff asked the Court to enjoin defendants from "[s]oliciting any business from any past or present customers or business prospects of Plaintiff" or "[d]isclosing, using, or otherwise benefitting from" Pinnacle's trade secrets and confidential information. *Id.* at 2. Further, plaintiff sought to compel defendants to turn over any confidential information in their possession that belongs to Pinnacle and to produce an accounting of any accounts that were formerly clients of Pinnacle. *Id.*

By order of October 15, 2019, the Court directed plaintiff to clarify whether defendants had notice of the Verified Complaint and motion, or what efforts Pinnacle had made to notify defendants of the proceedings, as required by Fed. R. Civ. P. 65(b)(1)(B). ECF 8. And, I directed plaintiff to present its view as to the appropriate amount of a bond. *Id.* Plaintiff filed executed

---

[4] The motion is reflected on the docket at ECF 6.

summons with the Court on October 23, 2019, reflecting that Mr. Krone was served on October 15, 2019, and Naples Wealth was served the next day. ECF 17; ECF 18. Plaintiff also filed an amended motion on October 23, 2019, containing a bond of $ 330,000.00. ECF 19 at 3.

The same day, I scheduled a hearing on the motion for October 29, 2019. ECF 20. Pursuant to a telephone conference on October 28, 2019, with counsel for both sides, I scheduled a preliminary injunction hearing for November 7, 2019. ECF 28. However, the hearing was postponed at the request of the parties. And, on November 8, 2019, the parties submitted a proposed "Agreed Order," staying the case for 45 days, pending mediation. The Court entered the Order the same day. ECF 35. Per the Order, the Court directed defendants, *inter alia*, to return any confidential information to Pinnacle and to refrain from performing services for or soliciting the business of any past or present clients of Pinnacle. *Id.*

Defendants answered the suit on November 22, 2019. ECF 36. The same day, Mr. Krone filed the "Motion To Compel Arbitration And Partially Dismiss Or Stay Action." ECF 37. Plaintiff responded to the Motion on December 5, 2019. ECF 40. Following a telephone conference with counsel on December 11, 2019, the Court stayed the case by Order of December 20, 2019 (ECF 43), which was amended on January 2, 2020. ECF 44.[5] On February 18, 2020, Pinnacle filed a Status Report informing the Court that "the parties' efforts to settle their dispute with the aid of a mediator did not result in a settlement." ECF 45. Therefore, plaintiff asked the Court to "move forward with the case." *Id.*

---

[5] The Court's Order of December 20, 2019, stayed the case until "March 2, 2019." *See* ECF 43. The Court's Order of January 2, 2020, corrected the date, staying the case until "March 2, 2020." ECF 44.

## II.  Legal Standards

### A. The Federal Arbitration Act

Mr. Krone moves to compel arbitration and to partially dismiss or stay this action pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*  Enacted in 1925, the FAA "requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, ___ U.S. ___, 139 S. Ct. 1407, 1412 (2019); *see also McCormick v. Am. Online, Inc.*, 909 F.3d 677, 679 (4th Cir. 2018) (the FAA "provides for the enforceability of arbitration agreements and specifies procedures for conducting arbitrations and enforcing arbitration awards").  Under § 2 of the FAA, an arbitration contract is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  Thus, the FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, ___ U.S. ___, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also McCormick*, 909 F.3d at 680 ("[T]he FAA elevates the arbitration of claims as a favored alternative to litigation when the parties agree in writing to arbitration.").

In *Adkins v. Labor Ready, Inc.*, 303 F.3d 496 (4th Cir. 2002), the Fourth Circuit explained, *id.* at 500-01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)):

> In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

The *Adkins* Court also said, 303 F.3d at 500: "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview."  Accordingly, a court must "engage in a limited review to ensure that the dispute is arbitrable—*i.e.*, that a valid agreement exists between the parties and that the specific

dispute falls within the substantive scope of that agreement." *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002).

Nevertheless, there must be an "independent jurisdictional basis" for suit in federal court. *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581-82 (2008). Of significance here, "diversity jurisdiction would authorize a federal court to resolve disputes concerning the arbitration process. . . ." *McCormick*, 909 F.3d at 681.

Section 3 of the FAA is also relevant. It provides, 9 U.S.C. § 3:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Thus, the Fourth Circuit has said: "The FAA requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.' This stay-of-litigation provision is mandatory." *Adkins*, 303 F.3d at 500 (quoting 9 U.S.C. § 3)). Nevertheless, in lieu of a stay, some courts have determined that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *see Willcock v. My Goodness! Games, Inc.*, PWG-16-4020, 2018 WL 3970474, at *4 (D. Md. Aug. 20, 2018); *Kabba v. Ctr.*, PWG-17-211, 2017 WL 1508829, at *2 (D. Md. Apr. 27, 2017), *aff'd*, 730 F. App'x 141 (4th Cir. 2018).

Under 9 U.S.C. § 4, a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a district court "for an order

directing that such arbitration proceed in the manner provided for in such agreement." Section 4 further provides that, when presented with such a petition, a court

> shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

Conversely, § 4 provides that if the "making of the arbitration agreement . . . be in issue," then "the court shall proceed summarily to the trial thereof." *Id*. Thus, § 4 requires the district court, not an arbitrator, to "decide whether the parties have formed an agreement to arbitrate." *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019); *see Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 296 (2010) (explaining that a dispute over the formation of an agreement to arbitrate "is generally for courts to decide"); *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 637 (4th Cir. 2002). However, the Supreme Court has said "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ___ U.S. ___, 139 S. Ct. 524, 529 (2019) (internal quotation marks omitted).

"Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: '[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Levin v. Alms and Assoc., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (alteration in *Levin*) (quoting *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 92 (4th Cir. 1996)); *see Berkeley Cty. Sch. Dist.*, 944 F.3d at 236; *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 913 F.3d 409, 415 (4th Cir. 2019). Notably, "[a]ny uncertainty regarding the scope of arbitrable issues agreed to by the parties must be resolved in favor of arbitration." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted); *see also Levin*, 634 F.3d at 266 ("The 'heavy presumption of arbitrability requires that

when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'"); *Adkins*, 303 F.3d at 50.

## B. Rule 12(b)(3)

The Supreme Court has observed that an arbitration clause is "a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974). In *Sucampo Pharmaceuticals, Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006), the Fourth Circuit determined that "a motion to dismiss based on a forum-selection clause," such as an arbitration provision, "should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue." The *Sucampo* Court explained, *id.* at 548 (internal and external citations omitted) (my alteration):

> [T]reating a motion to dismiss on the basis of a forum-selection clause under Rule 12(b)(1) presents practical difficulties that undercut the benefits gained from enforcement of the clauses. For example, the court must raise the issue of subject-matter jurisdiction *sua sponte*, if necessary. *See* Fed. R. Civ. P. 12(h)(3). Thus, in cases involving forum-selection clauses, both district and circuit courts would be under an obligation to confirm that the clause was not applicable before reaching the merits of the action. . . . More importantly a motion to dismiss under Rule 12(b)(1) is non-waivable and may be brought at any time—even on appeal—regardless of whether a litigant raised the issue in an initial pleading. Litigants, therefore, could hold back forum-selection clause objections, until after discovery—or even an adverse verdict.

Moreover, the Fourth Circuit has recognized that Rule 12(b)(6) "is not the appropriate motion for enforcing a forum-selection clause." *Sucampo*, 471 F.3d at 549. It explained that "because a 12(b)(6) motion may be brought at any time prior to adjudication on the merits, analyzing forum-selection clauses under Rule 12(b)(6) would present some of the same timing concerns as in the 12(b)(1) context." *Id.* (citations omitted). The Court reasoned: "Analyzing forum-selection agreements under Rule 12(b)(3) would avoid the doctrinal and timing

disadvantages of utilizing Rule 12(b)(1) or (6) and be consistent with Supreme Court precedent." *Id.* (citing *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998) (finding that motions to dismiss based on forum-selection clause should be analyzed under Rule 12(b)(3), based on the Supreme Court's decision in *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988))).

Since *Sucampo*, the Fourth Circuit has reiterated that a challenge based on a forum-selection clause, including an arbitration clause, should be addressed by way of a motion to dismiss for improper venue under Rule 12(b)(3). *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012). Nevertheless, other judges of this court have considered motions to dismiss in favor of arbitration under Rule 12(b)(1) and Rule 12(b)(6). *See, e.g., Willcock*, 2018 WL 3970474, *3 (D. Md. Aug. 20, 2018) (collecting cases); *Garrett v. Monterey Fin. Servs., LLC*, JKB-18-325, 2018 WL 3579856, at *2 (D. Md. July 25, 2018) ("[M]otions to dismiss in connection with a valid arbitration agreement are often brought under Rule 12(b)(6) based on the observation that the existence of a valid arbitration clause does not technically deprive the Court of subject matter jurisdiction. . . . However, courts have also found it proper to dismiss claims subject to arbitration agreements under Rule 12(b)(1)." (citations omitted)); *Lomax v. Weinstock, Friedman & Friedman, P.A.*, CCB-13-1442, 2014 WL 176779, at *2 (D. Md. Jan. 15, 2014) ("Courts have found it proper to dismiss claims subject to arbitration agreements under both Rule 12(b)(1) and Rule 12(b)(6)."), *aff'd*, 583 F. App'x 100 (4th Cir. 2014).

In light of the Fourth Circuit's guidance in *Sucampo*, I shall construe defendant's motion to dismiss as one brought under Rule 12(b)(3). *See, e.g., Am. Ins. Mktg. Corp. v. 5 Star Life Ins. Co.*, DKC-13-0560, 958 F. Supp. 2d 609, 612 (D. Md. 2013) (considering a motion to dismiss based on a forum selection clause pursuant to Rule 12(b)(3)); *Enter. Info. Mgmt., Inc. v.*

*SuperLetter.com, Inc.*, DKC-13-2131, 2013 WL 5964563, at *3 (D. Md. Nov. 7, 2013) (considering a motion to dismiss in favor of arbitration pursuant to Rule 12(b)(3)).

In the Fourth Circuit, when a challenge to venue is raised under Rule 12(b)(3), the plaintiff bears the burden of demonstrating that venue is appropriate. *Bartholomew v. Va. Chiropractors Ass'n*, 612 F.2d 812, 816 (4th Cir. 1979), *cert. denied*, 446 U.S. 938 (1980), *overruled on other grounds by Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982); *accord Tinoco v. Thesis Painting, Inc.*, GJH-16-752, 2017 WL 52554, at *2 (D. Md. Jan. 3, 2017); *Jones v. Koons Auto. Inc.,* 752 F. Supp. 2d 670, 679 (D. Md. 2010). If the court does not hold an evidentiary hearing, "the plaintiff need only make a prima facie showing that venue is proper." *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 732 (D. Md. 2017) (citing *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)). "In assessing whether there has been a prima facie venue showing, [the court views] the facts in the light most favorable to the plaintiff." *Aggarao*, 675 F.3d at 366. And, the court may "freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550; *see also Aggarao*, 675 F.3d at 365-56 ("On a motion to dismiss under Rule 12(b)(3), a court is permitted to consider evidence outside the pleadings."); *Taylor v. Shreeji Swami, Inc.*, PWG-16-3787, 2017 WL 1832206, at *1 (D. Md. May 8, 2017) (same); *Convergence Mgmt. Assocs., Inc. v. Callender*, TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (same).

Because "'it is possible for venue to be proper in more than one judicial district,' the question is not whether a given district is the best venue, but whether the events or omissions that occurred there are 'sufficiently substantial.'" *Carefirst*, 235 F. Supp. 3d at 732 (quoting *Mitrano*, 377 F.3d at 405). And, in considering "whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Mirtano*, 377 F.3d at 406 (citation omitted). Instead, "it should

review 'the entire sequence of events underlying the claim.'" *Id.*; *accord Taylor*, 2017 WL 1832206, at *1; *Callender*, 2016 WL 6662253, at *2.

As indicated, a motion to dismiss for improper venue, filed under Rule 12(b)(3), "allows the court to freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550. Here, the Court considers the exhibits submitted by the parties: the Agreement (ECF 1-2); the modified agreement (ECF 1-3); the Resignation Letter (ECF 1-4); Pinnacle's response to the Resignation Letter (ECF 1-5); a handwritten note from Mr. Krone to a Pinnacle client on Naples Wealth letterhead (ECF 1-6); a cease-and-desist letter sent from Pinnacle to Mr. Krone and Naples Wealth (ECF 1-7); and a reply letter sent by Mr. Krone to Pinnacle (ECF 1-8).

### C.  Choice of Law

"[I]nterpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004). Because federal courts exercising diversity jurisdiction "apply the choice of law rules of the forum state," I must consult the choice of law rules of Maryland, the state in which this Court is situated, to determine which state's substantive law applies. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)); *see also Small v. WellDyne, Inc.*, 927 F.3d 169, 173 n.3 (4th Cir. 2019); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011).

When a contract contains a choice of law provision, Maryland courts apply § 187(2) of the *Restatement (Second) of Conflict of Laws* (1971) ("Restatement"), which states: "The law of the state chosen by the parties to govern their contractual rights will be applied." *See Ace Am. Ins.*

*Co. v. Grand Banks Yachts, Ltd.*, 587 F. Supp. 2d 697, 704 (D. Md. 2008) (applying Restatement § 187(2)). Notwithstanding this general rule, "[i]n Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp.*, 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 921 A.2d 799, 803-05 (2011)); *see Restatement* § 187.

The Agreement expressly provides that Maryland law governs the terms of the Agreement. ECF 1-2 at 5. Neither party contests the validity of the Agreement's choice-of-law provision. Therefore, I shall apply Maryland law to determine whether Pinnacle's suit falls within the scope of the Agreement's arbitration provision. *See Berkeley Cty. Sch. Dist.*, 944 F.3d at 236.

### III. Discussion

As noted, Mr. Krone moves to compel arbitration of plaintiff's claims. ECF 37. He concedes that Count Two (Breach of Contract) and Count Four (violation of Maryland Uniform Trade Secret Act) are exempt from arbitration because they "relate to" Sections 9 and 10 of the Agreement. *Id.* at 3. However, Mr. Krone contends that the remaining counts "exceed sections 9 and 10 of the [Agreement]" and therefore fall within the scope of the arbitration clause. *Id.* Thus, Mr. Krone requests that the Court either dismiss Counts One, Three, Five, Six, Seven, and Eight, or stay the suit pending arbitration. *Id.* at 3-4.

Pinnacle opposes arbitration. ECF 40. According to Pinnacle, the Agreement unambiguously "carves out 'dispute[s] arising under Sections 9 and/or 10.'" *Id.* at 2 (quoting ECF 37-1 at 5-6) (emphasis omitted). The Agreement's arbitral exemption applies to Pinnacle's suit, it contends, because a "plain review of Pinnacle's Verified Complaint reveals that all claims asserted

arise from these two clauses—to wit, Krone's breach of a non-solicitation agreement, wrongful taking of Pinnacle's trade secrets, confidential information and intellectual property." *Id.*

As noted, because an agreement to arbitrate is "'a matter of contract,'" it is axiomatic that "'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). To decide whether the parties agreed to arbitrate a certain matter, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). However, where parties have agreed to an arbitration clause, courts apply "a presumption of arbitrability," according to which an "'order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am.*, 363 U.S. at 582).

Courts have distinguished between "narrow" and "broad" arbitration clauses. *See Am. Recovery Corp.*, 96 F.3d at 92. Whereas narrow arbitration clauses require "only the arbitration of claims arising under the contract," broad arbitration clauses "'embrace every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute.'" *Id.* (alteration omitted) (quoting *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)). Broad provisions do "'not limit arbitration to the literal interpretation or performance of the contract[.]'" *Am. Recovery Corp.*, 96 F.3d at 92 (quoting *J.J. Ryan & Sons*, 863 F.2d at 321) (emphasis omitted).

Here, the arbitration clause states, ECF 1-3 at 2 (emphasis added):

If a dispute *arises under this Agreement*, *other than a dispute arising under Sections 9 and/or 10 of this Agreement*, such dispute shall be resolved in accordance with arbitration

conducted in accordance with the rules of the American Arbitration Association for resolution of employment disputes.

The Fourth Circuit has construed the language "arising under [this agreement]" as embodying a narrow arbitration clause. *See Am. Recovery Corp.*, 96 F.3d at 92; *Great Am. Ins. Co. v. Hinkle Contracting Corp.*, 497 F. App'x 348, 354 (4th Cir. 2012).

Neither party addresses whether Pinnacle's claims pertain to the interpretation of the Agreement. However, even assuming that they do, Pinnacle's suit is nonetheless exempt from arbitration.

The Agreement's arbitration clause mandates that all disputes be resolved through arbitration, "other than a dispute arising under Sections 9 and/or 10 of this Agreement[.]" ECF 1-3 at 2. Section 9 of the Agreement, titled "Non-Competition Agreement," prohibits, *inter alia*, Mr. Krone from soliciting Pinnacle clients for one year following his departure from Pinnacle, unless Mr. Krone provided services to that client prior to joining Pinnacle. *Id.* at 2; *see also* ECF 1-2 at 4-5. And, in Section 10 of the Agreement, titled "Trade Secrets; Confidential Information and Intellectual Property," Mr. Krone agreed to refrain from "employ[ing] for any purpose whatsoever, except as necessary to accomplish the business objectives of [Pinnacle], any of the Company's trade secrets or other confidential information that have been obtained by or disclosed to the Employee as a result of the Employee's employment with the Company." ECF 1-2 at 6.

The heart of Pinnacle's suit is that Mr. Krone took confidential information from Pinnacle upon his departure and then utilized that information to solicit Pinnacle's clients to his new employer, Naples Wealth. ECF 1, ¶¶ 9-55. In other words, each of plaintiff's eight claims rest on the same factual basis: Mr. Krone engaged in misappropriation of trade secrets and improper solicitation of Pinnacle clients. Because plaintiff's suit is predicated on violations of the Agreement's non-solicitation and trade secret provisions, this "dispute aris[es] under Sections 9

and/or 10 of this Agreement[.]" ECF 1-2 at 7; *see Arise*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "arise" as "To originate; to stem (from)"). Accordingly, the unambiguous language of the Agreement exempts plaintiff's suit from arbitration.

Although Mr. Krone acknowledges that Counts Two and Four are exempt from arbitration, he nonetheless urges the Court to divvy up the Complaint's counts and compel the arbitration of Counts One, Three, Five, Six, Seven, and Eight, asserting that those claims "exceed" the scope of Sections 9 and 10 of the Agreement. ECF 37 at 3. Plaintiff's argument is miscast.

For starters, plaintiff's claim-by-claim approach conflicts with the plain language of the Agreement. The Agreement does not exempt *claims* from arbitration. Rather, it excludes from arbitration any "*dispute* arising under Section 9 and 10" of the Agreement. ECF 1-3 at 2 (emphasis added). A "dispute" is a "conflict or controversy . . . that has given rise to a particular lawsuit." *Dispute*, BLACK'S LAW DICTIONARY. Thus, instead of requiring the Court to parse the Complaint's counts, the Agreement's language exempts an entire action when it is rooted in alleged violations of the Agreement's non-solicitation or trade secret provisions.

Moreover, even embracing plaintiff's granular approach, his argument still fails because each of plaintiff's claims "arise under" Sections 9 and 10. For instance, Count Three alleges that Mr. Krone received "certain access to Pinnacle's trade secrets and Confidential Information" and "acted in bad faith and with an improper motive to destroy or injure the rights and business interests of Pinnacle[.]" ECF 1, ¶¶ 76-77. Likewise, Count Five lodges a conversion claim against defendants on the ground that defendants allegedly "had and have access to Pinnacle's Confidential Information and Trade Secrets" and "wrongfully converted Pinnacle's property for their direct benefit." *Id.* ¶¶ 92-93. In short, plaintiff's contention that some claims "exceed" the scope of Sections 9 and 10 of the Agreement is baseless.

Accordingly, because the Company's suit is a "dispute [that] aris[es] under Section 9 and 10 of th[e] Agreement," ECF 1-3 at 2, the Agreement does not mandate the arbitration of plaintiff's claims.

### IV. Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 37).

An Order follows, consistent with this Memorandum Opinion.


Date: March 18, 2020                                    _____/s/_____
                                                        Ellen L. Hollander
                                                        United States District Judge