IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WAYPOINT MANAGEMENT
CONSULTING, LLC,
  *Plaintiff*,

  v.

ANDREW J. KRONE, *et al*.,
  *Defendants*.

Civil Action No. ELH-19-2988

**MEMORANDUM OPINION**

This contract and trade secrets dispute pits plaintiff Waypoint Management Consulting,

LLC, formerly Waypoint Consulting, Inc. f/k/a Pinnacle Advisory Group, Inc. ("Pinnacle" or the

"Company"), a private wealth management firm, against two defendants: Pinnacle's former

employee, Andrew J. Krone, and the firm Krone joined after resigning from Pinnacle, Capital Rock

Financial, LLC ("Capital Rock") d/b/a Naples Wealth Planning ("Naples Wealth" or "NWP").

ECF 1; ECF 123.[1]  The suit is rooted in allegations that Krone breached a covenant not to compete

---

[1] Suit was initially filed by Pinnacle. ECF 1. As discussed, *infra*, during the pendency of this suit, Pinnacle sold substantially all of its assets to Congress Wealth Management LLC, pursuant to an Asset Purchase Agreement. *See* ECF 137-7. Thereafter, Pinnacle assumed the name Waypoint Consulting, Inc. ("Waypoint"). Accordingly, it moved to amend the Complaint to reflect the change in its name. ECF 111. I granted the motion by Memorandum (ECF 121) and Order (ECF 122) of August 27, 2021.

Thereafter, on January 21, 2022, Waypoint moved to substitute Waypoint Management Consulting, LLC ("WMC") as the plaintiff. ECF 141. Waypoint indicated that it had assigned its interest in this suit to WMC, pursuant to a "General Assignment And Assumption Agreement". *See* ECF 141-2. I granted the motion by Memorandum Opinion (ECF 144) and Order (ECF 145) of March 23, 2022.

However, the parties continue to refer to "Pinnacle" as the plaintiff. *See*, *e.g.*, ECF 124-1 at 6; ECF 135 at 9. Therefore, I shall do the same.

Plaintiff has referred to defendant Capital Rock as "CapitalRock." *See* ECF 123 at 1. But, defendant generally uses a spelling with two words. On occasion, however, defendant has also

when he left Pinnacle's employment, and that he misappropriated Pinnacle's trade secrets or confidential information, in violation of his employment agreement with Pinnacle as well as the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code, § 11-1201 *et seq.* of the Commercial Law Article ("C.L."). Jurisdiction is founded on diversity of citizenship, pursuant to 28 U.S.C. § 1332. *See* ECF 123, ⁋ 7.

In an eight-count Amended Verified Complaint (ECF 123, "Amended Complaint"), Pinnacle asserts the following claims: "Declaratory Judgment" (Count One); breach of contract (Count Two); breach of the covenant of good faith and fair dealing" (Count Three); violation of MUTSA, C.L. §§ 11-1201 *et seq.* (Count Four); conversion (Count Five); "Tortious Interference with Contract/Economic Advantage" (Count Six); unfair competition (Count Seven); and unjust enrichment (Count Eight). Each count includes an *ad damnum* clause in which Pinnacle seeks a judgment against both Krone and "CapitalRock Financial, LLC, jointly and severally . . . .". *See*, *e.g.*, *id.* at 11. Therefore, I shall assume that plaintiff has named both defendants in each count.[2]

Pinnacle has filed a post-discovery motion for partial summary judgment as to defendants' liability with respect to counts One, Two, and Six (ECF 124), supported by a memorandum (ECF 124-1) (collectively, the "Motion") and several exhibits. Defendants filed a combined opposition

---

used a spelling with one word (ECF 36), and used the spelling of "Capit**o**l," rather than "Capit**a**l." *See*, *e.g.*, ECF 112. Because defendant generally uses the spelling with two words, and the spelling of "Capital", I shall do the same.

[2] Counts Two through Eight present alternative legal theories. Despite the multiplicity of Pinnacle's claims, Pinnacle is entitled to only one recovery. *See*, *e.g.*, *Gen. Tel. Co. of the Northwest, Inc. v. E.E.O.C.*, 446 U.S. 318, 333 (1980) ("It also goes without saying that the courts can and should preclude double recovery . . . ."); *Bender v. City of New York*, 78 F.3d 787, 793 (2nd Cir. 1996) ("If two causes of action provide a legal theory for compensating one injury, only one recovery may be obtained."); *Seuss v. Champion Industries*, BEL-06-851, 2010 WL 11549554, at *3 (D. Md. May 26, 2010) ("It is well established that a plaintiff is entitled to only one compensation for an injury.").

to the Motion and a cross motion for summary judgment as to all counts.  ECF 134.  It is supported by a memorandum (ECF 135) (collectively, the "Cross Motion") and various exhibits.

The parties filed several exhibits under seal, along with motions to seal.  ECF 128 (plaintiff); ECF 138 (defendants).  I granted the motions in part and denied them in part.  ECF 145. I also asked the parties to confer and to submit redacted versions of certain exhibits, fit for filing on the public docket.  *Id.*  However, the parties have been unable to agree on proposed redactions. Defendants argue that all exhibits should be unsealed, without redaction.  ECF 146 ("Defense Response").   Pinnacle maintains that redactions are appropriate, and has submitted proposed redactions of some, but not all, of the exhibits that are currently sealed.  *See* ECF 147 ("Pinnacle Response").  The redacted versions are docketed at ECF 147-1 to ECF 147-14.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion and the Cross Motion in part and deny the Motion and the Cross Motion in part.  I shall also deny the Defense Response and grant the Pinnacle Response.

## I.      Factual Background[3]

### A.

Pinnacle is a Maryland corporation with its principal place of business in Columbia, Maryland.  ECF 123, ¶ 2.[4]  At the relevant time, Pinnacle was "a private wealth management firm"

---

[3] The Factual Background is drawn from the Motion, the Cross Motion, and the exhibits filed in support of the motions.  I also incorporate the facts recounted in my Memorandum Opinion of March 18, 2020 (ECF 46); my Memorandum of May 12, 2021 (ECF 102); and my Memorandum Opinion of March 22, 2022 (ECF 144).

The parties sometimes refer to documents that have not been provided as exhibits.  For instance, various email communications were reviewed at some depositions.  Yet, most of these emails were not provided to the Court.

[4] Of note, the Verified Complaint (ECF 1) is supported by several exhibits, including the sworn "Verification" of Erin Wendell, Pinnacle's "Chief Financial Officer & Chief Compliance

that "engaged in the business of financial planning and investment, asset management, and other financial services." *Id.* ¶¶ 9, 10. It had three "main" shareholders: Dwight Mikulis, John Hill, and Ken Solow. ECF 147-10 (Hill Dep.) at 4 (Tr. at 10-11); *see* ECF 137-7 at 1.[5] Mikulis was Pinnacle's managing partner. ECF 147-10 (Hill Dep.) at 4 (Tr. at 10). Solow was the "chair of the investment committee." *Id.* And, Hill was the Chief Executive Officer. *Id.* at 14 (Tr. at 97). Pinnacle recently sold most of its assets to Congress Wealth Management LLC ("CWM" or "Congress Wealth").

Krone is a resident of Naples, Florida. ECF 123, ¶ 3. He completed his undergraduate studies at Boston College and holds a "master's degree in finance from New York University." ECF 147-2 (Krone Dep.) at 6 (Tr. at 14). He also obtained a "CPA license in Virginia." *Id.*

Krone was employed by Pinnacle as a "Wealth Manager" from October 1, 2009, until August 30, 2019. ECF 123, ¶¶ 11, 23; ECF 137-1 (the "Offer Letter"). By the time Krone joined Pinnacle in 2009, he had fourteen years of experience in financial planning and investment management. *See* ECF 147-2 (Krone Dep.) at 7 (Tr. at 18-20).

From 2000 to 2009, Krone worked for West Financial Services ("West"), a registered investment advisory ("RIA") firm in McLean, Virginia. ECF 147-2 at 7 (Tr. at 19-20). Krone

---

Officer." *Id.* at 19. She "declare[d] under penalty of perjury" that the allegations contained within ECF 1 were "true and correct in accordance with 28 U.S.C. § 1746." *Id.*

As the Fourth Circuit has said, a verified complaint "'is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.'" *Goodman v. Diggs*, 986 F.3d 493, 498 (2021) (citation omitted). And, it is of no moment that plaintiff has since amended its suit. *See* ECF 123. Although "an amended complaint supersedes those that came before it," the Fourth Circuit has instructed that "an amended complaint does not divest an earlier verified complaint of its evidentiary value as an affidavit at the summary judgment stage." *Goodman*, 986 F.3d at 498.

[5] Five other individuals owned minority shares in Pinnacle. *See* ECF 147-10 (Hill Dep.) at 4 (Tr. at 11).

held the positions of Chief Operating Officer, Chief Financial Officer, and Chief Compliance Officer ("CCO"). ECF 147-2 at 7 (Tr. at 20). According to Krone, "the financial services is a highly regulated industry," relative to other industries. *Id.* at 8 (Tr. at 24). As the CCO, Krone was responsible for ensuring that West acted in accordance with "rules and regulations." *Id.*

Krone's involvement with Pinnacle began in or around mid 2009, when Krone conversed with Hill about the possibility of joining Pinnacle and relocating to Florida. *Id.* at 7-8 (Tr. at 21-22). Hill recalled that Pinnacle wanted to expand its operations into the Naples, Florida area for the purpose of "develop[ing] a very rich market with clientele that fit perfectly into [Pinnacle's] target market." ECF 147-10 (Hill Dep.) at 7 (Tr. at 30). As to Pinnacle's decision to hire Krone, Mikulis said: "[W]e thought he would be a good representative for our clients, that he would be a smart person, and that we could help create business opportunities with new clients in [the Naples area]." ECF 147-12 (Mikulis Dep.) at 4 (Tr. at 20-21).

Upon hiring Krone, Pinnacle opened an office in Naples. ECF 135 at 12, ⁋ 25; *see* ECF 147-10 (Hill Dep.) at 6 (Tr. at 28-29) (confirming that Pinnacle did not obtain "a physical presence in Naples" until after hiring Krone). Throughout Krone's employment with Pinnacle, he worked in the Naples office. ECF 135 at 12, ⁋ 27; *see* ECF 137-1 at 1 (specifying that Krone's offer of employment was for Pinnacle's "new Naples office").

When Krone left West, he had approximately one hundred clients. ECF 147-2 at 7 (Tr. at 19-20). About ten of them became clients of Pinnacle. *Id.* (Tr. at 20-21). According to Hill, Krone served as the "main point of contact" for all Pinnacle clients in the Naples area, and he "serviced" these clients "throughout his tenure at Pinnacle[.]" ECF 147-10 (Hill Dep.) at 8 (Tr. at 36).

Hill also worked out of the Naples office after it opened.  *See id.* at 7 (Tr. at 32) (describing that the Naples office contained offices for Krone and Hill); *see also* ECF 147-12 (Mikulis Dep.) at 5 (Tr. at 25) (confirming Hill "had an office" in the Naples office).  He was Krone's "sales manager over the years."  ECF 147-10 at 8 (Tr. at 36).  But, soon after Krone began working for Pinnacle, Hill "stopped actively advising clients for Pinnacle[.]"  *Id.* (Tr. at 35).  Thus, although Hill occasionally "would work with wealth managers," like Krone, to assist "with clients when necessary," he stopped directly servicing clients soon after Krone joined Pinnacle.  *Id.* (Tr. at 34). Rather, Hill assumed "[t]ypical management roles" and helped with tasks such as "strategic planning, [and] policy issues relating to investment policies."  *Id.* (Tr. at 35).

Pinnacle paid for various expenses associated with Krone's employment, including the lease for the Naples Office, an office phone, and Krone's computer.  ECF 147-2 at 19-20 (Tr. at 69-71).  Additionally, Pinnacle reimbursed Krone for various business-related expenses, such as "car expenses"; "mileage"; "reasonable business expenses"; and "[s]nacks incidental to the office".  *Id.* at 19 (Tr. at 66-67); *see also* ECF 137-1 (Offer Letter) (outlining reimbursable expenses, such as an "Auto Allowance" and an "Entertainment and travel allowance").

At an unspecified time during Krone's employment with Pinnacle, plaintiff acquired another business, The Enrichment Group, which had office space in the Miami, Florida area.  ECF 147-12 (Mikulis Dep.) at 5 (Tr. at 22-23); *see* ECF 147-10 at 11 (Tr. at 64) (specifying that the acquired firm was known as The Enrichment Group).  But, the Miami office, in large part, served clients "located in the Miami area," and the "the majority of the clients serviced outside of the Naples Office were in the Naples area[.]"  ECF 147-12 at 5 (Tr. at 24).

**B.**

"On or about May 5, 2010, Pinnacle and Krone executed an Employment Agreement[.]" ECF 123, ⁋ 12; *see* ECF 135-3 (the "Employment Agreement"); *see also* ECF 1-2 (same).[6]   The Employment Agreement refers to Krone as the "Employee" or "Andrew" and Pinnacle as "Pinnacle" or the "Company".   *See* ECF 135-3 at 1; *id.* at 5 ⁋ 9(B).   Further, the Employment Agreement includes a provision titled "<u>Governing Law</u>."   *Id.* at 6, ⁋ 1 (underlining in original).[7] It states, *id.*: "This Agreement shall be governed by, and enforceable by, the laws of the State of Maryland without regard to its conflicts of law principles."

Among other things, the Employment Agreement provided that it would last "for a period of one year commencing on May 5, 2010 ('Initial Term')" and that, "[u]pon the expiration of the initial term, [it would] automatically renew for additional consecutive one-year terms ('Additional Terms')."   *Id.* ⁋ 2.   Pursuant to the Employment Agreement, Krone agreed to "provide financial planning and investment, asset management, and other related financial services and shall perform such other duties that are incidental and customary to that profession."   *Id.* ⁋ 4(A).

Under the Employment Agreement, Pinnacle could terminate Krone's employment for cause if certain enumerated events occurred.   *Id.* ⁋ 8(A)(1).   "Upon determination of termination for cause . . . the Company shall notify the Employee in writing, which shall include the reason(s) for termination."   ECF 135-3 ⁋ 8(A)(2).   In such circumstances, Krone would be provided "thirty

---

[6] As noted, Krone joined Pinnacle in October 2009.   The parties do not indicate whether, prior to May 5, 2010, an earlier employment agreement governed the relationship between Krone and Pinnacle.   But, the Employment Agreement includes a clause titled "<u>Other Agreements</u>".   ECF 135-3, ⁋ 13 (underlining in original).   It states: "Any earlier employment agreements between the Employee and the Company are hereby terminated and shall be of no further effect after the effective date hereof."   *Id.*

[7] The Employment Agreement includes three paragraphs numbered "1".   *See* ECF 135-3 at 1, 5-6.

(30) days after the notice date within which to cure the cited reasons for termination (where any such reason is reasonably capable of being cured); failing which, the notified Employee's status shall be terminated effective immediately." *Id.*

Moreover, the Employment Agreement specifies that "the Employee's employment may be terminated for any other reason by the Company upon 30 days written notice." *Id.* ¶ 8(B). Similarly, in Paragraph 8(C), the "Notice Covenant," Krone had the right to terminate his employment, subject to providing equivalent notice of thirty days. The Employment Agreement states: "In the event the Employee elects to terminate his employment, he must give at least 30 days prior written notice of termination to the Company. The date that the Employee provides the written notice shall constitute the 'Date of Withdrawal.'" *Id.* ¶ 8(C).

Paragraph 9 of the Employment Agreement is titled "Non-Competition Agreement". *Id.* ¶ 9 (underlining in original). I shall refer to this provision as the "Noncompete Covenant." It provides, in relevant part, *id.*:

> A.    Employee agrees that, for one year following termination from the Company for any reason, the Employee will not, as an individual, stockholder, officer, director, partner, agent, employee, consultant, or representative, act for or on behalf of, or have any interest, direct or indirect, in any business similar to or competitive with the Company's business within a 20-mile radius of the Company's office in Naples, Florida.

> B.    Employee agrees, during the Initial Term of employment and for any Addition [sic] Term, and for one year following the termination of Employee's employment for any reason, Employee will not perform or render services or attempt to perform or render services, for his own account or on behalf of any person or corporation other than the Company, for any customer or client of Company for which Employee (or employees under his managerial control) has performed any services ("Company Clients"). This restriction does not apply to Pinnacle Advisory Group clients that were served by Andrew prior to his joining Pinnacle Advisory Group[.]

On October 20, 2010, Krone and Pinnacle agreed to modify Paragraph 9(A) of the Employment Agreement. *See* ECF 1-3 (the "Modification").[8]  In particular, they reduced from 20 miles to five miles the radius of the non-compete provision, as follows, *id.*: at 2:

> Employee agrees that, for one year following termination from the Company for any reason, the Employee will not, as an individual, stockholder, officer, director, partner, agent, employee, consultant, or representative, act for or on behalf of, or have any interest, direct or indirect, in any business similar to or competitive with the Company's business within a 5-mile radius of the Company's office in Naples, Florida.

Additionally, the Employment Agreement contains a provision governing "Trade Secrets; Confidential Information and Intellectual Property".  ECF 135-3, ⁋ 10 (underlining in original).  I shall refer to Paragraph 10 as the "Nondisclosure Covenant."  Pertinent here, it specifies, *id.*: "Employee acknowledges that as a result of his employment with the Company, Employee has, is and will be making use of, acquiring, and adding to information of a special and unique nature and value relating [to] the Company's intellectual property, trade secrets and other confidential information."  Accordingly, pursuant to this paragraph, Krone agreed, among other things, to the following, *id.*:

> A.      All files, notes, data, reference items, sketches, drawings, memoranda, records, books, computer programs, and other materials in any way relating to any of the information referred to in the paragraph above or to the Company's business shall belong exclusively to the Company.  Employee agrees to turn over to the Company all copies of such materials in Employee's possession or control at the Company's request or upon the termination of Employee's employment.  The Employee shall not, at any time during or following his employment with the Company, divulge or disclose, or employ for any purpose whatsoever, except as necessary to accomplish the business objectives of the Company, any of the Company's trade secrets or other confidential information that

---

[8] The Modification was filed as an exhibit to the Complaint.  But, it was not resubmitted with the Motion or the Cross Motion.  Nonetheless, the Court may take judicial notice of the filings on its Docket.  *See Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990).

9

have been obtained by or disclosed to the Employee as a result of the Employee's employment with the Company.

B.     This section does not apply to trade secrets or confidential information relating to accounts/clients generated by the Employee prior to Employee's term of employment with the company.

C.     Employee agrees to notify the Company of any unauthorized disclosure of Company's trade secrets or other confidential information and to cooperate in mitigating any damage to Company and its clients as a result of such disclosure.

And, the Employment Agreement indicates that it "shall extend to, and be binding upon the Employee, his legal representatives, heirs and distributees, and upon the Company and its successors and assigns and the term 'Company' as used herein shall include its successors and assigns whether by merger, consolidation, combination or otherwise."  ECF 135-3 at 7, ¶ 1(E).

Further, Pinnacle agreed to compensate Krone in accordance with the following schedule, *Id.* ¶ 3; *see id.* at 8:

| Total Client Net Revenue | | Payout Rate | AJK Income |
|---|---|---|---|
| $ -- | $ 225,000 | 50% | $112,500 |
| $225,001 | $360,000 | 45% | $162,000 |
| $360,001 | $495,000 | 40% | $198,000 |
| $495,001 | $630,000 | 35% | $220,500 |
| $630,001 | $765,000 | 33% | $252,450 |
| $765,001 | $900,000 | 30% | $270,000 |
| $900,001 | $1,200,000 | 27% | $324,000 |
| $1,200,001 | $2,000,000 | 25% | $500,000 |

The schedule also specifies: "Net Revenue in excess of $2,000,000 will have a 23% payout," and "Net Revenue in bands that would produce less payout than the previous band will

have the maximum dollar payout of the previous band." ECF 135-3 at 8. Mikulis testified that, to his knowledge, the structure of Krone's compensation never changed throughout Krone's employment with Pinnacle. ECF 147-12 (Mikulis Dep.) at 7 (Tr. at 60). Nonetheless, at some unspecified time during Krone's employment, "there were certain clients that Mr. Krone was only paid 20%," which was below the lowest payout rate contemplated by the compensation schedule set forth in the Employment Agreement. *Id.* (Tr. at 61); *see* ECF 135-3 at 8.

According to plaintiff, Krone's employment with Pinnacle was also governed by Pinnacle's "Code of Conduct & Compliance Manual." ECF 124-1 at 9, ¶ 8; *see* ECF 124-3 through ECF 124-9 (the "Compliance Manual" or the "Manual").[9] It was implemented by Pinnacle on November 22, 2004, although the version of the Manual submitted to the Court was last amended on January 31, 2019. ECF 124-3 at 2.[10]

The Manual includes a "Code of Conduct and Compliance Manual Acknowledgement Form". ECF 124-9 at 2 (the "Form"). It states: "I have read and understand the following policies and procedures contained in the Code of Conduct and Compliance Manual and recognize that they apply to me and agree comply [sic] in all respect [sic] with the procedures described therein for the duration of my employment with Pinnacle." *Id.* It then provides a list of all policies implicated by the Form, including "Client Privacy" and "Cybersecurity." *Id.* Further, it asks the employee to certify that the employee "attended the annual Compliance Training" on either "December 11 or December 12, 2019." ECF 124-9 at 2.

---

[9] The Compliance Manual was submitted to the Court in piecemeal fashion.

[10] The parties do not indicate what changes were made to the Manual at that time, or the previous date on which the Manual was amended.

Additionally, the Form contains a space for the employee's signature. *Id.* Krone testified that he signed the Form on October 2, 2018. *See* ECF 147-2 (Krone Dep.) at 24 (Tr. at 88). However, the parties have not provided the Court with any documentation to that effect.

Pinnacle directs the Court's attention to provisions of the Compliance Manual concerning access, use, retention, and disclosure of "'Nonpublic Personal Information.'" ECF 124-1 at 9-10, ¶¶ 9-17. The provisions are contained within the section of the Manual titled "Client Privacy." *See* ECF 124-4 at 3-7.

The Manual defines "'Nonpublic Personal Information'" as follows, *id.* at 4:

- Personally identifiable financial information, including any information a client provides to obtain a financial product or service; any information about a client resulting from any transaction involving a financial product or service; or any information otherwise obtained about a client in connection with providing a financial product or service to that client; and

- Any list, description, or other grouping of clients (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available information.

The Manual provides several examples of Nonpublic Personal Information. These include "name, address, phone number, social security and tax identification numbers, birth dates, financial circumstances, income, and account balances." *Id.*

Further, the Client Privacy section of the Manual broadly proscribes the disclosure of Nonpublic Personal Information. It states: "Pinnacle will not disclose a client's Nonpublic Personal Information to anyone unless it is permitted or required by law, at the direction of a client, or is necessary to provide Pinnacle's services." *Id.* It also instructs: "Pinnacle shall not sell Nonpublic Personal Information to anyone." *Id.* And, the Manual provides: "Employees shall not disclose Nonpublic Personal Information to other Pinnacle employees, except to people who have a bona fide business need to know the information in order to serve the business purposes of

12

Pinnacle or its clients."  ECF 124-4 at 5.  Moreover, according to the Manual, Pinnacle may only

provide Nonpublic Personal Information to certain third-parties, as follows: "To broker/dealers to

open a client's brokerage account"; "To other firms as directed by clients, such as accountants,

lawyers, etc."; "To authorized family members or Trusted Contacts (as designated on custodian

paperwork or internal Pinnacle designation forms)"; and "To regulators, when required by law".

*Id.* at 4.

Consistent with those limitations, the Compliance Manual purports to regulate the means

by which Pinnacle stores Nonpublic Personal Information as well as the circumstances in which

Pinnacle employees may access such information.  It states, *id.* at 5:

> Nonpublic Personal Information shall be maintained, to the extent possible,
> in computer files that are protected against access by means of a password system
> or are other otherwise secured against unauthorized access.  Access to specific
> Pinnacle databases and files shall be given only to employees who have a bona fide
> business need to access such information.  To avoid unauthorized access, all
> Pinnacle employees shall close out programs and lock their terminals when they
> leave the office for an extended period of time and overnight.

In addition, the Compliance Manual includes a section titled "Cybersecurity."  ECF 124-5

at 2-8.  Among other things, it "establishes a usage policy for [Pinnacle's] computer systems,

networks, and information resources."  *Id.* at 2.  This policy "pertains to all employees, contractors

and individuals (collectively, 'Users'), who are granted access to the network."  *Id.*  And, it states:

"Users have a responsibility to promptly report theft, loss or unauthorized disclosure of proprietary

information."  *Id.*[11]

The Cybersecurity section also states: "Proprietary and other confidential information that

is stored on electronic devices is the property of Pinnacle regardless of whether the device is owned

or leased by Pinnacle, the employee or a third-party."  ECF 124-5 at 2.  And, "[u]sers are prohibited

_____

[11] As best I can determine, the Manual does not define the term "proprietary information".

from making unauthorized copies of such confidential information and/or distributing it to unauthorized people outside of Pinnacle." *Id.*  Further, the Manual states: "Users may not intentionally . . . divert system resources to their own use, or gain access to company systems for which they do not have authorization." *Id.* at 4.  And, "[u]nauthorized use of the system constitutes theft and may be punishable by law and constitute grounds for civil or criminal prosecution." *Id.*

As noted, Krone brought about ten clients from West to Pinnacle.  ECF 147-2 at 7 (Tr. at 20-21).  Pinnacle asserts: "While employed by Pinnacle, Mr. Krone was both provided clients by Pinnacle and reimbursed for expenses incurred by Mr. Krone related to the creation of customer good will."  ECF 124-1 at 11, ¶ 24.  Krone recalled that on one occasion Pinnacle acquired a book of business from an individual named Maryann Lambert, and he was subsequently assigned to provide services to six of the new clients.  *See* ECF 147-2 (Krone Dep.) at 13 (Tr. at 43-45).

The parties also reference relationships between Pinnacle and two other investment management firms, Charles Schwab & Co., Inc. ("Schwab") and Fidelity Investments, Inc. ("Fidelity").  The parties occasionally reference Schwab and Fidelity as "custodians".  *See* ECF 124-1 at 7, ¶ 36; ECF 140 at 19.[12]  Defendants reference the clients that Schwab referred to Pinnacle as "Joint Clients" of Schwab.  *See* ECF 135 at 12, ¶ 34.

Pinnacle's relationship with Schwab was "reflected by way of a Services Agreement."  ECF 147-12 (Mikulis Dep.) at 18 (Tr. at 200).[13]  Pinnacle claims: "Schwab and Plaintiff enjoyed a contractual relationship as Plaintiff was a fee-paying member of the Schwab Advisor Network since approximately 1997."  ECF 135-13 (Discovery responses), ¶ 2.  Further, Pinnacle asserts:

---

[12] Some of the parties' filings imply that Pinnacle shared a similar relationship with another firm, "Lincoln Trust."  *See* ECF 124-1 at 13, ¶ 41; ECF 140 at 19.  But, the parties do not provide any detail regarding Pinnacle's relationship with this firm.

[13] The parties have not provided the Court with a copy of this agreement.

"As a member of the Schwab Advisor Network since approximately 1997, Plaintiff regularly received referrals from Schwab that Plaintiff would assign to its investment advisors." *Id.* ¶ 3. Mikulis confirmed that through this network, "Schwab has clients that they refer" to authorized firms "for certain services." ECF 147-12 at 18 (Tr. at 200).

According to Schwab's website, the "Schwab Advisor Network includes approximately 200 prescreened independent advisory firms nationwide." *Schwab Advisory Network*, CHARLES SCHWAB, https://www.schwab.com/advisor-network (last accessed Jun. 29, 2022).[14] Further, the website states, *id.*:

> Schwab Advisor Network ('SAN') advisors are independent and are not employees or agents of Charles Schwab & Co., Inc. ('Schwab'). Schwab prescreens advisors and checks their experience and credentials against criteria Schwab sets, such as years of experience managing investments, amount of assets managed, professional education, regulatory licensing and business relationship as a client of Schwab. Advisors pay fees to Schwab in connection with referrals. Schwab does not supervise advisors and does not prepare, verify or endorse information distributed by advisors. Investors must decide whether to hire an advisor and what authority to give the advisor. Investors, not Schwab, are responsible for monitoring and evaluating an advisor's service, performance and account transactions.

Before Pinnacle hired Krone, Schwab only referred clients to work with Pinnacle employees in its Maryland office. *See* ECF 147-10 (Hill Dep.) at 8 (Tr. at 37) (confirming that Pinnacle was "considered on the matrix[15] for Schwab in Maryland, Virginia and DC" and "outside of the matrix . . . with regard to [the vicinity of Naples, Florida]"); ECF 147-2 (Krone Dep.) at 12 (Tr. at 40) (stating that prior to Krone's employment, Pinnacle's relationship with Schwab was

---

[14] The Court may take judicial notice of "'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see* Fed. R. Evid. 201(b). Broadly speaking, this includes "factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

[15] The parties do not define the term "matrix" as used here.

limited to "the Maryland/Virginia area" and Pinnacle had "no relationship with Schwab in southwest Florida"). Accordingly, defendants assert: "Mr. Krone was also hired to help Pinnacle build a referral relationship with the Naples, Florida branch" of Schwab. ECF 135 at 12, ⁋ 31; *see* ECF 147-10 (Hill Dep.) at 9 (Tr. at 38) ("[O]ne of Andy Krone's assignments was to develop a relationship with the local folks for Schwab down in Naples[.]").

After Krone joined Pinnacle, he developed a professional relationship with a Schwab official, Chris Harvey, who also worked in the Naples area. *See* ECF 147-10 (Hill Dep.) at 9 (Tr. 39-41). Hill claims that, through this informal relationship, "Krone was actually able to get some clients referred over from Schwab to the Naples office[.]" *Id.* (Tr. at 40).[16] Thus, Pinnacle asserts, ECF 135-13, ⁋ 3: "Plaintiff began receiving referrals from Schwab in the Naples, Florida area beginning in 2013 or 2014. As an advisor within Plaintiff's Naples office, Krone would be assigned referrals from Schwab in the Naples, Florida area." And, according to Hill, when a Joint Client was referred to Pinnacle by Schwab, the "Schwab representative would stay engaged, although . . . [t]hey basically passed off every day ongoing relationship [sic] to [the Pinnacle] team." ECF 147-10 at 10 (Tr. at 42). Beyond that point, "the client periodically might check in with the Schwab rep, and the Schwab rep would ask them how things are going[.]" *Id.* But, "[m]ost of their relationship [was] assumed by [Pinnacle] advisers after their transition [was] over." ECF 147-10 at 10 (Tr. at 42).

Hill also testified that "[a]ll the assets" pertaining to such clients remained within Schwab's custody, including all relevant information concerning the "value of the [client] accounts, the name on the accounts, all the identifier information." *Id.* (Tr. at 42-43). Further, Hill claimed: "[Schwab had] . . . all the statements, it's at Schwab we pull the data from Schwab. So, . . . there's nothing

---

[16] Defendants refer to these clients as "'joint' clients." ECF 135 at 12, ⁋ 34.

they can't get that is not on their own system before we have it." *Id.* (Tr. at 44). Nonetheless, in the event a Schwab official were to "inquire" about the status of a Joint Client's account, it was Krone's job to provide that information to Schwab. *Id.* (Tr. at 43-44). However, Hill maintained that Pinnacle did not develop a relationship with Schwab with respect to the Naples area similar to the one it enjoyed in Maryland. *Id.* at 8 (Tr. at 37) (affirming that Pinnacle "never did officially get on the matrix in the Naples region with Schwab"). Rather, Schwab provided Pinnacle "direct referrals . . . outside the matrix" in the Naples area, through the process described above. *Id.* at 9 (Tr. at 38).

With respect to Fidelity, Pinnacle enjoyed a nationwide referral relationship. *Id.* (stating that "Fidelity had a national coverage changeover where we . . . had allowable referrals"). Pinnacle's discovery responses indicate that, "[a]s a member of Fidelity's Wealth Advisory Solutions program, Plaintiff regularly received referrals from Fidelity that Plaintiff would assign to its investment advisors." ECF 135-13, ¶ 5.[17] Moreover, at least one client was "referred by Fidelity to Plaintiff and thereafter assigned by Plaintiff to Krone." *Id.*

Fidelity's website provides: "Fidelity Wealth Advisor Solutions® (WAS) is by Fidelity Personal and Workplace Advisors LLC (FPWA), a registered investment adviser and a Fidelity Investments company. WAS is a referral service designed for existing and prospective clients of Fidelity who seek to receive referrals to third-party independent investment advisory firms . . . . Participating investment advisors pay FPWA a referral fee." *Fidelity Wealth Advisor Solutions®*, FIDELITY, https://www.fidelity.com/wealth-management/private-wealth-management-advisors (last accessed Jun. 29, 2022).

---

[17] The parties have not provided any documentation corroborating the relationship between Pinnacle and Fidelity. Nor do they specify when this relationship began.

When Pinnacle was operative, it maintained a website that displayed Pinnacle's fee schedule.  *See* ECF 135-8 (the "Page").[18]  Among other things, the Page stated: "Pinnacle charges clients a fee based on the amount of money we manage on their behalf."  *Id.* at 1.  It also stated, *id.*: "Unlike traditional brokers or dealers, **we act as a fiduciary**, so there are no commissions and we sell no products or separate financial instruments as investments."   (Bold in original). Specifically, "[m]anagement fees are based upon a percentage of the assets under management and are paid pro-rata in January, April, July, October.  Fees are paid in advance at the beginning of each billing period, and are assessed based upon the account asset value(s) on the last business day of the previous billing period. . . .  Some transaction fees are passed on to our clients and could be higher in the first year as our strategy is implemented."  *Id.* at 3.

The Page also specified Pinnacle's "Annual Fee," in accordance with the client's "Assets Under Management," as follows, *id.* at 2-3:

| Assets Under Management | Annual Fee |
|---|---|
| First $500,000 | 1.3% |
| Next $1,000,000 ($500,000.01 - $1,500,000) | .85% |
| Next $1,000,000 ($1,500,000.01 - $2,500,000) | .80% |
| Next $1,000,000 ($2,500,000.01 - $3,500,000) | .75% |
| Next $1,500,000 ($3,500,000.01 - $5,000,000) | .70% |
| Next $2,500,000 ($5,000,000.01 - 7,500,000) | .60% |
| Next $2,500,000 ($7,500,000.01 - $10,000,000) | .50% |

---

[18] The Page is no longer operative.  ECF 135 at 34.  But, defendants were able to access it using "publicly available internet archives, such as the Wayback Machine."  *Id.*  And, the Page is available at https://bit.ly/3sBmtHZ.  Plaintiff does not dispute defendants' assertions or otherwise dispute the authenticity of ECF 135-8.

Next $5,000,000 ($10,000,000.01 - $15,000,000)          .40%

Above $15,000,000                                                            .30%

The Page illustrated the fee with several examples: "Clients with $650,000 in assets under management (AUM) will be charged 1.3% of the first $500K, plus 0.85% on the next $150K." ECF 135-8 at 3. And, the website also specified "five blended rates based on [Pinnacle's] fee schedule," *id.* at 1-2: "$1 million = **1.08%**"; "$ 2 million = **.95%**"; "$3 million = **.89%**"; "4 million = **.85%**"; "$5 million = **.82%**". It also indicated: "The fee schedule above is for new individual clients of Pinnacle Advisory Group, Inc. who meet the minimum asset management requirement and who are assigned a Pinnacle advisor to assist them with financial planning and investment management objectives. This fee schedule is not necessarily in place for institutional/401(k) management or other ancillary business areas at Pinnacle." *Id.* at 4.

### C.

On March 8, 2019, plaintiff met with Brian Bruneau, then the Chief Operating Officer ("COO") of Naples Wealth, "about the possibility of working for Naples Wealth." ECF 124-1 at 11, ¶ 25; *see* ECF 147-2 (Krone Dep.) at 44 (Tr. at 168-69) (specifying date of meeting); *see also* ECF 147-2 at 34 (Tr. at 126) (identifying Bruneau as the COO of Naples Wealth). At the relevant time, Naples Wealth was a Florida limited liability company with its principal place of business in Naples. ECF 123, ¶ 4.[19]

---

[19] During the pendency of this suit, Naples Wealth sold most, but not all, of its assets, including "the former Pinnacle client accounts that are at issue in this lawsuit, as well as the trade name 'Naples Wealth Planning,'" to Laidlaw Wealth Management, LLC ("Laidlaw"). ECF 108 (NWP Local Rule 103.3 Disclosure), ¶ 2. But, "[a]ny liabilities of [NWP] arising out of or related to this lawsuit were specifically excluded from the Laidlaw-[NWP] transaction and remain solely with [NWP]." *Id.* ¶ 3. And, NWP "continues to exist as a separate entity from Laidlaw[.]" *Id.* ¶ 6.

At that meeting, or soon after, Krone provided Bruneau with a copy of his Employment Agreement. ECF 147-3 (Bruneau Dep.) at 18 (Tr. at 64). Krone also discussed the noncompete provision of the Employment Agreement with Bruneau. *See* ECF 147-2 (Krone Dep.) at 11-12 (Tr. at 37-38).[20] Further, the Employment Agreement was provided to Andrew May, counsel for NWP. *See id.* (Tr. at 36-37); ECF 147-3 (Bruneau Dep.) at 18 (Tr. at 64-65).[21]

It is undisputed that after Krone's meeting with Bruneau, Krone "prepared" information pertaining to Pinnacle clients on at least one occasion. ECF 147-2 at 26 (Tr. at 96). Krone testified at his deposition that he "put together a schedule of client names, information, assets under management, and shared that with Brian Bruneau" for the purpose of discussing Krone's "potential" value to NWP. *Id.* at 15 (Tr. at 53). Krone stated that he prepared this schedule by "pull[ing] . . . up" client records stored on Pinnacle's server and drafting a handwritten copy of some of the information contained therein. ECF 147-2 at 26 (Tr. at 96). Krone did not specify the date on which he prepared this schedule or the date on which he "shared" this schedule with Bruneau. But, he testified that he did not ask for permission to prepare it. *Id.* at 15 (Tr. at 53).

Bruneau recalled that he received an email from Krone on March 19, 2019, referring to Krone's preparation of a schedule of client information. *See* ECF 147-3 (Bruneau Dep.) at 23 (Tr.

---

Bruneau is currently employed as the president of Naples Wealth, in its current form as a division of Laidlaw. *See* ECF 147-3 at 31-32 (Tr. at 117-18). But, "Laidlaw does not have a financial interest in the outcome of this litigation[.]" ECF 108, ¶ 4.

[20] Bruneau could not recall the precise date on which Krone provided him with a copy of the Employment Agreement, but affirmed that he reviewed the Employment Agreement before hiring Krone. *See* ECF 147-3 (Bruneau Dep.) at 18 (Tr. at 63-64).

[21] May assumed representation for Krone in mid September 2019. ECF 147-2 (Krone Dep.) at 10 (Tr. at 31-33). His pro hac vice status was approved on October 30, 2019. ECF 30. However, May moved to withdraw on April 15, 2020 (ECF 51), which I granted by Order of the same date. ECF 52.

at 85).  But, Bruneau claimed that Krone did not provide such a schedule to him at that time.  *See id.* at 24 (Tr. at 86); *see also id.* at 34 (Tr. at 127) (denying that Krone provided him with a schedule of client information in March 2019).

Thereafter, on June 25, 2019, Krone sent another email to Bruneau, which plaintiff's counsel read to Bruneau at his deposition.  *Id.* at 26 (Tr. at 95).  It stated, *id.*: "I'll be putting together a client list of account numbers and physical addresses[.]"  Bruneau testified that he did not "encourage Mr. Krone to provide information in writing about his customers that he was servicing when he was at Pinnacle."  *Id.* at 26 (Tr. at 96).  But, on an unspecified date, Bruneau responded to the email, stating: "Terrific on the list to get us a solid jump on things[.]"  *Id.*  The record does not establish whether Krone subsequently transmitted a schedule of client information to Bruneau.

In any case, during Krone's deposition, plaintiff's counsel read an email from Bruneau to Krone, dated July 15, 2019, which stated: "I had a call with our SEC attorney today to review the tentative schedule as a protocol transaction."  ECF 147-2 at 34 (Tr. at 128); *see* ECF 135-20 (copy of email).[22]  The email continued: "[O]nce you are comfortable with the timing and key action items, I will finalize the plan with our Fidelity and Schwab contacts to get everything in motion."  ECF 147-2 (Tr. at 128-29).[23]

---

[22] The import of the term "protocol" is discussed below.

[23] Plaintiff also asserts: "On June 21, 2019 Krone provided Naples with information related to Pinnacle's relationship manager at Fidelity Clearing and Custody Solutions, an account custodian."  ECF 124-1 at 12, ¶ 36.  But, the portion of the record to which Pinnacle cites pertains to an email sent by Bruneau to Krone on July 15, 2019, which referenced efforts to "finaliz[e] a plan with both our Fidelity and Schwab contacts to get everything in motion[.]"  ECF 147-3 at 27-28  (Tr. at 100-01).  There is no further information pertaining to Pinnacle's relationship with Fidelity in the portion of the email discussed during Bruneau's deposition.

On July 30, 2019, Krone again emailed Bruneau.  ECF 147-3 at 28 (Tr. at 102-03).  He "convey[ed] information as to how and when Pinnacle bills its customers[.]"  *Id.* (Tr. at 103).  Bruneau testified: "[W]e were trying to come up with a timing to be sure that clients weren't affected and as I recall . . . most IRA's are on a quarterly billing cycle and I think Pinnacle was an exception to that."  *Id.*  It had implemented a "trimester billing cycle."  *Id.*  According to Bruneau, "the concern there was . . . to make a smooth transition and not have the clients in any kind of quandary . . . ."  *Id.*

The following day, July 31, 2019, Krone sent an email to Bruneau, stating: "'I put together the schedule of clients we discussed yesterday, which includes Custodian, AUM[24], and whether the client was assigned to me by Pinnacle or brought in by me to Pinnacle.'"  *Id.* (Tr. at 104).  The email continued: "I'll mail you a copy since I don't want to scan and e-mail using Pinnacle's technology."  *Id.*  Krone also wrote: "'In brief, schedule shows 45 clients, 11 signed to me and 34 brought in by me . . . Total AUM 86.3 million with 46 million at Schwab, 34 million at Fidelity and six million at Lincoln Trust.'"  *Id.* (Tr. at 105).  Bruneau responded the same day, stating: "'Thanks for sending along the info[.]'"  *Id.* at 29 (Tr. at 108); *see id.* (Tr. at 107) (establishing date of Bruneau's response).  In the email, Bruneau also said, ECF 147-3 at 29 (Tr. at 108): "Look forward to refining the schedule and talking soon[.]"

Krone subsequently "prepared a list" and sent it to NWP via "[r]egular mail" because "it was easier for [him] to handwrite it . . . ."  ECF 147-2 (Krone Dep.) at 28 (Tr. at 104-05).  Bruneau affirmed that "Krone mailed [him] something around July 31st" that arrived in an envelope.  ECF

---

[24] Elsewhere, Bruneau clarified that AUM refers to "[a]ssets under management".  ECF 147-3 at 23 (Tr. at 85).

147-3 at 34 (Tr. at 128).[25]  But, according to Bruneau, he destroyed the mailing because, by the time he received the envelope in the mail, he had learned that, contrary to his earlier belief, Pinnacle was not a party to a private, contractual arrangement known as the "Broker Protocol" (the "Protocol"), discussed *infra*.  *Id.* at 22 (Tr. at 78).  Bruneau stated: "[Krone] mailed me a document that was said to include that information but when we found out that Pinnacle was not in protocol, when I received that in the mail, I never opened it and I shredded it with our shredding company . . . .  [Krone] described that there would be information on that."  *Id.*  Bruneau also claimed that, "shortly after [Krone] joined" Naples Wealth, he told Krone that he "destroyed that envelope and [he] never looked at the contents of it."  *Id.* at 34 (Tr. at 127-29).

Pinnacle advises that the Protocol is "a set of rules by which financial advisory firms may elect to abide by.  Those rules govern the transition of advisors from firm to firm, specifically disregarding restrictive covenants and the transition of client accounts/information."  ECF 124-1 at 30 n.1 (citing ECF 147-3 (Bruneau Dep.) at 20 (Tr. at 72-73)).  Although the parties have not provided the Court with a copy of the Protocol, public records provide that where financial advisors "move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm . . . and are prohibited from taking any other documents or information."  *See Read The Broker Protocol*, THE BROKER PROTOCOL, https://www.thebrokerprotocol.com/index.php/authors/read-the-protocol (last accessed Jun. 29, 2022).  In return, a financial advisor who adheres to the limitations guarantees that "neither the departing [financial advisor] nor the firm that he or she joins would have any monetary or other

---

[25] Bruneau did not specify the year in which Krone mailed him "something."  ECF 147-3 at 34 (Tr. at 128).  But, in context, it is apparent that Bruneau meant that Krone "mailed [him] something" on July 31, 2019.  *Id.*

liability to the firm that the [financial advisor] left by reason of the [financial advisor] taking [certain client information] or the solicitation of the clients serviced by the [financial advisor] at his or her prior firm . . . ."  *Id.*; *see generally Hayden Royal LLC v. Hoyt*, 20-cv-02388-PHX-JJT, 2021 WL 2637501, at *2 (D. Ariz. Jan. 22, 2021) (describing terms of the Protocol).

According to Bruneau, Capital Rock was "a member of the protocol."  ECF 147-3 at 20 (Tr. at 71).[26]  However, Pinnacle was not a signatory to the Protocol.  *Id.* (Tr. at 71-72). Nonetheless, Bruneau claimed that he initially misapprehended Pinnacle's status with respect to the Protocol.  Specifically, he testified that he "requested that due diligence be done by our compliance consultant and our attorney, Andrew May."  *Id.* (Tr. at 71).  And, on an unspecified date, it was "reported back" to Bruneau "by a broker for protocol that Pinnacle was part of Broker Protocol[.]"  *Id.* (Tr. at 72).  But, in either late July or early August of 2019, Bruneau learned that, contrary to his earlier belief, Pinnacle was not a signatory to the Protocol.  *Id.* at 41 (Tr. at 154). In any event, by the time that Bruneau received the schedule of client information that Krone mailed to him, he was aware that Pinnacle did not participate in the Protocol.  *Id.* at 22 (Tr. at 78). Therefore, he "took the envelope" containing the schedule "and just shredded it."  *Id.* (Tr. at 80).

At Bruneau's deposition, plaintiff's counsel read an email dated April 19, 2019, that Bruneau had sent to Krone.  ECF 147-3 at 24 (Tr. at 88-89).  It stated: "'I attach a . . . sample resignation letter designed to engage protocol, however, in our case we will modify it since Pinnacle is not in the protocol program from what we've researched[.]"  *Id.* (Tr. at 89).[27]  However, Bruneau testified that this assertion was based on a "cursory look."  *Id.*  And, he later reasserted

_____

[26] As mentioned, Naples Wealth is a trade name for Capital Rock Financial, LLC.  *See* ECF 123 at 1.

[27] The parties did not submit a copy of the "Resignation Protocol Sample."  *See* ECF 147-3 at 24 (Tr. at 87-88).

that he did not definitively learn Pinnacle's status with respect to the Protocol until late July 2019 or early August 2019.  *See id.* at 26 (Tr. at 94-95); *id.* at 41 (Tr. at 154-55).

Pertinent here, on August 27, 2019, a Pinnacle client serviced by Krone sent an email to Krone, on behalf of himself and his spouse (Clients A), indicating their intention to withdraw their investments from Pinnacle's management.  ECF 147-13.[28]  The email stated, in part, *id.*:

> The service you have provided to us over the last several years has been fantastic. However, we are considering moving most, if not all, of our accounts to "self directed" status due to the performance of our Pinnacle investments as compared to the total stock market index and the S & P index, over the last several years.  We recently read the Bogleheads Guide to Investing and feel empowered to self manage more of our investments.  We are not looking to beat the indexes, just to keep up with them.  We are also interested in saving the . . . annual management expense that we pay to Pinnacle.  We are happy to discuss this with you if you would like to have a conference call with us.
>
> I am thinking that we will sell our current positions with Pinnacle in the next few weeks, on a day that the market is up.  How much advance notice do you need to process the sale of our accounts?  Same day?.

Three days later, on August 30, 2019, Krone submitted a resignation letter to Hill via email, effective immediately.  *See* ECF 135-4 ("Resignation Letter").  Krone wrote, *id.*:

> Dear John:
>
> Effective immediately, I am tendering my voluntary resignation from Pinnacle Advisory Group, Inc. ("Pinnacle") as Director of Naples Branch – Wealth Manager.
>
> I have enjoyed working with the firm and appreciate what we were able to accomplish during my tenure with the company.  I've left behind all items

---

[28]  As discussed, *infra*, plaintiff has redacted the names of its former clients in the exhibits it submitted to the Court.  *See* ECF 147.  Therefore, when discussing any individual Pinnacle client, I shall reference the client through the use of a pseudonym.

Relevant here, it appears that the individual who sent an email to Krone on August 27, 2019, held a joint account with another individual.  I shall refer to them collectively, as "Clients A."  When referring to either individual client, I shall refer to them as "Mr. Client A" or "Ms. Client A," respectively.

belonging to Pinnacle, including my computer and all records regarding clients. . . .

There are numerous clients that I brought to Pinnacle from my prior employer that are exempted from certain provisions in our contract.  I expect Pinnacle to honor our agreement by refraining to contact those clients, and if contacted by them, to kindly provide them with my contact information above.

If I can be of any assistance during this transition, please feel free to contact me at the number provided.

Sincerely,

Andrew J. Krone – CPA, MBA
Director of Naples Branch – Wealth Manager

Also on August 30, 2019, Bruneau "created a [sic] excel document containing Pinnacle's client names, contact information, account types, and account custodians."  ECF 124-1 at 14, ¶ 46 (citing, *inter alia*, Order of June 30, 2021, ECF 120, indicating that "[t]he parties have reached agreement that the metadata provided with the native file for NWP 231-241 reflects a creation date of August 30, 2019, and that it was 'created by' Mr. Bruneau, according to the metadata.").[29] Krone testified that he "assume[d]" that Bruneau created this "document" from the schedule that he sent to NWP and through access to "public information through the white pages . . . ."  ECF 147-2 (Krone Dep.) at 34-35 (Tr. at 129-30).

Specifically, Krone confirmed that he "must have" provided Bruneau with the information concerning the "type of investment [each client] had," as reflected in this document.  *Id.* at 35 (Tr. at 130).  He also implied that he provided Bruneau with information regarding "the amount [each client] had under management, the assets under management."  *Id.* (Tr. at 130-31).

---

[29] Given the importance of the specific information contained within the Excel document, it is curious that the parties failed to submit a copy of it with their motions.

Bruneau offered a somewhat different account of the creation of the Excel document. He testified that it was produced with the assistance of Krone and another Naples Wealth representative, Shannon Knaggs. *See* ECF 147-3 (Bruneau Dep.) at 29-31 (Tr. at 109-15); *id.* at 37 (Tr. at 138) (identifying Knaggs as an intern for NWP who had the title of "operations and client services associate"). Bruneau also claimed that Knaggs worked on the document with Krone. *Id.* at 29-31 (Tr. at 109-15). Bruneau maintained that he had "very little" involvement with the creation of the document. *Id.* at 30 (Tr. at 112).[30] Moreover, Bruneau testified that the document was created solely by employing the "white pages" and "Andy's memory of the clients he has" and "potentially" information contained in Krone's cell phone. *Id.* (Tr. at 110-11).

On September 3, 2019, Krone became an employee of Naples Wealth. ECF 147-2 at 9 (Tr. at 28). In the wake of Krone's resignation from Pinnacle, plaintiff took several measures to ensure that Pinnacle did not lose clients. For instance, on September 5, 2019, Hill sent an email to all Pinnacle clients for whom Krone had provided services. *See id.* at 39 (Tr. at 147-48). The parties did not submit a copy of the email as an exhibit. But, defendants previously submitted a copy. *See* ECF 31-1 at 6-7 (the "Notice Email").

The subject line of the Notice Email states: "Pinnacle: Notice of Andy Krone's Departure". *Id.* at 6. Hill wrote, in relevant part *id.*:

> We are reaching out by email to inform you that Andy Krone has tendered his resignation at Pinnacle. We will follow this email with a personal phone call as soon as possible. Andy's resignation came as a surprise to us given our many discussions with him about his eventual retirement from Pinnacle. We thought that we had agreed that it was in our client's [sic] best interest to provide a gradual

---

[30] Notably, Bruneau provided this deposition testimony on June 2, 2021 (ECF 147-3 at 2), about four weeks before the parties agreed that the metadata associated with the Excel spreadsheet reflected that Bruneau "created" the spreadsheet. *See* ECF 120 at 1. The Order of June 30, 2021, did not establish the role that Krone or Knaggs played in obtaining the information contained in the spreadsheet.

transition over the next few years. Given that Andy did not honor his contractual obligation to provide 30 days advance notice of his departure, we are providing you with a list of team member contacts to help support any financial planning, administrative or portfolio related questions you may have.  We are currently engaged in carefully evaluating who would be the best wealth manager for your needs.  Fortunately, we have an excellent team of advisors who will travel to the Naples office or your home to continue providing you with outstanding service and ongoing financial planning support.

We also want to notify you that when he joined Pinnacle Advisory Group, Andy signed a strict non-solicit, non-compete agreement that is the standard in the financial services business.  He is bound by the terms which prohibit solicitation of investment management or financial planning services to Pinnacle clients after his resignation.  Please reach out to us if Andy has been in contact with you, or if you are considering a move to another advisor. . . .

In discussing the Notice Email, Krone testified: "[Hill] kind of defamed me, he railed on about my character, he made a lot of representations that weren't true in that e-mail.  That kind of changed things, you know, changed my feelings about [Pinnacle]."  ECF 147-2 at 39 (Tr. at 147-48).  And, Krone testified that several Pinnacle clients found the Notice Email to be in poor taste.  *See id.* at 63-64 (Tr. at 245-46); *id.* at 68 (Tr. at 262-63); *id.* at 74 (Tr. at 286-87).  Krone stated: "[T]hat e-mail drove a number of clients to me.  I had several clients . . . who thought John was trying to threaten them into staying . . . ."  *Id.* at 64 (Tr. at 246).  However, Krone did not specify the number of clients who communicated with him regarding the Notice Email, or how many of those clients became NWP clients.

Krone "left a voicemail and sent a text message" to a Pinnacle client, "Client B," on September 3, 2019.  ECF 147-2 at 76 (Tr. at 294).[31]  He followed up with Client B on October 2, 2019, and October 4, 2019.  *Id.* (Tr. at 295).  Krone testified that, in these communications, he simply told Client B to "call [him]."  *Id.* (Tr. at 296).  Thereafter, Client B called Krone.  *Id.* (Tr. at 294-95).  And, Client B sent Krone an email on October 4, 2019.  *See* ECF 135 at 49, ¶ 53; ECF

---

[31] As mentioned, I shall refer to any individual former Pinnacle clients by letter.

139 at 12, ¶ 53.  According to Krone, Client B "felt very strongly that the [Notice Email] was insulting, threatening . . . ."  ECF 147-2 at 63-64 (Tr. at 245-46).  The client wrote: "Haha, I hope you stick it in [Pinnacle's] ass[.]"  *Id.* at 64 (Tr. at 246).  Krone replied, "thanks, that's exactly my intention."  *Id.*  Client B became a client of NWP.  *Id.* at 76 (Tr. at 296).

Pinnacle also took measures to enforce various restrictive covenants contained in the Employment Agreement.  On September 6, 2019, an individual named Matthew A. Mace wrote to Bruneau and Sean McVey, the managing director of NWP.  *See* ECF 1-5 (the "Warning Letter").  In context, it appears that Mace served as Pinnacle's counsel at the time.  Mace warned NWP about soliciting Pinnacle clients, stating, *id.* at 2: "[I]t is my client's understanding that your firm has hired Mr. Krone as an advisor in your Naples, Florida office.  This letter is to inform you that Mr. Krone's employment with Pinnacle was governed by an Employment Agreement that prohibits him from directly or indirectly providing any services to a client of Pinnacle's for a period of one (1) year following his termination of employment.  It is my client's belief that, on behalf of your firm, Mr. Krone may well attempt to solicit clients that he worked with at Pinnacle.  That, of course, would be a breach of his Employment Agreement."  The letter also said: "Pinnacle anticipates that you will encourage Mr. Krone to comply with the post-employment terms of his Employment Agreement."  ECF 1-5 at 2.  And, Mace informed NWP that Pinnacle "intends to vigorously enforce the terms of the Employment Agreement."  *Id.*

However, Pinnacle did not arrange for another advisor to replace Krone in its Naples office.  *See* ECF 147-12 (Mikulis Dep.) at 17 (Tr. at 175-76) (confirming that Pinnacle "did not put a physical person into the [Naples] office" following Krone's departure); ECF 147-10 (Hill Dep.) at 15 (Tr. at 98-99) (confirming that Pinnacle never "staff[ed] the [Naples] office in the interim just to meet with clients").  Indeed, on November 21, 2019, Pinnacle "made the decision not to renew

the lease any further for Naples[.]" ECF 147-10 (Hill Dep.) at 19 (Tr. at 144-45); *see* ECF 135-11 at 1-2 (email dated November 21, 2019, from Hill to landlord of Naples office, indicating Pinnacle's decision not to renew the lease for the Naples office). Hill explained that Pinnacle "initially anticipated hiring a new employee" to handle Krone's clients, but ultimately it "made the decision to consolidate the [Naples] office with the Miami support team." ECF 147-10 at 19 (Tr. at 144). In Pinnacle's view, its "Miami team could handle in a first class fashion these clients." *Id.* at 18 (Tr. at 139).

Raoul Rodriguez, a Pinnacle employee who worked at the Miami office, attempted to discuss with Clients A their decision to discontinue the use of Pinnacle's services. *See* ECF 147-14 (email exchanges between Hill, Rodriguez, and Mr. Client A).[32] On September 5, 2019, Mr. Client A sent an email to Hill, in which he said, in relevant part: "We have had great service from Andy and Vanessa[33] over the years. However, we have been disappointed with the performance of our Pinnacle managed investments. We recently read the book Bogleheads Guide to investments and are seriously thinking of moving most or all of our accounts out of Pinnacle to a self-managed status. We intend to focus on index funds. FYI, Andy has not solicited our business." ECF 147-14 at 4.

Later that afternoon, via email, Hill responded to Mr. Client A, on which Rodriguez was copied. *Id.* at 3-4. Hill offered to meet personally with Clients A. *Id.* at 3. Further, he indicated, *id.*: "I believe it is hugely beneficial to compare and contrast Pinnacle's risk managed approach

[32] Hill testified that Pinnacle had previously reassigned some of Krone's clients to Rodriguez after determining that these clients were "too small" for Krone. ECF 147-10 (Hill Dep.) at 11 (Tr. at 65).

[33] Mr. Client A's reference to "Vanessa" appears to pertain to Vanessa Sandoval, another Pinnacle employee. ECF 147-2 (Krone Dep.) at 77 (Tr. at 300).

with the approach you have read in John Bogle's book, particularly considering where we are in this market."  Additionally, Hill wrote, referencing Rodriguez: "We have an outstanding individual that will become your wealth manager with your approval.  He will only work with a select group of Andy's largest clients." *Id.*  Hill also offered that Rodriguez would be available to meet Clients A.  *Id.* at 4.  Mr. Client A responded on September 12, 2019, reiterating, in pertinent part, *id.* at 2: "I want to mention that prior to the announcement of Andy Krones [sic] departure from Pinnacle, we obtained the Bogleheads investment guide and Were [sic] planning to move our investments to a self-directed status.  It was just a coincidence that our change to self-directed happened at the time of Andy's departure."

Hill testified that he had a meeting with Mr. Client A and Rodriguez on September 13, 2019, and "during that meeting, he told us he would consider staying with us."  ECF 147-10 at 16 (Tr. at 132); *see id.* at 17 (Tr. at 134) (indicating that Rodriguez also attended this meeting).  Nonetheless, Clients A pulled their investments from Pinnacle's management.  *Id.* at 17 (Tr. at 134-35).  In Hill's view, if Krone had been "there to take care of [Clients A], . . . [Clients A] very well may have stayed." *Id.* at 16 (Tr. at 133).

### D.

Defendants took several steps to inform Pinnacle clients of Krone's new role with NWP and to provide them with information pertaining to NWP products.

 Bruneau confirmed that an attorney for Naples Wealth "create[d] a script for Mr. Krone" for the purpose of contacting Pinnacle clients.  ECF 147-3 (Bruneau Dep.) at 42 (Tr. at 161); *see id.* at 43 (Tr. at 162-65); *see also* ECF 135-21 (the "Script").  According to Bruneau, Krone was "required to follow" this script when contacting Pinnacle clients.  ECF 147-3 at 43 (Tr. at 165).  The Script stated, in part, ECF 135-21 (underline and italics in original):

Hello _____,

As you may have heard, I am no longer working for Pinnacle Advisory Group, Inc. I am sorry to have not reached out sooner, but I wanted to make sure that I am on solid legal ground by reaching out to you. I am contractually prohibited from soliciting you for your business and this is _not_ the reason that I am calling you now. You might have received an email from Pinnacle implying that I am violating my non-compete provisions. I can assure you that is not the case as my new firm is more than 5 miles from the old one so that the non-competition portion is exempt. I am simply reaching out so that you have my current contact information.

I can be reached at: Naples Wealth Planning

\* \* \* \* \*

While I _cannot_ and am _not_ soliciting your business, the ultimate decision of whom you wish to do business with is entirely up to you.

After Krone became an employee of NWP, he met in person with various Pinnacle clients. *See*, *e.g.*, ECF 147-2 at 62-63 (Tr. at 241-44) (indicating that Krone met in person with a Pinnacle client on an unspecified date, but while Krone was an NWP employee); *id.* at 74 (Tr. at 287-88) (indicating that Krone met with a Pinnacle client on September 13, 2019, to finalize the client's transition to NWP); ECF 147-2 at 75 (Tr. at 291-92) (reflecting that Krone met with a Pinnacle client on October 3, 2019).[34]

Krone's deposition testimony is replete with discussions of communications that Krone initiated with various Pinnacle clients in the weeks following his resignation from Pinnacle. *See*, *e.g.*, *id.* at 64 (Tr. at 247-48) (confirming that Krone sent an email to a Pinnacle client); *id.* at 70 (Tr. at 271) (stating that plaintiff initiated a phone call to a Pinnacle client on September 10, 2019, and September 22, 2019). Moreover, the record shows that Krone "made multiple calls, sent

_____

[34] Krone did not expressly state that this meeting occurred in 2019. And, counsel did not clarify. But, in context, it is apparent that the meeting would have occurred in 2019.

emails, [and] sent text messages . . . with Pinnacle clients, even [if] he received no response."  ECF

139 at 20, ⁋ 54.  However, the parties did not submit copies of the written communications.

Bruneau confirmed that NWP officials "put together an information package" for Krone to

give to certain "customers."  ECF 147-3 at 42 (Tr. at 158).  Bruneau did not specify the number of

"customers" for whom NWP officials prepared these packages or the content in them.  Moreover,

Bruneau indicated that he did not "communicate to any [NWP officials] who should or should not

receive a package[.]"  *Id.* (Tr. at 159).  But, Bruneau confirmed that the information packages

should have only been sent to "customers who asked for them."  *Id.* (Tr. at 158).  And, Krone

confirmed that he mailed an unspecified number of "packages," which contained brochures with

information about NWP.  *See* ECF 147-2 at 81 (Tr. at 314-15); *id.* at 40 (Tr. at 151-52).

On September 17, 2019, Krone drafted a letter on NWP letterhead, directed to a Pinnacle

client, "Client C."  *See* ECF 1-6 (the "NWP Letter").  He discussed various NWP products,

criticized the performance of Pinnacle's services, and offered to arrange a call with Client C and

Kevin Simpson, another NWP representative.  *See id.* at 2-3.  The record does not reflect whether

this call materialized.  However, Client C did not leave Pinnacle following Krone's departure.

ECF 147-11 (Rosenthal Dep.) at 6 (Tr. at 47-48).[35]

Three days later, on September 20, 2019, Mace mailed a cease and desist letter to Krone,

contending that Krone was acting in contravention of the terms of the Employment Agreement.

*See* ECF 1-7 (the "Cease and Desist Letter").  Specifically, the Cease and Desist Letter noted that

Krone had failed to respond to a letter dated September 6, 2019, in which Pinnacle's counsel

_____

[35] R. Christopher Rosenthal serves as plaintiff's expert witness in this case.  *See* ECF 147-
5 at 4.  He prepared reports concerning the extent of plaintiff's damages in this case.  *See* ECF
147-5 (expert report); ECF 147-7 (rebuttal report).

reminded Krone of his obligations under the Employment Agreement.   *Id.* at 2.[36]   And, Mace stated: "[S]ince your resignation from Pinnacle, at least ten (10) Pinnacle clients have left Pinnacle. . . . In fact, Pinnacle has obtained direct evidence of improper solicitation of a client."   *Id.*   And, Pinnacle directed Krone's attention to a copy of the NWP Letter, which was included with the Cease and Desist Letter.   *Id.* at 4-5.

Accordingly, plaintiff's counsel directed Krone to "confirm in writing . . . by 5 p.m. on September 23, 2019," that he had "ceased violating [the] Agreement," provide a list of clients that he believed were "exempted from the Agreement," and that he "will comply with all provisions of that Agreement."   *Id.* at 3.   Pinnacle also stated that it would "consider all legal avenues . . . ."   *Id.*

Seven days later, on September 27, 2019, Krone responded.   ECF 1-8.   He said: "I do not believe that the handwritten letter that you attached to your letter referred to above constitutes 'solicitation.' . . . Be that as it may, I will not send any similar letters in the future.   Nor will I take actions that are not exempt from those allowable under my contract."   ECF 1-8 at 2.   And, Krone provided a list of ten "exempt clients."   *Id.* at 3.[37]

Pinnacle seeks damages for twenty-nine of Krone's clients who terminated their relationship with Pinnacle by the end of 2019.   *See* ECF 147-11 (Rosenthal Dep.) at 5 (Tr. at 43) (confirming that plaintiff seeks damages for twenty-nine clients who terminated their relationship

---

[36] It is not clear whether the reference to the letter of September 6, 2019, pertains to the letter transmitted to Bruneau and McVey, discussed above.   To the extent that Pinnacle's counsel sent a separate letter to Krone, directing him to comply with the Employment Agreement, Pinnacle has not submitted a copy of it.

[37] In this letter, Krone, who was sixty-eight years of age at the time of his deposition, also indicated his belief that he had "a claim for age discrimination based on comments made by senior Pinnacle management . . . earlier this year."   ECF 1-8 at 3; *see* ECF 147-2 at 44 (Tr. at 166) (stating Krone's age).   However, Krone never initiated such an action.   *See* ECF 147-2 (Krone Dep.) at 43-44 (Tr. at 165-67).

with Pinnacle following Krone's departure).  Of that group, nineteen became NWP clients.  ECF 147-11 at 8 (Tr. at 111-12).[38]  According to defendants, however, all nineteen clients "signed affirmations stating their decisions were voluntary, and Mr. Krone did not solicit their business."  ECF at 135 at 13, ₱ 49 (citing ECF 135-12, the "Acknowledgments").[39]

This suit followed on October 14, 2019.  ECF 1.  On April 30, 2021, Pinnacle "sold its entire financial planning, asset and investment management business to Congress Wealth Management, LLC ('CWM' [or 'Congress']) . . . ."  ECF 135 at 14, ₱ 54; *see* ECF 137-7 (the "Asset Purchase Agreement" or the "APA").[40]

The APA refers to Pinnacle as the "Seller," Congress Wealth as the "Purchaser," as well as Hill, Solow, and Mikulis, collectively, as the "Shareholders."  ECF 137-7 at 1.  The APA

---

[38] Between September 9, 2019, and October 15, 2019, seventy-six Pinnacle client accounts became NWP client accounts.  *See* ECF 147-4 (redacted list of clients and dates that they were "accepted by NWP").  The list reveals that some clients moved multiple accounts from Pinnacle to NWP.  *Id.*

[39] Defendants submitted only eighteen signed Acknowledgements.  *See* ECF 135-12.  But, plaintiff does not dispute that nineteen Pinnacle clients signed the Acknowledgments.  *See* ECF 139 at 19, ₱ 49.

However, plaintiff asserts that the Acknowledgments constitute inadmissible hearsay under F.R.E. 802.  *Id.*  Further, plaintiff complains that these individuals "have not been designated by Defendants as witnesses" and they "have not supplied affidavits in compliance with Rule 56(C)(4)."  *Id.*  In response, defendants note that even if the Acknowledgements amount to hearsay, they may still be considered because they are "'capable of being converted into admissible evidence.'"  ECF 140-1, ₱ 49 (quoting *Gleklen v. Democratic Cong. Campaign Comm. Inc*., 199 F.3d 1365, 1369 (D.C. Cir. 2000)).  They also provided a signed affidavit from Bruneau, attesting to the accuracy of the Acknowledgments.  *See* ECF 140-2, ₱ 3.  I shall address the objection, *infra*.

[40] The APA provides that it was effective on March 11, 2021.  ECF 137-7 at 1.  But, it also indicates: "The closing of the purchase and sale of the Purchased Assets provided for in this Agreement . . . shall take place by electronic transfer . . . no later than April 30, 2021[.]"  *Id.* at 2; *see* ECF 147-10 (Hill Dep.) at 24 (Tr. at 166) (confirming that closing occurred on April 30, 2021).  The exact date is immaterial.

specifies that Hill, Solow, and Mikulis collectively own approximately 85% of the "issued and outstanding capital stock of [Pinnacle]." *Id.*  Pursuant to the APA, Congress Wealth entered into an agreement with Pinnacle, as well as Hill, Solow, and Mikulis in their capacities as Pinnacle's majority shareholders. *Id.*  Under the APA, Congress agreed "to purchase from Seller, and Seller agrees to sell, convey, transfer, assign, and deliver to Purchaser . . . all of the properties, rights and assets of Seller," with certain enumerated exceptions, "free and clear of all liens, mortgages, claims, encumbrances, voting agreements, voting trusts, proxies, puts, calls, security interests, restrictions, prior assignments, easements, covenants, conditions or claims of any kind or nature whatsoever . . . other than Permitted Liens." *Id.*  But, Pinnacle retains "[a]ll rights and benefits, including any judgment, award of damages of any kind, or interest," relating to this litigation. *Id.* at 6; *see id.* at 7 (describing the scope of the suit).

Pertinent here, the APA also includes certain restrictive covenants that, *inter alia*, prohibit Pinnacle and its shareholders from providing "Investment Management Services to any Person that is a Past Client, Present Client, or Prospective Client of Purchaser" for a five-year period, beginning on the Closing Date.  ECF 137-7 at 3.  But, the APA provides that Pinnacle may provide such services for such "Persons" if they are rendered "for the benefit of the Purchaser or its Affiliates," or if Pinnacle first obtains the "express written approval of Purchaser . . . ."  *Id.* Moreover, the APA provides that neither the Seller nor the Shareholders shall "render services to, become affiliated with or employed by, own, or have a financial or other interest in . . . any business that is engaged in Investment Management Services[.]"  *Id.* at 4.

The APA defines "**Investment Management Services**" as "any services that involve (A) the management of an investment account or fund (or portions thereof or a group of investment accounts for funds), or (B) the giving of advice with respect to the investment and/or reinvestment

of assets or funds (or any group of assets or funds)." *Id.* (bold in original).  And, of import here,

the APA defines "**Past Client**" as follows, *id.* (bold in original): [41]

> [A]ny Person who at any point within two years prior to such time (A) had been a client of Seller, or, to Seller's Knowledge or the knowledge of any Shareholder, as applicable, a client of Purchaser or any Affiliate of Purchaser, receiving Investment Management Services, (B) had been an advisee or investment advisory customer of, or recipient of Investment Management Services from, Seller, or, to Seller's Knowledge or the knowledge of any Shareholder, as applicable, Purchaser or any Affiliate of Purchaser, or (C) had been an intermediary with respect to Investment Management Services between Seller and any other Past Client, but at such time is not an advisee or investment advisory customer or client of, or recipient of Investment Management Services from, Seller or an intermediary with respect to Investment Management Services between Seller, Purchaser or any Affiliate of Purchaser and any other Past Client.

According to defendants, Pinnacle cannot provide investment services for those who were

Pinnacle clients during the period April 30, 2019 through April 30, 2021.  *See* ECF 135 at 14, ¶

56, 57.  Thus, defendants assert that the covenants encompass Krone's "Non-Exempt Clients,"

who form the basis of Pinnacle's damages claim.  ECF 135 at 14, ¶ 56.

Hill confirmed that, pursuant to the restrictive covenants contained within the APA,

Pinnacle is "basically out of the financial advisory business for at least five years . . . ."  ECF 147-

10 (Hill Dep.) at 24 (Tr. at 168).  Therefore, Pinnacle no longer provides "financial planning, asset

and investment management services."  ECF 135 at 14, ¶ 57; *see* ECF 147-10 (Hill Dep.) at 4-5

(Tr. at 13-15).  Mikulis testified: "Pinnacle, now Waypoint, is not providing [financial] services

today, currently."  ECF 147-12 (Mikulis Dep.) at 7 (Tr. at 58-59).  Nevertheless, Mikulis said:

"We are allowed to provide those services."  *Id.* (Tr. at 59).

---

[41] Although not pertinent for present purposes, the APA also defined the terms "Present Client" and "Prospective Client."  ECF 137-7 at 4-5.

Hill testified that as of April 30, 2021, Pinnacle does not generate any revenue.  ECF 147-10 at 5 (Tr. at 14).  But, according to Hill, there are no current plans to "shut down Pinnacle[.]"  *Id.* (Tr. at 14-15).  Hill confirmed, however, that there have been discussions about "shutting down Pinnacle in the future[.]"  *Id.* (Tr. at 15).

Mikulis is Pinnacle's only remaining employee.  ECF 147-10 (Hill Dep.) at 4 (Tr. at 13).  His role is to manage the "wrap-up process of the sale process and to deal with issues such as [this litigation]."  *Id.* at 5 (Tr. at 14).  On May 25, 2021, Mikulis, as President of Pinnacle, executed "Articles Of Amendment."  *See* ECF 111-6.  In principal part, the Articles of Amendment identified Pinnacle's new trade name as "Waypoint Consulting, Inc."  *Id.* at 2.  In addition, it specified "[t]he purposes for which the Corporation is formed," as follows: "To engage in any lawful purpose and/or business other than the profession of financial planning and investment and asset management services" and "[t]o do anything else permitted by Section 2-103 of the Maryland General Corporation Law, as amended from time to time (the 'MGCL')."  *Id.*

## II.    Legal Principles

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009);

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In other words, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; accord *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).  But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).  Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

Pursuant to Fed. R. Civ. P. 56(c)(1), if the moving party bears the burden of proof on the issue at trial, it must support its factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ."  But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing' that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249;

accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Brown v. Lott*, ___ F. App'x ___, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 Fed. App'x 285, 294 (4th Cir. 2012).  Notably, "to avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment."  *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).  At the same time, if testimony from a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving.  *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017).

When, as here, the parties have filed cross motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021). And, as noted, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Def. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In sum, simply because opposing parties have moved for summary judgment does not mean that summary judgment to one side or the other is necessarily appropriate. Indeed, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2022) ("Wright & Miller").

### B. Jurisdiction and Choice of Law

Pinnacle is a Maryland corporation and Krone is domiciled in Florida. ECF 123, ¶¶ 2-3. NWP is a limited liability corporation, and its two members are citizens of Florida. *See id.* ¶¶ 5-6; ECF 38 at 2. Therefore, when suit was filed the Court had jurisdiction pursuant to 28 U.S.C. § 1332(a), as there existed complete diversity between the parties and the amount in controversy exceeds $75,000. ECF 123, ¶ 7.

As mentioned, WMC was substituted as the plaintiff in this case, pursuant to Fed. R. Civ. P. 25(c). *See* ECF 145 (Order of March 22, 2022). And, the record reflects that WMC is a "Maryland limited liability company." *See* ECF 141-2 at 3. But, it is well established that "the citizenship of a limited liability company . . . is determined by the citizenship of all of its

members." *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).  There is no information in the record pertaining to the identity of WMC's members or their State of citizenship.

Nevertheless, the omission is immaterial, as "the general rule is that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Evanston Insurance Co. v. Dan Ryan Builders, Inc.*, MJG-15-3419, 2017 WL 262620, at *3 (D. Md. Jan. 20, 2017) (quoting *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004)).   In other words, "if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991).

In this case, there was complete diversity between the parties at the time suit was filed. ECF 1, ¶¶ 2-5. Thus, the Court retains subject matter jurisdiction.   *See* 7C Wright & Miller, § 1958 ("[I]t has been held that if diversity jurisdiction was established at the time the complaint was filed, the substitution of a nondiverse party does not destroy diversity jurisdiction.[1]").

"When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  Maryland is, of course, the forum state.

As to contract claims, Maryland applies the law of the state where the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA*

*Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

Plaintiff's breach of contract claim is predicated on plaintiff's violation of the Employment Agreement. And, the Employment Agreement specifies, ECF 135-3 at 5, ⁋ 1: "This Agreement shall be governed by, and enforceable by, the laws of the State of Maryland without regard to its conflict of law principles." The parties seem to assume that Maryland law applies, without discussion. ECF 124-1 at 18; ECF 135 at 17. Accordingly, I shall apply Maryland law as to plaintiff's claim for breach of contract.

As to plaintiff's tort claims, Maryland adheres to the doctrine of *lex loci delicti*, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph,* 529 F. Supp. *at 606* (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619, 925 A.2d 636, 648-49 (2007)) (other citations omitted). Many of the relevant actions took place within Florida. *See* ECF 124-1 at 8-15; ECF 135 at 9-15. Nonetheless, the parties seem to agree, again without discussion, that Maryland law governs the resolution of plaintiff's tort claims. *See*, *e.g.*, ECF 124-1 at 27-28 (applying Maryland law to plaintiff's claim for tortious interference); ECF 135 at 38-39 (suggesting the same as to plaintiff's claim for conversion). And, where the parties agree, implicitly or otherwise, that the law of the forum state governs their dispute, a court need not consider the choice-of-law question further. *See Vanderhoof-Forschner v. McSweegan*, 215 F.3d 1323, at *2 n.2 (4th Cir. 2000) (Table); *see also American Fuel Corp. v. Utah Energy Dev. Co.*,

122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."). Accordingly, I shall also apply Maryland law in analyzing plaintiff's tort claims.

## III.   Discussion

As mentioned, Pinnacle has moved for partial summary judgment. It seeks summary judgment as to its Declaratory Judgment claim (Count One), asking the court to declare the Employment Agreement, including the restrictive covenants, valid and enforceable. ECF 124-1 at 17-21. Pinnacle also seeks summary judgment as to its claims for breach of contract (Count Two), and tortious interference (Count Six). *Id.* at 21-30. Defendants oppose the Motion and have filed a cross motion for summary judgment as to all eight counts enumerated in the Amended Complaint. ECF 135.

### A.  Count One: Declaratory Judgment

In Count One of the Amended Complaint, Pinnacle asks the Court to issue a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, which "affirm[s] and enforce[es] Pinnacle's rights under the terms of the [Employment] Agreement." ECF 123, ⁋ 60. Plaintiff's request for declaratory judgment is predicated on the Noncompete Covenant. *See* ECF 124 at 17-21.[42] Both sides seek summary judgment as to Count One.

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not

---

[42] As discussed, *infra*, I conclude that the Noncompete Covent is valid but the Nondisclosure Covenant is overbroad and unenforceable. A plaintiff's claim for declaratory relief is coterminous with its substantive claims. *See Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 484 (S.D.N.Y. 2015) ("Given that [plaintiff] has failed to establish his other claims, and the declaratory relief sought rests on those claims, his claim for declaratory judgment also fails.").

further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

In order to bring a declaratory judgment action under 28 U.S.C. § 2201, the plaintiff must establish the existence of a dispute that is "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that [is] 'real and substantial[.[]'"  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).  This is necessary in order to satisfy the case or controversy requirement of Article III of the Constitution.  *Id.* at 126-27.

The Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights."  *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 55 (4th Cir. 2011) (citing *Skelly Oil Co. v. Phillips Petroleum Co*., 339 U.S. 667, 671-72 (1950)); *see also Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742, 752 (D. Md. 2020) ("The Declaratory Judgment Act 'provides a remedy in cases otherwise in the Court's jurisdiction; it does not create an independent cause of action.'") (quoting *Elec. Motor and Contracting Co., Inc. v. Travelers Indemnity Co. of Am.*, 235 F. Supp. 3d 781, 793 (E.D. Va. 2017)).   Consequently, "'[a] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred.'"  *CGM, LLC*, 664 F.3d at 55-56 (alteration in original) (citation omitted).

Further, the statute's "permissive language has long been interpreted to provide discretionary authority to district courts to hear declaratory judgment cases."  *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998).  Thus, the Declaratory Judgment Act "'merely permits' federal courts to hear those cases rather than granting litigants a right to judgment."  *Medical Mutual Ins. Co. of N.C. v. Littaua*, 35 F.4th 205, 208 (2022) (quoting *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201-02 (4th Cir. 2019)).

Defendants argue that they are entitled to summary judgment as to Count One because the Noncompete Covenant "only applies for the 'one year following the termination of [Krone's] employment.'"  ECF 135 at 15 (quoting ECF 135-2 ⁋ 9(B) (alteration in ECF 135)).  And, because Krone's employment terminated on August 30, 2019, the Noncompete Covenant "terminated no later than September 30, 2020 . . . ."  ECF 135 at 15.

But, according to defendants, "the most fatal and glaring flaw in [Count One] is that declaratory judgment will serve no useful purpose, as the alleged danger to Pinnacle no longer exists."  *Id.* at 16.  They explain: "It is undisputed that Pinnacle sold its entire financial planning and investment management business to CWM, and is contractually prohibited from providing any such services for the next five years to any clients—including all of the clients at issue."  *Id.*

Plaintiff responds: "There can be no doubt that there is an actual controversy between the parties regarding the enforceability of the Agreement."  ECF 139 at 22.  Pinnacle continues, *id.*: "Indeed, the fact is self-evident given Defendants' opposition and cross-motion."  And, concerning the import of the APA as to this claim, Pinnacle asserts that it "is still an active entity and was active at the time Mr. Krone terminated his employment and violated the Agreement."  *Id.* at 29.

In my view, defendants have the better of the argument.  Even assuming that the sale of Pinnacle's assets to CWM in April 2021 did not divest Pinnacle of its interest in the enforcement of the Noncompete Covenant, it is plain that Pinnacle is not entitled to prospective enforcement.  As defendants lay bare, the Noncompete Covenant was valid only for a term of one year, commencing with Krone's departure from Pinnacle.  ECF 135-3, ⁋ 9(B).  It is undisputed that Krone resigned from his employment on August 30, 2019.  *See* ECF 1-4.  Thus, the utility of a declaratory judgment has long since expired.  And, despite Pinnacle's protestations to the contrary, the fact that the parties have continued to argue about the enforceability of the Noncompete

47

Covenant does not itself warrant declaratory relief.  By Pinnacle's logic, "every lawsuit filed would merit declaratory judgment."  ECF 140 at 8.

In short, given the circumstances attendant here, a declaratory judgment would not resolve an ongoing dispute that is "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that [is] 'real and substantial.'"  *MedImmune, Inc.*, 549 U.S. at 127 (2007).  Accordingly, I shall deny the Motion as to Count One, and I shall grant the Cross Motion as to Count One.

### B.  Count Two: Breach of Contract

Both sides have moved for summary judgment as to Count Two of the Amended Complaint, which asserts a claim for breach of contract.  ECF 123, ¶¶ 61-73.  In particular, plaintiff alleges that Krone violated various obligations in the Employment Agreement, including the Noncompete Covenant, contained in paragraph 9(B); the Nondisclosure Covenant contained in paragraph 10(A); as well as the Notice Covenant in paragraph 8(C).  ECF 123, ¶¶ 66-71; *see* ECF 135-3, ¶¶ 8(C), 9(B), 10(A).

With respect to the Noncompete Covenant and the Nondisclosure Covenant, defendants maintain that, in light of Pinnacle's sale of assets to Congress Wealth, and the termination of Pinnacle's business, Pinnacle has no legitimate business interest in enforcing either covenant.  ECF 135 at 26-30.[43]  But, even assuming that Pinnacle retains an interest in the enforcement of these

---

[43] Defendants also assert that summary judgment is "ripe on Pinnacle's alleged damages resulting from Mr. Krone's alleged breaches" of the Noncompete Covenant and the Nondisclosure Covenant.  ECF 135 at 26.  But, neither side has moved for this relief.

In my view, the extent of damages plaintiff may have suffered as a result of defendants' alleged breach is downstream of the principal inquiry raised by the Motion and the Cross Motion: whether there is a genuine dispute of material fact as to defendants' liability.  Accordingly, I do not address the issue of damages.

restrictive covenants, defendants maintain that the covenants are overly broad and thus unenforceable.  *Id.* at 18-26.  And, they argue that the doctrine of "blue-penciling" cannot save these provisions.  *Id.* at 30-31.  Moreover, defendants contend that Pinnacle violated the terms of the Employment Agreement before Krone contravened its terms.  *Id.* at 30.  Thus, in their view, any breach committed by Krone should be excused.  *Id.*  With respect to the Notice Covenant, defendants concede that Krone failed to provide 30 days' notice to Pinnacle before terminating his employment.  But, they maintain that Krone's conduct does not amount to a material breach of the Employment Agreement.  *Id.* at 56-57.

Plaintiff disputes defendants' contentions.  It asserts that it retains a legitimate interest in the enforcement of the covenants, and that defendants' argument to the contrary is unsupported by the law and the record.  ECF 139 at 28-29.  Moreover, plaintiff claims that the Noncompete Covenant and the Nondisclosure Covenant are valid and enforceable under Maryland law.  *Id.* at 22-28.  Further, it states that Krone's breach of the Notice Covenant was material and denied Pinnacle the opportunity to plan for Krone's departure.  *Id.* at 31-32.  And, Pinnacle maintains that defendants may not raise the defense of "'first' breach" for the first time in a motion for summary judgment.  *Id.* at 32.

### 1.  Overview of Contract Principles

As indicated, the issues in Count Two are rooted in the terms of the Employment Agreement.  Therefore, I pause to review general principles of contract law.

A contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990) ("Williston on Contracts"); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App.

298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)), *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

In determining whether there is an enforceable contract, courts in Maryland begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc*., 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

Ordinarily, a contract is not enforceable unless it is supported by consideration. *Harford Cty. v. Town of Bel Air*, 348 Md. 363, 381, 704 A.2d 421, 430 (1998). "In Maryland, consideration may be established by showing 'a benefit to the promisor or a detriment to the promisee.'" *Forty W. Builders, Inc*., 178 Md. App. at 384-85, 941 A.2d at 1213 (citations and some internal quotation marks omitted). The Maryland Court of Appeals has said: "A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 148, 835 A.2d 656, 661 (2003).

"Generally, a breach of contract is defined as a 'failure, without legal excuse, to perform any promise that forms the whole or part of a contract.'" *Weaver v. ZeniMax Media, Inc*., 175 Md. App. 16, 51, 923 A.2d 1032, 1052 (2007) (citing Williston on Contracts § 63:1). Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F.Supp.3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)); *see also RRC Ne., LLC*

*v. BAA Md., Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010) (noting the elements of contractual obligation and breach); *Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015) (same).

Further, in Maryland "a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing'" the existence, and the breach, of a contractual obligation. *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012) (emphasis in original) (citation omitted). The agreement between the parties "ultimately determines" whether a breach occurred. *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). But, ordinarily, "a person cannot be held liable under a contract to which he was not a party." *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 316, 728 A.2d 783, 794 (1999); *see Weems v. Nanticoke Homes, Inc.*, 37 Md. App. 544, 551-57, 378 A.2d 190, 194-97 (1977).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). "'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594

(2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.").

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *W.F. Gebhardt & Co., Inc. v. American European Ins. Co.*, 250 Md. App. 652, 666, 252 A.3d 65, 73 (2021); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract subjectively intended or personally thought it meant. *See Martz v. Day Development Co., L.C.,* 35 F.4th 220, 225 (4th Cir. 2022); *Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was

effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see Cochran,* 398 Md. 1, 919 A.2d at 710 ("Under the objective theory of contracts, [courts] look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement."); *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated.").

Notably, "the plain meaning is determined by 'focus[ing] on the four corners of the agreement.'" *Martz*, 35 F.4th at 225 (citation omitted) (alteration in *Martz*). "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted).

"'Traditionally, to supply contractual language with its ordinary and accepted meanings[,] this Court consults the dictionary definition of such terms.'" *W.F. Gebhardt*, 250 Md. App. at 668, 252 A.3d at 74 (quoting *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303, 311 (2019)) (alteration in *Credible Behavioral Health*). "Furthermore, 'simply because [a party] can point to several slightly different dictionary definitions of [a word] does not render that term ambiguous.'" *W.F. Gebhardt*, 250 Md. App. 667, 252 A.3d at 74 (quoting *Rigby v. Allstate Indem.*, 225 Md. App. 98, 110, 123 A.3d 592, 598-99 (2015)) (alterations in *W.F. Gebhardt*).

A contract is ambiguous "'if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning.'" *Martz*, 35 F.4th at 225 (citation omitted); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999); *W.F. Gebhardt*, 250

54

Md. App. at 667, 252 A.3d at 74.  But, a contract is not ambiguous merely because the parties do not agree on its meaning.  *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996).  And, the determination of whether a contract is ambiguous is a question of law.  *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Washington*, 376 Md. at 163, 829 A.2d at 544.

To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract.  *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985).  Generally, "'ambiguities are resolved against the draftsman of the instrument.'"  *John L. Mattingly Const. Co.*, 415 Md. at 334, 999 A.2d at 1078 (citation omitted).  But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'"  *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

Consideration of extrinsic evidence is unnecessary when a contract is unambiguous.  *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006).  Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'"  *Cty. Commissioners of Charles Cty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010); *see Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 213 Md. 152, 157-58, 582 A.2d 493, 495 (1990).  For example, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . .whether the ambiguous

language has a trade usage.'" *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977).  But, extrinsic evidence may "not be used to contradict other, unambiguous language." *Calomiris*, 353 Md. at 441, 727 A.2d at 366.

If a court determines as a matter of law that the contract is ambiguous, "'it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.'" *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).  Nevertheless, if "'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.'"  *Washington Metro. Area Transit Auth.*, 476 F.3d at 235 (quoting *Goodman*, 7 F.3d at 1126); *see Sheridan v. Nationwide Ret. Sols., Inc.*, 313 Fed. App'x 615, 619 (4th Cir. 2009).  Moreover, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'"  *CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015) (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Pac. Indem. Co.*, 302 Md. at 389, 488 A.2d at 489.

## 2.  Contract Claim against NWP

As an initial matter, given that NWP is named in the *ad damnum* clause for Count Two, the breach of contract claim is arguably lodged against NWP.  *See* ECF 123, ¶¶ 61-73.  But, it is axiomatic that "[a] defendant cannot be held liable for breaching a contract if there is no contractual

privity between the parties." *Premium of America, LLC v. Sanchez*, 213 Md. App. 91, 121, 73 A.3d 343, 361 (2013); *see Residential Warranty Corp.*, 126 Md. App. at 316, 728 A.2d at 794. And, as defendants point out, it is undisputed that "there is no privity of contract between NWP and Pinnacle[.]" ECF 135 at 30. Indeed, plaintiff advances no argument to the contrary. Thus, to the extent that Count Two is lodged against NWP, defendants are entitled to summary judgment.

### 3. First Breach Defense

In the Cross Motion, defendants argue that, to the extent that Krone's conduct amounts to a breach of contract, plaintiff's claim must fail because, prior to Krone's actions, "Pinnacle breached the Employment Agreement by failing to pay Mr. Krone as agreed, specifically for those clients where Krone was entitled to receive a 40% payout." ECF 135 at 30 (citing ECF 147-12 (Mikulis Dep.) at 7 (Tr. at 59-61)); *see* ECF 135-3 at 8 (payment schedule). According to defendants, "[t]his resulted in Mr. Krone being significantly underpaid" and thus "constitutes a material breach of contract, meaning Pinnacle's material 'first' breach of contract extinguished Mr. Krone's obligations as they relate to restrictive covenants." ECF 135 at 30. Because Pinnacle allegedly compensated Krone below the minimum payout rate contemplated by the Employment Agreement, Krone claims that he was excused from complying with the various covenants set forth in the Employment Agreement. *Id.*

Plaintiff counters that the assertion of this defense is untimely. In support, it argues: "Mr. Krone neither brought a counterclaim nor an affirmative defense of a 'first' breach in his Answer," nor did the parties "engage in discovery on this unpled defense." ECF 139 at 32. And, plaintiff points out that defendants neglected to specify "when this alleged 'first' breach occurred—a fact relevant to a determination of whether such a breach was indeed first." *Id.*

In Maryland, a duty to perform under a contract may be discharged by a "material" breach. *Alston v. TowneBank*, GJH-20-690, 2022 WL 971008, at *7 (D. Md. Mar. 31, 2022) (quoting *Jay Dee/Mole Joint Venture v. Mayor and City Council of Balt.*, 725 F. Supp. 2d 513, 526 (D. Md. 2010)).  But, as a matter of Maryland law, a claim that one party's breach of contract should be excused because of a prior breach committed by the other contracting party is an affirmative defense. *See Holloway v. Faw, Casson & Co.*, 78 Md. App. 205, 245-46, 552 A.2d 1311, 1331 (1989), *aff'd in part and rev'd in part on other grounds*, 319 Md. 324, 572 A.2d 510 (1990); *Simko, Inc. v. Graymar Co.*, 55 Md. App. 561, 570, 464 A.2d 1104, 1109 (1983), *cert. denied*, 298 Md. 244, 469 A.2d 452 (1983).  Defendants do not dispute the characterization of their argument as an affirmative defense.

Fed. R. Civ. P. 8(c)(1)  provides: "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]"  Thus, "[i]t is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule of Civil Procedure 8(c) results in the waiver of that defense and its exclusion from the case.[ ]"  5 Wright & Miller, § 1278; *see also Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N.C.*, 508 F. App'x 243, 251-54 (4th Cir. 2013) (finding that failure to raise the affirmative defense of first material breach until after bench trial constituted a forfeiture of the defense).

Critically, defendants never asserted this affirmative defense in their Answer.  *See* ECF 36 at 34.  Nor did they seek to amend the Answer to add the defense.  And, defendants have not offered any explanation as to why the Court should overlook their failure to assert the affirmative defense.  Accordingly, defendants' failure to assert this defense until lodging it in the Cross Motion amounts to a forfeiture of it.

In any event, even if I were to consider the contention, it would be unavailing at this juncture. This is because there is a paucity of evidence supporting the defense that Pinnacle breached the Employment Agreement by paying Krone at a payout rate below the minimum contemplated in the compensation schedule.

In the Cross Motion, defendants cite only to the deposition testimony of Dwight Mikulis. ECF 135 at 30. But, his testimony does little, if anything, to support defendants' position. Mikulis testified that for a certain, unidentified subset of the clients who were assigned to Krone by Pinnacle, Krone was paid below the minimum payout rate established by the compensation schedule set forth in the Employment Agreement. ECF 147-12 (Mikulis Dep.) at 7 (Tr. at 61). And, to Mikulis's knowledge, there was no agreement between Pinnacle and Krone providing for such a deviation in the payout schedule. ECF 147-12 at 7 (Tr. at 61). But, Mikulis also stated that any agreement modifying the compensation schedule "would have been negotiated with [Krone] and [Hill]." *Id.* And, he had no personal knowledge as to whether Hill and Krone entered such an agreement. *See id.* (stating that he was "not sure" whether Hill and Krone entered an another "agreement that provides for a payout rate of 20%"). Moreover, Mikulis's testimony does not indicate *when* Pinnacle allegedly underpaid Krone. Therefore, the Court cannot determine whether plaintiff's actions amounted to a "first breach."

In sum, defendants have not shown that any deviation in the compensation schedule amounted to a prior, material breach of the Employment Agreement. Therefore, the affirmative defense of first breach is unavailing.

59

### 4. Restrictive Covenants

### a. In General

Turning to the substance of Count Two, it is predicated on Krone's alleged breach of restrictive covenants contained in the Employment Agreement. ECF 123, ¶¶ 61-73. The determination of enforceability of a restrictive covenant depends "on the scope of each particular covenant itself" and, "if that is not too broad on its face, the facts and circumstances of each case must [also] be examined." *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835, 838 (1973); *accord Millward v. Gerstung Int's Sport Educ., Inc.*, 268 Md. 483, 488, 302 A.2d 14, 16 (1973).

Under Maryland law, there are four requirements that must be met to enforce a restrictive covenant. *Medispec, Ltd. v. Chouinard*, 133 F. Supp. 3d 771, 773-74 (D. Md. 2015) (citing *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 438 (4th Cir. 2004) (per curiam)). They are, *Medispec*, 133 F. Supp. 3d at 773-74:

> (1) The employer must have a legally protected interest; (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest; (3) the covenant cannot impose an undue hardship on the employee; and (4) the covenant cannot violate public policy.

*See also Paul v. ImpactOffice LLC*, TDC-16-2686, 2017 WL 2462492, at *4 (D. Md. June 6, 2017), *appeal dismissed sub nom. ImpactOffice LLC v. Siniavsky*, 17-1634, 2017 WL 6543801 (4th Cir. Dec. 1, 2017); *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 334, 572 A.2d 510, 515 (1990); *Silver v. Goldberger*, 231 Md. 1, 6, 188 A.2d 155, 158 (1963).

Generally, "restrictive covenants may be applied and enforced only against those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers." *Becker*, 268 Md. at 97, 299 A.2d at 838 (discussing *Tuttle v. Riggs-Warfield-Roloson*, 251 Md. 45, 246 A.2d 588 (1968); *Ruhl v. F. A.*

*Bartlett Tree Expert Co.*, 245 Md. 118, 225 A.2d 288 (1967); *Western Md. Dairy v. Chenowith*, 180 Md. 236, 23 A.2d 660 (1942); and *Tolman Laundry v. Walker,* 171 Md. 7, 187 A. 836 (1936)); *see also Ecology Servs., Inc. v. Clym Envtl. Servs., LLC*, 181 Md. App. 1, 15, 952 A.2d 999, 1007 (2008); *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 459, 598 A.2d 794, 799 (1991), *cert. denied*, 325 Md. 619, 602 A.2d 710 (1992).  However, the restrictions must be reasonable. *See Ruhl*, 245 Md. at 123, 225 A.2d at 291 (finding that restrictive covenants are enforceable where they are "confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer").

As to duration, "Maryland has consistently upheld two year limitations on employment with competitors as reasonable."  *PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002).  Moreover, the geographic scope must also be reasonable.  *See Ruhl*, 245 Md. at 123, 225 A.2d at 291.  Generally, the validity of the radius depends on the facts of the case.  But, judges of this Court have observed that even a fifty-mile radius may be reasonable.  *See*, *e.g.*, *Aerotek, Inc.*, *v. Obercian*, 377 F. Supp. 3d 539, 547 n.5 (D. Md. 2019); *TEKsystems, Inc. v. Bolton*, RDB-08-3099, 2010 WL 447782, at *5 (D. Md. Feb. 4, 2010).  Further, in *Ruhl*, 245 Md. at 128-29, 225 A.2d at 293, the Maryland Court of Appeals upheld the geographical restriction prohibiting the defendants from working for a competing business in five Maryland Eastern Shore counties and an adjoining Delaware county, because that was the area in which the employee had worked for the company.  And, the absence of a geographic limitation for a noncompete clause has also been upheld, generally when the employer competes on a national level, if the restriction is reasonable based on the facts.  *See*, *e.g.*, *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998); *Allegis Group, Inc. v. Jordan*, GLR-12-2535, 2014 WL 2612604, at *6 (D. Md. Jun. 10, 2014).

If a court finds that a restrictive covenant is overbroad, it may nevertheless preserve and enforce the covenant by excising, or "blue penciling," unreasonable language. *Deutsche Post Glob. Mail, Ltd.*, 116 F. App'x at 439 (citation omitted); *see Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 400 (D. Md. 2015); *Fowler*, 89 Md. App. at 465-66, 598 A.2d at 802.  However, "[a] court may only blue pencil a restrictive covenant if the offending provision is neatly severable." *Deutsche Post Glob. Mail, Ltd.*, 116 F. App'x at 439.

So, "[i]f two provisions of a noncompete are distinct, divisible promises, a court may excise the offending provision." *Aerotek, Inc.*, 377 F. Supp. 3d at 548.  Conversely, "a court may not excise 'the dominant language or words' from a covenant that is part of a 'single indivisible promise.'" *Paul*, 2017 WL 2462492, at *8 (citation omitted).  Neither may a court "'rearrange or supplement the language of the restrictive covenant.'" *Cytimmune Sci., Inc. v. Paciotti*, PWG-16-1010, 2016 WL 4699417, at *4 (D. Md. Sept. 8, 2016) (quoting *Deutsche Post Glob. Mail, Ltd.*, 116 F. App'x at 439).  I discuss, *infra*, the scope of the restrictive covenants in the Employment Agreement.

### b.  Legally Protected Interest

As noted, to enforce a restrictive covenant, the employer must have a legally protected interest.  In determining whether there is a legally protected interest, Maryland courts consider whether "goodwill" was generated by one party for the benefit of the other party.  *See Seneca One Finance, Inc. v. Bloshuk*, 214 F.Supp.3d 457, 464 (D. Md. 2016) ("[T]he interest protectable by a non-compete provision is the goodwill that the *employee* creates with the customer while working for the employer.") (emphasis in original); *see also Deutsche Post*, 116 F. App'x at 438; *Tolman Laundry*, 171 Md. at 7, 187 A. at 838. The Maryland Court of Appeals said in *Silver*, 231 Md. at 7, 188 A.2d at 158 (emphasis in original):

> *[R]estraint is justified* if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee . . . *restraint is not justified* if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor.

*Accord Holloway*, 319 Md. at 335, 572 A.2d at 515; *Fowler*, 89 Md. App. at 459, 598 A.2d at 799.

Protecting goodwill "guards against the risk that the customer will be loyal to the employee with whom he has a relationship, rather than the relatively impersonal employer." *Seneca One*, 214 F. Supp. 3d 457, 465 (D. Md. 2016); *see also Holloway*, 319 Md. at 335, 572 A.2d at 515; *Silver*, 231 Md. at 6, 188 A.2d at 158. Typically, the degree to which a former employee is responsible for the contacts between the customer and the employer is pertinent to the existence of goodwill. Thus, "[t]here is a distinction" to be drawn

> between the cases where business success is attributable to the quality of the product being sold, and those where the personal contact of the employee with the customer is an important factor. In the latter case, the employer has a stronger need for protection against diversion of his business to the former employee who has had personal contacts with customers which the employer lacks.

*Millward*, 268 Md. at 488-89, 302 A.2d at 17 (internal quotation marks and citation omitted; alteration added).

Pinnacle asserts that that it has a legally protected interest in "prevent[ing] the misuse of [its] trade secrets, . . . client lists, and established customer relationships." ECF 124-1 at 18 (citing *Becker*, 268 Md. at 96-97, 299 A.2d at 838). Further, Pinnacle claims that the "good will" it has established with its clients is a "covenant-protectible interest under Maryland law." ECF 124-1 at 18. And, according to plaintiff, this interest is "strongest for businesses" like Pinnacle's, "in which the personal contacts between the employee and the customer are an important element for determining the business's success." *Id.* at 19.

Defendants argue that Pinnacle divested itself of any interest it may have had in the enforcement of the Noncompete Covenant and the Nondisclosure Covenant when it executed the Asset Purchase Agreement on or about April 30, 2021.  ECF 135 at 28-30.  Specifically, it points out that the APA "includes restrictive covenants on Pinnacle, its shareholders and executive officers which prohibit them from providing any financial planning, asset and investment management services to its prior clients for five years."  *Id.* at 28.  These clients include "any clients Pinnacle serviced during the period of April 30, 2019 through April 30, 2021," which, by Pinnacle's own admission, "includes all twenty-nine of the clients forming the basis of Pinnacle's damages claim in this lawsuit."  *Id.* (citing ECF 147-10 (Hill Dep.) at 24 (Tr. at 166-67)).

To be sure, pursuant to the terms of the APA, Pinnacle has sold substantially all its assets and assumed a legal obligation that bars Pinnacle from providing investment services to its past clients.  *See* ECF 137-7 at 4.[44]  Moreover, Pinnacle currently does not generate any revenue or provide financial advisory or investment management services.  ECF 147-10 (Hill Dep.) at 5 (Tr. at 14); ECF 147-12 (Mikulis Dep.) at 7 (Tr. at 58-59).  And, it has only one employee, whose sole task is to finalize the sale of Pinnacle's assets and manage this litigation.  ECF 147-10 at 4-5 (Tr. at 13-14)).

But, crucially, the restrictions to which Pinnacle is now subject are prospective.  Of relevance here, for five years from the date of the agreement, Pinnacle cannot provide investment management services to its prior clients, among others.  *See* ECF 137-7 at 3.  However, the restrictions included in the APA are not retroactive.  Thus, they do not pertain to the period between September 3, 2019, the day on which the Krone became an employee of NWP, through April 30, 2021, the closing date specified in the APA.

---

[44] The issue of the enforceability of the provision is not before me.

Indeed, plaintiff did not assume these restrictions until well after the expiration of the one-year term of the Noncompete Covenant. *Compare* ECF 135 at 15 (indicating defendants' view that the Noncompete Covenant expired on September 30, 2020, if not before) *with* ECF 137-7 at 2 (reflecting closing date of APA as April 30, 2021). In my view, it is nonsensical to suggest that plaintiff forfeited the right to assert a claim for breach of a restrictive covenant because, at some point well after the breach, the plaintiff ceased work in the relevant industry.

As plaintiff notes (ECF 139 at 28), the case law cited by defendants involves circumstances in which a former employee breached a restrictive covenant *after* the employer stopped participating in the relevant business. *See*, *e.g.*, *Cronimet Holdings, Inc. v. Keywell Metals, LLC*, 73 F. Supp. 3d 907, 911-12 (N.D. Ill. 2014) (employee violated noncompete provision after employer sold its assets in bankruptcy proceeding). In other words, the case law cited by defendants does not establish that an employer is precluded from pursuing damages for breach of a restrictive covenant simply because the employer subsequently ceased operating in the relevant industry. Such a result would be perverse; it would prohibit an employer from obtaining relief in a case wherein an employee arguably damaged his former employer to the point where the employer could not continue to participate in the relevant market.

Accordingly, I am persuaded that the APA does not bar plaintiff's claim for breach of contract.

### c. Noncompete Covenant

As mentioned, plaintiff seeks summary judgment as to Krone's purported violation of the Noncompete Covenant, as set forth in Paragraph 9(B) of the Employment Agreement. ECF 124-1 at 19-24. Again, it provides, ECF 135-3, ¶ 9(B).

> Employee agrees, during the Initial Term of employment and for any
> Addition [sic] Term, and for one year following the termination of Employee's

employment for any reason, Employee will not perform or render services or attempt to perform or render services, for his own account or on behalf of any person or corporation other than the Company, for any customer or client of Company for which Employee (or employees under his managerial control) has performed any services ("Company Clients").  This restriction does not apply to Pinnacle Advisory Group clients that were served by Andrew prior to his joining Pinnacle Advisory Group.

Plaintiff argues that the covenant is enforceable because it is "clearly reasonable in its duration because it is only for a period of one (1) year."  ECF 124-1 at 19.  Further, Pinnacle maintains: "The restrictive covenant is equally reasonable in scope because it is tailored to only restrain Mr. Krone from providing services to 'any customer or client of [Pinnacle] for which [Mr. Krone] (or employees under his managerial control) has performed any services.'"  *Id.* at 20 (quoting ECF 1-2, ¶ 9(B) (alteration in ECF 124-1)).  Plaintiff also claims that the restriction does not "seek to limit any activity which may affect adversely" Pinnacle's interests, nor does it "cover all of Pinnacle's customers, . . . just those serviced by Mr. Krone."  ECF 124-1 at 20 (internal quotation marks and citations omitted).  And, according to plaintiff, "the restrictive covenant does not impose an undue burden on Mr. Krone because it does not restrict him from earning a living and does not limit fair competition," as it "applies only to a narrow class of clients—to wit, Pinnacle client for which Mr. Krone rendered services either directly or indirectly through Pinnacle employees under Mr. Krone's managerial control."  ECF 124-1 at 21.

Defendants counter that the Noncompete Covenant is facially overbroad and thus unenforceable for four reasons.  First, they note that the restriction is not narrowly drawn, because it is not limited "to those clients Mr. Krone serviced within a certain time period before his resignation," nor is it otherwise restricted to "those who were still Pinnacle clients at the time of Mr. Krone's resignation."  ECF 135 at 19.  Second, the Cross Motion points out that "§ 9(B)'s restrictions also apply to any Pinnacle clients serviced by 'employees under Krone's managerial

control,' regardless of whether Mr. Krone would have ever met or had any real interaction with such a client." *Id.* (quoting ECF 1-2, ⁋ 9(B)).  Third, the Cross Motion posits that the Noncompete Covenant is overbroad because it "bar[s] any passive acceptance of a former customer's business without any solicitation on the employee's part."  ECF 135 at 20.  Fourth, defendants contend that the restriction is unenforceable because it prohibits "Krone from soliciting or providing *any* services to any of his non-exempt former Pinnacle clients, regardless of whether such services are related to financial advisory services."  *Id.* at 21 (italics in original).

I begin with the duration and geographic reach of the Noncompete Covenant.  As mentioned, its duration was limited to a one-year period.  ECF 135-3, ⁋ 9(B).  Maryland courts regularly find that such limitations on employment with competitors are reasonable.  *See*, *e.g.*, *PADCO Advisors, Inc.*, 179 F. Supp. 2d at 606.

The Noncompete Covenant is devoid of any language limiting its geographic reach.  *See* ECF 135-3, ⁋ 9(B).  Nonetheless, this deficiency, on its own, is not necessarily sufficient to render the Noncompete Covenant overbroad.  *See TEKsystems, Inc.*, 2010 WL 447782, at *5.  Indeed, defendants do not advance any argument to the contrary.  As mentioned, the enforceability of a restrictive covenant turns on whether it is narrowly tailored to the employer's protectable interest.  *See Medispec*, 133 F. Supp. 3d at 773-74; *see also Aerotek, Inc.*, 377 F. Supp. 3d at 547 (declining to evaluate the geographic scope of a noncompete clause where defendant did not challenge the enforceability of the noncompete on this ground).

The case of *Gill v. Computer Equip. Corp.*, 266 Md. 170, 292 A.2d 54 (1972), is informative.  In *Gill*, a restrictive covenant prevented a former employee, Earl Gill, from working for customers of his former employer, but only customers of the particular division in which Gill had worked.  *Id.* at 181, 292 A.2d at 59.  Gill argued that the restrictive covenant was "unduly

restrictive because it contain[ed] no limitation as to [geographic] area." *Id.* at 180, 292 A.2d at 59. However, the Maryland Court of Appeals enforced the restrictive covenant. *Id.* at 181, 292 A.2d at 59. It said: "The scope of the limitation . . . basically is to customers of [the former employer] in the narrow area in which [the former employee] was employed." *Id.* In other words, the "prohibition was limited to a specific, identifiable class." *Hebb v. Stump, Harvey & Cook, Inc.*, 25 Md. App. 478, 489, 334 A.2d 563, 570 (1975) (construing *Gill*, 266 Md. 170, 292 A.2d 54).

Accordingly, in the absence of any argument to the contrary, I am persuaded that the lack of a geographic limitation is not fatal to the enforceability of the Noncompete Covenant. And, as I explain below, because the Noncompete Covenant is limited to the narrow class of Pinnacle clients with whom Krone, or an employee under his management, had a direct relationship, it is sufficiently tailored to Pinnacle's protectable interest in preserving its customer goodwill.

On this point, *Medispec,* 133 F. Supp. 3d 771, provides guidance. There, the court concluded that a covenant not to compete was "overly broad and not reasonably targeted to achieve Plaintiff's stated interest in protecting its goodwill." *Id.* at 775. It reached that conclusion because the covenant barred the former employer "from taking any job, no matter how unrelated to his prior sales work." *Id.*; *see also RLM Communications, Inc. v. Tuschen*, 831 F.3d 190, 196 (4th Cir. 2016) (construing North Carolina law and concluding that restriction of the employee's future employment was "unmoored" from employer's legitimate business interests).

The case of *Seneca One*, 214 F. Supp. 3d 457, is also instructive. There, the employer, Seneca One, sued a former employee for breach of a restrictive covenant that barred the employee from "soliciti[ing]  . . . any of Seneca One's Customers," including those "with whom [she] dealt or had direct contact," and those "about whom, even without direct contact, [she] received Confidential Information." *Id.* at 464 (internal citation omitted). The nonsolicitation provision

broadly defined "Customers" to include "potential customers" and "all individuals, firms, or entities that . . . have been in contact with Seneca One." *Id.*

The employee moved to dismiss, arguing that the restrictive covenant was overbroad. *Id.* at 459. The district court granted the motion. In its view, the restrictive covenant's definition of "Customer," coupled with the ban on "soliciting business even from individuals with whom [the employee] had no direct contact (thus eliminating any concerns regarding potential competitive advantage)," rendered the provision facially overbroad. *Id.* at 464. The court reasoned that it was "not possible" for an employee with "no contact or communication with the potential customers" to generate "goodwill" with the customers. *Id.* at 465.

Defendants rely, *inter alia*, on *Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565 (D. Md. 2019), and *Paul*, 2017 WL 2462492. *See* ECF 135 at 20-21. *Bindagraphics, Inc.*, 377 F. Supp. 565, involved a customer nonsolicitation provision and a noncompete provision included in an employment agreement between a salesman, Eric Rodgers, and his former employer, Bindagraphics, Inc. ("Bindagraphics"). The nonsolicitation provision declared "that, for one year following his termination, Mr. Rodgers will not directly or indirectly solicit any customer or prospective customer for products or services the same as, or similar to, those sold by Bindagraphics's trade binding division." *Id.* at 574. Additionally, the covenant barred Rodgers "from selling, or being otherwise involved in the sale of, any such product or service to customers or prospective customers during that year." *Id.* The restriction pertained to customers "within Mr. Rodgers's sales territory who were either served by Bindagraphics in the year preceding Mr. Rodgers's departure or with whom Mr. Rodgers spoke within one year of them being a Bindagraphics customer." *Id.* Notably, "prospective customers" were defined as any customer

who was "solicited by Mr. Rodgers or Bindagraphics in the year preceding Mr. Rodgers's termination." *Id.*

Judge Blake found that the provision was overbroad and thus unenforceable. *Id.* at 575. She reasoned, *id.* at 574-75 (internal citations omitted):

> The nonsolicitation clause at issue here is broader in scope than reasonably necessary because it applies to prospective customers and the passive sale or provision of services to a customer that Mr. Rodgers did not solicit. First, the covenant's restriction on solicitation of prospective customers, those within the sales territory solicited by Bindagraphics in the year preceding Mr. Rodgers's departure, is not narrowly drawn to cover only those with whom Mr. Rodgers had contact. Instead, while Mr. Rodgers may have contacted some prospective customers in his capacity with Bindagraphics, the prohibition includes all potential customers solicited by the Bindagraphics trade binding division, drawing a wide prohibition well beyond Mr. Rodgers's personal connections. . . . Limiting contact with prospective customers is sufficiently untethered from the protected goodwill concern to render this provision overbroad.

Additionally, Judge Blake observed that the covenant purported "to limit Mr. Rodgers's ability to sell 'or otherwise service' any Bindagraphics trade binding division customer." *Id.* at 575. Accordingly, the provision "extende[d] to unsolicited bids from customers who initiate contact with Mr. Rodgers, his work on projects solicited or arranged by other employees, and work on behalf of customers who patronize both competitors." *Id.* Thus, she determined that "the risk this provision seeks to forestall is a risk of greater competition," which is not a protected interest. *Id.* (citing *Deutsche Post Global Mail, Ltd.*, 116 F. App'x at 438).[45]

---

[45] Judge Blake also said that "it is possible that the facially overbroad components of the nonsolicitation covenant are sufficiently separate (and severable) as to be blue-penciled. But . . . [Bindagraphics did] not put forth a particular proposal for how the provision might be blue-penciled to pertain only to customers with whom Mr. Rodgers interacted." *Id.* at 575. Therefore, she dismissed the claim, without prejudice. *Id.* at 576.

In *Paul*, 2017 WL 2462492, the plaintiff, a former employee, sought a declaratory judgment concerning the enforceability of a nonsolicitation provision and a noncompete provision contained within his employment agreement. The nonsolicitation provision, in relevant part, prohibited the employee from "[s]olicit[ing] or accept[ing], directly or indirectly, the business of any customer or prospective customer . . . ." *Id.* at *5. The district court determined that the clause was overbroad and unenforceable. *Id.* at *6.

In particular, the district court found that the nonsolicitation restriction on "accepting" business from the employer's customers was overbroad because "an employer's protectable interest is in 'preventing an employee from *using* the contacts establish[ed] during employment to pirate the employer's customers.'" *Id.* (quoting *Holloway*, 319 Md. at 335, 572 A.2d at 515) (emphasis in *Paul* ). The court elaborated, *Paul*, 2017 WL 2462492 at *6 (emphasis added):

> A bar on mere passive acceptance of unsolicited business prohibits activity that necessarily involved *no use* of prior customer relationships. Under this provision, a former employee would breach the agreement by taking an unsolicited telephone order from any company that had previously bought office supplies from [the former employer], even if the former employee had never interacted with that company and had no knowledge of its prior dealings with [the former employer]. Without any requirement that the former employee have such knowledge, the bar on accepting business is not reasonably tailored to address that concern.

In addition, the court found overbroad the bar on soliciting the former employer's "prospective customers," as it included "those with whom the former employee may have had no personal contact . . . ." *Id.* It noted that the term "prospective customer" would "encompass virtually any company with a need to purchase" the employer's product, even if that company had never previously interacted with the employer. *Id.*

As to "prospective" customers, the court noted that they "would not have been the subject of customer goodwill generated by a former [employee]." *Id.* at *6; *Compare Holloway*, 319 Md. at 335-36, 345, 572 A.2d at 516, 521 (stating that "an accounting firm has a legitimate and

protectable interest in the ongoing business relationship it has established with its clients" and that the former employee "had served" those clients while he was with the employer).  By implication, "the bar on accepting business" *is* "reasonably tailored" when the former employee has "interacted" with a customer or has "knowledge of [a customer's] prior dealings with [the employer]."  *Paul*, 2017 WL 2462492 at *6.

In my view, *Paul* and *Bindagraphics* do not advance defendants' position.  Unlike the restrictive covenants in those cases, the Noncompete Covenant here is "limited to a specific, identifiable class."  *Hebb*, 25 Md. App. at 489, 334 A.2d at 570; *see also Tuttle*, 251 Md. at 50-51 246 A.2d at 590-91 (recognizing that Maryland courts enforce covenants that have the effect of preventing the "diversion of . . . business to the former employee who has had personal contacts with customers which the employer lacks").  It does not prohibit Krone from providing services to prospective clients of Pinnacle.  Nor does it preclude him from servicing all Pinnacle clients.  Rather, it merely prohibits Krone from servicing Pinnacle clients with whom he, or an employee who reported to him, had a direct relationship.  ECF 135-3, ¶ 9(B).

As defendants point out, it is conceivable that the Noncompete Covenant would preclude Krone from providing services to a client with whom Krone had never directly interacted.  But, such clients would, by definition, have interacted with a Pinnacle employee under Krone's direct supervision.  *See Gill*, 266 Md. at 181, 292 A.2d at 59 (upholding restrictive covenant where "[t]he scope of the limitation" pertained "to customers of [the employer] in the narrow area in which [the employee] was employed").

Defendants also argue that the Noncompete Covenant is invalid because "[t]he plain language of § 9(B) restricts Mr. Krone from soliciting or providing any services to any of his non-exempt former Pinnacle clients, regardless of whether such services are related to financial

advisory services.  It does not define what those services are, either in § 9(B) or anywhere else in the Employment Agreement."  ECF 135 at 21-22 (emphasis omitted); *see* ECF 135-3, ⁋ 9(B).  Thus, according to defendants, "[t]he vagueness of what 'services' are restricted creates another facial overbreadth in the restriction," as it "seeks to bar Mr. Krone from offering any services to his former Pinnacle clients, regardless of whether they were actually competitive to Pinnacle."  ECF 135 at 22.

Pinnacle counters that the contention is misplaced because it "directs this Court to improperly read the restrictive covenant in a vacuum."  ECF 139 at 24.  Further, plaintiff notes: "'[S]ervices' are repeatedly noted and defined in the Agreement—to wit, financial planning and investment, asset management, and other related financial services."  *Id.* at 24-25.

The Noncompete Covenant does not expressly restrict its scope to a particular kind of "service[ ]."  ECF 135-3, ⁋ 9(A).  Nor does the Employment Agreement expressly define the term "services."  Thus, in isolation, the Noncompete Covenant could arguably be construed in the open-ended manner that defendants urge.  But, as discussed, "Maryland courts subscribe to the objective theory of contract interpretation."  *W.F. Gebhardt & Co., Inc.*, 250 Md. App. at 666, 252 A.3d at 73 (citing *Myers*, 391 Md. at 198, 892 A.2d at 526-27).  To that end, Maryland law instructs that courts should "attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect."  *Walker v. Dep't of Human Resources*, 379 Md. 407, 42l, 842 A.2d 53, 61 (2004) (citing *Jones v. Hubbard*, 513, 534-35, 740 A.2d 1004, 1016 (1999)).  The Employment Agreement, read as a whole, limits the scope of the term "services" as used in the Noncompete Covenant, such that the Noncompete Covenant is narrowly drawn to further Pinnacle's legitimate interest in preserving goodwill with its customers in the financial services industry.  *See Deutsche Post Global Mail, Ltd.,* 116 F. App'x at 438.

The Employment Agreement is replete with references to the kind of services it contemplates.  For instance, the opening paragraphs of the Employment Agreement note that Krone is "duly licensed and registered to provide financial planning, insurance and securities services"; "Pinnacle engages in the profession of financial planning and investment, asset management, and other financial services"; and "Krone "desires to be employed by Pinnacle and to provide professional services through Pinnacle on the terms and conditions set forth in this Agreement, and Pinnacle desires to employ [Krone] and secure [Krone's] professional services as an employee of the Company . . . ."  ECF 135-3 at 1.  Moreover, the Employment Agreement requires Krone to "provide financial planning and investment, asset management, and other related financial services . . . ."  *Id.* ¶ 4(A).

The Employment Agreement plainly indicates that Pinnacle sought to employ Krone so that he could perform "financial investment, planning and investment, asset management, and other related financial services" on Pinnacle's behalf.  *Id.*  Construing the Employment Agreement as a whole, it is readily apparent that the Noncompete Covenant's use of the term "services" pertains to "financial planning and investment, asset management, and other related financial services . . . ."  ECF 135-3, ¶ 4(A).  *Cf. MCS Services, Inc. v. Jones*, WMN-1901942, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010) (finding restrictive covenant overbroad where it prohibited employee from "directly or indirectly" owning or otherwise participating in "any other entity engaged in a business in competition with, or similar in nature to the Company's Business" because "the scope of the proscribed activity [was] not properly bounded" and thus it was "not reasonably necessary to protect the customer goodwill [the defendant] created").

Defendants advance one further argument challenging plaintiff's claim for breach of the Noncompete Covenant.  They maintain that there remains a "genuine issue of dispute of material

fact," with respect to the "alleged 'wrongful solicitations' and servicing of the Non-Exempt Clients at issue in this matter." ECF 135 at 53. They argue that "servicing alone does not constitute a violation" of the Noncompete Covenant. *Id.* And, according to defendants, "there is ample evidence in the record to contest Pinnacle's contention that Krone's alleged solicitations . . . caused any of the twenty-nine clients to leave." *Id.*

As I see it, the claim is a specious one. As discussed, the Noncompete Covenant prohibits Krone from "perform[ing] or render[ing] services or attempt[ing] to perform or render services, for his own account or on behalf of any person or corporation other than the Company, for any customer or client of Company for which Employee (or employees under his managerial control) has performed any services . . . ." ECF 135-3, ⁋ 9(B). The Employment Agreement makes an exception for clients for whom Krone provided services prior to becoming a Pinnacle employee. *Id.* Thus, to the extent Krone provided services to clients covered by the Noncompete Covenant, it is a violation of the Noncompete Covenant. Whether Krone solicited the relevant clients has no bearing on the inquiry.

Further, it is undisputed that Krone rendered services to Pinnacle clients covered by the Noncompete Covenant within one year of terminating his employment with Pinnacle. Specifically, plaintiff asserts that "Krone admitted to providing services to Pinnacle clients on behalf of Naples Wealth and produced an accounting of such clients." ECF 124-1 at 15, ⁋ 59; see ECF 147-4 (list of Pinnacle client accounts that became NWP client accounts by October 15, 2019). Defendants do not dispute plaintiff's assertion. *See* ECF 135 at 43 (indicating that defendants do not dispute the statement of fact contained within paragraph 59 of the Motion). To the contrary, defendants expressly state that nineteen Pinnacle clients became NWP clients following Krone's departure from Pinnacle. *See id.* at 13, ⁋⁋ 40-49.

Therefore, to the extent that Count Two is predicated on Krone's breach of the Noncompete Covenant, I shall grant the Motion and deny the Cross Motion.

### d.  Nondisclosure Covenant

Count Two is also predicated on Krone's purported breach of the Nondisclosure Covenant. As reflected above, this provision indicates, ECF 135-3, ¶ 10: "Employee acknowledges that as a result of his employment with the Company, Employee has, is and will be making use of, acquiring, and adding to information of a special and unique nature and value relating [to] the Company's intellectual property, trade secrets and other confidential information[.]"  Further, Krone agreed to the following terms, *id.* (emphasis added):

> A.     All files, notes, data, reference items, sketches, drawings, memoranda, records, books, computer programs, and other materials in any way relating to any of the information referred to in the paragraph above or to the Company's business shall belong exclusively to the Company.  Employee agrees to turn over to the Company all copies of such materials in Employee's possession or control at the Company's request or upon the termination of Employee's employment.  *The Employee shall not*, at any time during or following his employment with the Company, *divulge or disclose*, or employ for any purpose whatsoever, except as necessary to accomplish the business objectives of the Company, *any of the Company's trade secrets or other confidential information that have been obtained by or disclosed to the Employee as a result of the Employee's employment with the Company*.

According to plaintiff, the provision should be read in light of the restrictions on the disclosure of "'Nonpublic Information,'" as set forth in the Compliance Manual, as well as the definition of "personally identifiable information," contemplated by federal law.  ECF 124-1 at 24-26.  In particular, Pinnacle claims that the Employment Agreement incorporated the definitions of "personal identifiable financial information" in 17 C.F.R. §§ 248.3, 248.10.  *See* ECF 124-1 at 24-25; ECF 139 at 27.

Of import here, the Compliance Manual proscribes the disclosure of Nonpublic Personal Information, stating: "Pinnacle will not disclose a client's Nonpublic Personal Information to anyone unless it is permitted or required by law, at the direction of a client, or is necessary to provide Pinnacle's services."  ECF 124-4 at 4.  The Manual defines "'Nonpublic Information'" as follows, *id.*:

> Personally identifiable financial information including any information a client provides to obtain a financial product or service; any information about a client resulting from any transaction involving a financial product or service; or any information otherwise obtained about a client in connection with providing a financial product or service to that client; and

> Any list, description, or other grouping of clients (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available information.

Pinnacle points out that Krone testified that he "prepared a 'schedule of client names, information, assets under management, and shared that with Brian Bruneau' of Naples Wealth." ECF 124-1 at 26 (quoting ECF 147-2 (Krone Dep.) at 15 (Tr. at 53)).  Thus, in its view, Krone's conduct was plainly in contravention of the Nondisclosure Covenant.  ECF 124-1 at 27.  Therefore, Pinnacle maintains that it is entitled to summary judgment as to Krone's purported violation of the Nondisclosure Covenant because the provision is enforceable and there is no dispute that Krone breached it.  ECF 124-1 at 24-27.

In support of its claim, Pinnacle directs the Court's attention to paragraph 8(A)(1)(viii) of the Employment Agreement.  ECF 139 at 27.  It states: "Employee's employment shall terminate upon the happening" of certain enumerated events, including if "Employee has engaged in professional misconduct in violation of the standards set forth in local or state regulations or statutes, or in rules of conduct established within the profession by the Certified Financial Planning

Board or other recognized organizations established to regulate ethical standards".   ECF 135-3, ⁋ 8(A)(1)(viii).

In the Cross Motion, defendants maintain that they are entitled to summary judgment as to plaintiff's claim for breach of the Nondisclosure Covenant because the covenant is too broad and therefore unenforceable.   ECF 135 at 23-26.   They assert: "In the context of confidentiality restrictive covenants, what qualifies as 'overbroad' is heavily influenced by Maryland statutory law," namely MUTSA, C.L. § 11-1201 *et seq. Id.* at 23.   And, defendants posit: "Maryland courts tend to disfavor confidentiality restrictions which include a broader scope of protected information than what is covered by the MUTSA."   *Id.* at 24 (citing *Ameritox, Ltd.*, 92 F. Supp. 3d at 401). According to defendants, the covenant is impermissibly vague because it encompasses a broader range of information than MUTSA, and does not contain any "definition of what constitutes Pinnacle's 'confidential information' or 'trade secrets' in the covenant (or elsewhere in the Employment Agreement)."   ECF 135 at 25 (quoting ECF 135-3, ⁋ 10).

Defendants have the better of the argument.   Maryland law recognizes that "'restrictive covenants may be applied' to protect against 'the future misuse of trade secrets, routes or lists of clients, or solicitation of customers.'"   *Ameritox, Ltd.*, 92 F. Supp. 3d at 401 (quoting *Becker*, 268 Md. at 97, 299 A.2d at 838 (1973)).   But, "'questions arise as to the enforceability of the Confidentiality Provisions by virtue of their having wider breadth than the [MUTSA].'"   *Ameritox, Ltd.*, 92 F. Supp. 3d at 401 (quoting *Structural Pres. Sys., LLC v. Andrews*, MJG-12-1850, 2013 WL 3820023, at *4 (D. Md. Jul. 23, 2013)).

As discussed below, MUTSA defines "'Trade secret'" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that . . . (1) Derives independent economic value, actual or potential, from not being generally known to, and not being

readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." C.L. § 11-1201(e).

The Nondisclosure Covenant exceeds the scope of the definition of "Trade secret" information, as defined in MUTSA. It prohibits the disclosure of any "files, notes, reference items, sketches, drawings, memoranda, records, books, computer programs, and other materials in any way relating to any of the information referred to in the paragraph above . . . ." ECF 135-3, ⁋ 10(A). And, the "paragraph above" references "information of a special and unique nature and value relating to the Company's intellectual property, trade secrets and other confidential information." *Id.* ⁋ 10. But, the Nondisclosure Covenant does not attempt to specify, or otherwise define what information is "special and unique," nor does it define "intellectual property, trade secrets, and other confidential information," as contemplated by the Employment Agreement.

The omissions are fatal to plaintiff's claim. In the absence of such a definition, the Nondisclosure Covenant failed to provide Krone with "firm, solid guidance on what he can and cannot do if he leaves his employer." *SNS One, Inc. v. Hage*, BEL-10-1592, 2011 WL 2746713, at *2 (D. Md. Jul. 11, 2011). Indeed, the reference in the Nondisclosure Covenant to "files" that relate to "other confidential information" could plausibly be construed to encompass nearly any piece of information contained within Pinnacle's possession. ECF 135-3, ⁋ 10. Thus, the Nondisclosure Covenant is overbroad.

Nor can the definition of Nonpublic Information found in the Compliance Manual save the Nondisclosure Covenant. As mentioned, the "search to determine the meaning of a contract is focused on the four corners of the agreement." *Cochran*, 398 Md. at 17, 919 A.2d at 710 (citing *Walton*, 391 Md. at 660, 894 A.2d at 594). And, the plain text of the Nondisclosure Covenant does

not incorporate the Compliance Manual or otherwise reference the definition of "Nonpublic Personal Information" contained within it.  Indeed, the Employment Agreement is wholly devoid of any mention of the Manual.  And, the Court cannot rewrite the Nondisclosure Covenant to incorporate the Compliance Manual's definition of "Nonpublic Personal Information."  *See Deutsche Post Glob. Mail, Ltd.*, 116 F. App'x at 439.

Citing paragraph 8(A)(1)(viii) of the Employment Agreement, Pinnacle asserts that federal regulations are "explicitly incorporated" therein.  ECF 139 at 27.  But, plaintiff's invocation of federal regulations to clarify the scope of the Nondisclosure Covenant is wide of the mark.  This is because the Employment Agreement is devoid of any mention of the federal regulations cited by plaintiff.   The paragraph concerns only "local or state regulations or statutes, or . . . rules of conduct established within the profession . . . ."  ECF 135-3, ¶ 8(A)(1)(viii).  More to the point, however, even assuming this paragraph references federal regulations, the paragraph only enumerates circumstances in which Pinnacle may terminate Krone's employment for cause.  *See id.*  It does not follow that the Nondisclosure Covenant's use of the term "confidential information" incorporated the definition of "personally identifiable financial information," as set forth in 17 C.F.R. §§ 248.3, 248.10.

Finally, the Court may not apply the blue-pencil doctrine to the terms of the Non-Disclosure Covenant.  This is because the covenant's deficiency does not stem from specific offending terms that might easily be excised.  Rather, the overbreadth of the Nondisclosure Covenant is rooted in its failure to define clearly the kinds of information encompassed by the terms "intellectual property, trade secrets, and other confidential information."  ECF 135-3, ¶ 10.  To remedy such an error, the Court would be forced to rewrite the Nondisclosure Covenant, which it is not permitted to do.  *See Medispec, Ltd.*,133 F. Supp. 3d at 775 n.3 ("Because no independent

sentence or clause could be excised here to narrow sufficiently the scope, blue penciling is inappropriate.").  In any event, plaintiff has not offered the Court any proposals to salvage the provision.

Thus, I am persuaded that the Nondisclosure Covenant is facially overbroad and consequently unenforceable.  Therefore, to the extent that Count Two is predicated on Pinnacle's assertion that Krone violated the Nondisclosure Covenant, I shall deny the Motion and I shall grant the Cross Motion.

### e.  Notice Covenant

As mentioned, under the Employment Agreement, when "the Employee elects to terminate his employment, he must give at least 30 days prior written notice of termination to the Company." ECF 135-3, ¶ 8(C).  Pinnacle contends that Krone violated the Employment Agreement when he tendered his resignation because he did not provide thirty days of notice, as required by the Notice Covenant.  ECF 124-1 at 23-24; *see* ECF 135-4 (Resignation Letter).  According to plaintiff, because Krone did not provide this notice before resigning, "Pinnacle was denied to [sic] opportunity to plan for Mr. Krone's withdrawal and to transition its clients from Mr. Krone to other Pinnacle advisors."  ECF 124-1 at 24.

Defendants do not argue that Krone's conduct was consistent with the Notice Covenant. Nor could they.  The Resignation Letter lays bare that Krone terminated his employment with Pinnacle on August 30, 2019, "[e]ffective immediately."  ECF 135-4.

Rather, defendants assert that plaintiff has failed to meet its burden for summary judgment with respect to Krone's admitted violation of the Notice Covenant because "Pinnacle did not explain how this breach was, indeed, a material breach, as is required under Maryland law."  ECF 135 at 56-57.  Defendants claim, without citation to the record, that the principal purpose of the

Employment Agreement was "Pinnacle's employment of Mr. Krone[.]"  *Id.* at 57.  They contend: "Given the ten years of Mr. Krone's employment with Pinnacle, the Employment Agreement's primary objective . . . was not frustrated by his mere failure to give 30 days' written notice."  *Id.* And, "[e]ven if this failure does create a material breach, damages are not proven, as Pinnacle has yet to show how Mr. Krone's failure to give notice caused it to suffer damages." *Id.*

Plaintiff counters that defendants' assertion is without merit because restrictions similar to the Notice Covenant "are routinely addressed and enforced in Maryland."  ECF 139 at 31 (citing *Storetrax.com, Inc. v. Gurland*, 168 Md. App. 50, 72-73, 895 A.2d 355, 368 (2006), *aff'd*, 397 Md. 37, 915 A.2d 991 (2007)).  Pinnacle reasserts that the breach was material because Krone's actions deprived Pinnacle of the "opportunity to plan for Mr. Krone's withdrawal and to transition its clients to other Pinnacle advisors."  ECF 139 at 31.  Further, Pinnacle claims: "Mr. Krone's actions . . . during this notice period left Pinnacle on its heels facing the prospect of not only trying to retain clients in the face of a scheme concocted over many months, but also to simultaneously try in vain to re-staff its office."  *Id.* at 31-32.

In reply, defendants note that Pinnacle had long planned for Krone's "anticipated retirement."  ECF 140 at 16.  In particular, they point to the deposition testimony of John Hill, in which he discussed "the non-disputed fact that in 2014, Plaintiff and Mr. Krone devised a 'five-year plan'" for the purpose of "begin[ning] Plaintiff's transitioning of clients and preparations" for Krone's encroaching departure from Pinnacle.  ECF 140 at 16.  Further, they state: "In fact, Pinnacle started transitioning some of Mr. Krone's clients to other advisors in 2016."  *Id.* (citing ECF 147-10 (Hill Dep.) at 11 (Tr. at 79)).  They add: "The record shows Pinnacle was quite aware that Mr. Krone's time was limited and even had a plan already in place for his transition, making

Pinnacle's unsubstantiated claims of hardship from Mr. Krone's lack of notice even more absurd." ECF 140 at 16-17 (citation omitted).[46]

As discussed earlier, "[t]o prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationBanks, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001). And, "[e]very breach [of contract] gives rise to a claim for damages, and may give rise to other remedies. Even if the injured party sustains no pecuniary loss or is unable to show such loss with sufficient certainty, he has at least a claim for nominal damages." RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. a. But, courts may "ignore trifling departures[.]" *Id.* § 235 cmt. a. And, in such circumstances, "there is no breach and no claim arises." *Id.* § 236 cmt. a.

Under Maryland law, "'[a] breach is material if it affects the purpose of the contract in an important or vital way.'" *Jay Dee/Mole Joint Venture*, 725 F. Supp. 2d at 526 (quoting *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005)) (alteration in *Jay Dee*). "'Whether a given breach is material or essential, or not, is a question of fact.' There are instances, however, when the issue is so clear that it may be decided as a matter of law." *Barufaldi v. Ocean City, Chamber of Commerce, Inc.*, 196 Md. App. 1, 23, 7 A.3d 643, 657 (2010) (internal citation omitted).

As I see it, defendants offer a cramped interpretation of the Employment Agreement. Essentially, they claim that because Krone worked for Pinnacle for ten years, Pinnacle got the benefit of its bargain, and thus Krone was excused from compliance with the Notice Covenant. The Employment Agreement expressly states: "Pinnacle desires to employ the Employee and

---

[46] In support of this claim, defendants cite to pages of the Hill Deposition that were not provided to the Court.

secure the Employee's professional services as an employee of the Company . . . ."  ECF 135-3 at

1.  Krone's employment was a means for Pinnacle to provide investment management services to

its clients, but not an end in and of itself.

Other exhibits suggest that Pinnacle intended Krone to "create business opportunities with

new clients in [the Naples area]."  ECF 147-12 (Mikulis Dep.) at 4 (Tr. at 21).  Indeed, Hill testified

that Krone served as the "main point of contact" for Pinnacle clients in the Naples area.  ECF 147-

10 (Hill Dep.) at 8 (Tr. at 36).  Krone's proximity to his clients was particularly important because

the investment management industry is one that is generally dependent upon personal relationships

between clients and advisors.  *See* ECF 147-2 at 69 (Tr. at 269) (confirming that the financial

services "business is a relationship business").  Thus, any actions taken by Krone that impeded

Pinnacle from servicing clients in the Naples area could amount to a material breach of the

Employment Agreement.

The parties agreed that Krone would provide thirty days' notice.  Pinnacle was entitled to

decide that it needed such notice to assure a smooth transition in the event of Krone's departure.

There is evidence indicating that the suddenness of Krone's departure took Pinnacle by surprise.

ECF 31-1 at 6 (email from Hill to Pinnacle clients stating "Andy's resignation came as a surprise

to us").  Moreover, evidence shows that Krone's termination of his employment put Pinnacle in

the position of scrambling to establish contact with Krone's clients for the purpose of keeping

them from discontinuing their use of Pinnacle's services.  For instance, Pinnacle officials exerted

substantial effort to retain Clients A in the weeks following Krone's departure.  *See* ECF 147-14.

Mr. Client A was willing to entertain a meeting with Pinnacle officials, even after he previously

indicated his intent to move accounts to self-directed status.  *See* ECF 147-10 (Hill Dep.) at 16 (Tr.

at 133).  Nonetheless, Clients A ultimately discontinued use of Pinnacle's services.  *See* ECF 147-

2 (Krone Dep.) at 62 (Tr. at 240-41).   And, Hill testified that, in his view, had Krone remained a Pinnacle employee during this time, Clients A would not have terminated their relationship with Pinnacle.  ECF 147-10 (Hill Dep.) at 16 (Tr. at 133).

At bottom, it is undisputed that Krone flouted his contractual obligation to provide thirty days' notice to Pinnacle.  *See* ECF 135-4 (resignation letter indicating that Krone's termination of employment was effective immediately).  Further, there is at least some evidence that Pinnacle's ability to maintain relationships with clients in the Naples area was frustrated by Krone's failure to provide thirty days' notice of his intention to resign.  Thus, the evidence supports the conclusion that Krone breached the Employment Agreement and that the breach was material.

Defendants argue that plaintiff failed to show damages.  But, as mentioned above, "[e]ven if the injured party sustains no pecuniary loss or is unable to show such loss with sufficient certainty, he has at least a claim for nominal damages."   RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. a.  Put another way, it is for the finder of fact to determine the extent of the materiality of the breach.

Accordingly, I shall grant the Motion and deny the Cross Motion as to Count Two, to the extent it is predicated on Krone's breach of the Notice Covenant.

### C.  Count Three: Breach of the Covenant of Good Faith and Fair Dealing

Defendants have moved for summary judgment as to plaintiff's claim for breach of the implied covenant of good faith and fair dealing, set forth in Count Three of the Amended Complaint.  ECF 135 at 31-32; *see* ECF 123, ¶¶ 74-78.  They argue: "The assertions in Count III are bald and unsupported to the point where it is unclear what, exactly, they are based upon."  ECF 135 at 31.  Further, they maintain that "there is simply no separate cause of action for breach of the implied covenant of good faith and fair dealing under Maryland law."  *Id.* at 32.

In Maryland, every contract embodies an implied duty of good faith and fair dealing. *See Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166, 174 (1964); *see also Adobe Sys. Inc. v. Gardiner*, 300 F. Supp. 3d 718, 727 (D. Md. 2018). But, as defendants maintain (ECF 135 at 32), and as plaintiff appears to acknowledge (ECF 139 at 33), Maryland courts have not explicitly recognized an independent cause of action for breach of a duty of good faith and fair dealing. *Dixon v. Select Portfolio Servicing Co.*, DKC-19-1710, 2020 WL 470314, at *4 (D. Md. Jan. 28, 2020); *Maryland Physician's Edge, LLC v. Behram*, DKC-17-2756, 2019 WL 4573417, at *8 (D. Md. Sept. 20, 2019) (citing *Abt Associates, Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000)); *see Baker v. Sun Co.*, 985 F. Supp. 609, 610 (D. Md. 1997) ("Maryland does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing."); *Mount Vernon Props., LLC v. Branch Banking And Trust Co.*, 170 Md. App. 457, 472, 907 A.2d 373, 381-82 (2006) ("A breach of the implied duty of good faith and fair dealing is better viewed as an element of another cause of action at law, *e.g.*, breach of contract . . . and we conclude that no independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing"); *cf. Alig v. Quicken Loans*, 990 F.3d 782, 797 (4th Cir. 2021) (noting that West Virginia law does not allow an independent claim for breach of the implied covenant of good faith and fair dealing, and "plaintiffs cannot pursue a claim for breach of the implied covenant where they failed to allege breach of contract").

Breach of the covenant may be alleged as part of an action for breach of contract. But, there is no "duty requiring affirmative steps beyond those required by the contract itself.[ ]" *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 794 (D. Md. 2002) (citing *Parker v. The Columbia Bank*, 91 Md. App. 346, 366, 604 A.2d 521, 531 (1992)). Indeed, the Fourth Circuit has said: "[W]hile the implied duty of good faith and fair

dealing as recognized in Maryland requires that one party to a contract not frustrate the other party's performance, it is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir. 2000).

Notably, under Maryland law, every employment contract also contains an "implied duty [of loyalty] that an employee act solely for the benefit of his employer in all matters within the scope of employment." *Maryland Metals, Inc. v. Metzner*, 28 Md. 31, 38, 382 A.2d 564, 568 (1978)). In particular, an employee may be liable for a breach of fiduciary duty if he commits a "fraudulent, unfair, or otherwise wrongful act such as misappropriation of trade secrets, conspiracy to bring about mass resignation of key employees or interference with an employer's business opportunities." *EndoSurg Medical, Inc. v. EndoMaster, Inc.*, 71 F. Supp. 3d 525, 556 (D. Md. 2014) (citing *Maryland Metals, Inc.*, 282 Md. at 38-39, 382 A.2d at 568-69). "The misuse of confidential information" can also constitute a breach of fiduciary duty. *Fundamental Admin. Servs., LLC v. Anderson*, JKB-13-1708, 2014 WL 5797125, at *3 (D. Md. Nov. 6, 2014) (citing *Dworkin v. Blumenthal*, 77 Md. App. 774, 779, 551 A.2d 947, 949 (1989)). However, plaintiff did not allege breach of fiduciary duty.

In sum, plaintiff may not advance an independent cause of action for a breach of the covenant of good faith and fair dealing. *See White Marlin Open, Inc. v. Heasley*, 262 F. Supp. 3d 228, 256 (D. Md. 2017) ("It is to avoid precisely these types of redundant claims that Maryland courts do not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing.") (citation and internal quotation marks omitted). Therefore, I shall grant the Cross Motion as to Count Three.

### D. Count Four: Violation of MUTSA

### 1.

In Count Four of the Amended Complaint (ECF 123, ¶¶ 79-90), plaintiff asserts violations of the Maryland Uniform Trade Secrets Act, C.L. § 11-1201 *et seq.* In particular, Pinnacle alleges that its "pricing, investment strategies, client lists and confidential client information, such as revenue information, assets under management, nature of investments, investment allocations, investment fund selections, and client goals," constitute trade secret information. ECF 123, ¶ 82. And, plaintiff alleges that Krone communicated Pinnacle's "Confidential Information and Trade Secrets to third parties, including Naples Wealth." *Id.* ¶ 84. Pinnacle also asserts: "Defendants have misappropriated and used Pinnacle's Confidential Information and Trade Secrets" by "wrongfully solicit[ing] Pinnacle's clients on behalf of Naples Wealth" and "negotiat[ing] their respective engagements with third parties, including with former Pinnacle clients." *Id.* ¶¶ 85-87.

Defendants argue that they are entitled to summary judgment because plaintiff has no evidence to show that defendants obtained any information from Pinnacle, other than "Pinnacle's Fee Schedule referenced in [a] handwritten note" and "the client names and information retained in Mr. Krone's memory." ECF 135 at 34. And, they argue that this information does not qualify as a trade secret within the meaning of Maryland law. *Id.* at 34-38.

With respect to the fee schedule, defendants claim that it is not a trade secret because it "was publicly available and accessible on [Pinnacle's] public website in the months prior to Mr. Krone's resignation from Pinnacle, where it was posted until Pinnacle's business was sold to CWM on April 30, 2021." ECF 135 at 34. Concerning the client information contained within Krone's memory, defendants concede that, "[i]n limited situations, client lists may qualify as a company's trade secrets under the MUTSA." *Id.* at 35. But, they maintain that such circumstances are not

present here because Pinnacle "cannot prove that the client information used by Mr. Krone came from Pinnacle's internal database" and, in any event, "Pinnacle has not been able to point to anything outside of the SEC Regulations, its Compliance Manual, or the Employment Agreement regarding the steps it took to safeguard this information." *Id.* at 37-38.

In reply, plaintiff reasserts that its trade secrets include its "pricing, investment fund selection or generally how it manages monies for its clients, and its client list (which includes confidential client information). ECF 139 at 35. And, Pinnacle contends that information of this kind is routinely found to qualify as trade secrets under MUTSA. *Id.* at 35-38. Further, plaintiff claims that it "can clearly demonstrate efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets." *Id.* at 39.

## 2.

To establish a misappropriation claim under MUTSA, a plaintiff must show that the documents at issue constitute trade secrets and that the defendant misappropriated those trade secrets. *See* C.L. §§ 11-1201 to 11-1203. In other words, a plaintiff must demonstrate that "(1) it possessed a valid trade secret, (2) the defendant acquired its trade secret, and (3) the defendant knew or should have known that the trade secret was acquired by improper means." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (citing C.L. § 11-1201(c)(1)); *see Airfacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018).

MUTSA defines "'Trade secret'" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that . . . (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure

or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." C.L. § 11-1201(e); *see also EndoSurg Med., Inc.*, 71 F. Supp. 3d at 545.

In addition to establishing that an item is a trade secret, a plaintiff must also demonstrate that the defendant has misappropriated it. *AirFacts*, 909 F.3d at 95; *Trandes*, 996 F.2d at 660. Under MUTSA, "Misappropriation" is, in relevant part: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who" improperly acquired it or knew another person improperly or mistakenly acquired it. C.L. § 11-1201(c).

Of import here, a customer list has independent economic value when a company expended resources to create the list and the company's competitors could use the list to pursue the customers or undercut the company's prices. Courts have found that business plans, pricing and cost information, and customers lists for companies operating in competitive sales industries derive independent economic value from their confidentiality. "In a competition for sales, information about potential customers and their buying habits, a competitor's pricing, business strategies, and vendors is a windfall, granting the recipient a key to undercut the competition's pricing, outbid their vendor contracts, and attract their customers." *Albert S. Smyth Co., Inc. v. Motes*, CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (finding documents containing customer lists, pricing sheets, and business strategies to be trade secrets); *see MCS Services, Inc.*, 2010 WL 3895380, at *7; *see, e.g.*, *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 309-10, 849 A.2d 451, 463-64 (2004) (finding pricing information that disclosed an employer's manufacturing costs and profit margins were trade secrets because of the "unique, competitive nature of the currency acceptor industry"); *PADCO Advisors, Inc.*, 179 F. Supp. 2d 600 (mutual fund customer list

qualified as a trade secret; information not ascertainable by competitors had economic value because the information helped the company develop new products, and the company guarded the secrecy of database by limiting its availability and protecting it with passwords and firewalls).

To be sure, courts have found that financial information and marketing strategies do not always qualify as trade secrets, particularly when they are "subject to change" or "readily available from the marketplace." *Optic Graphics, Inc. v. Agee*, 87 Md. App. 770, 787-88, 591 A.2d 578, 587 (1991), *cert. denied*, 324 Md. 658, 598 A.2d 465 (1991).  Courts look to whether the business has invested time and resources to develop and protect the customer information.  *Ameritox, Ltd.*, 92 F. Supp. 3d at 402 (customer information qualified as a trade secret because company invested resources to develop the information and maintain its secrecy)*; see also PADCO Advisors, Inc.*, 179 F. Supp. 2d at 610.  But, a business plan may still constitute a trade secret, even if some aspects of the plan are public, as long as the business plan also includes a compilation of "personal insights and analysis." *Motor City Bagels v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 478-79 (D. Md. 1999) (finding a company's business plan was a trade secret because it included "personal insights and analysis brought to bear through diligent research and by marshaling a large volume of information").

The decision of the Maryland Court of Appeals in *LeJeune*, 381 Md. 288, 849 A.2d 451, is instructive.  In that case, a company that manufactured currency acceptance machines alleged that its budgeting software, strategic marketing plan, pricing and cost information, service pricing information, and detailed specifications for models of machinery constituted trade secrets.  *Id.* at 309, 849 A.2d at 464.  The court noted that the documents at issue contained "a vast amount of information related to [the company's] manufacturing costs and profit margins" and "the currency acceptor industry is highly competitive." *Id.*  As a result, a competitor could undercut the

company's prices if it acquired the information.  *Id.*  Additionally, the company's competitor could "improve the commercial value of its own products" if it acquired the company's manufacturing specifications.  *Id.* Therefore, the court concluded that the documents had independent economic value sufficient to qualify as trade secrets.  *Id.*; *see also PADCO Advisors, Inc.*, 179 F. Supp. 2d at 610 (noting competitor would derive economic value from company's customer list because only three companies competed in mutual fund market).

**3.**

I turn to plaintiff's MUTSA claim as to Pinnacle's "pricing."  It is undisputed that Pinnacle publicly displayed its fee schedule on its website, which, according to defendants, was operative until plaintiff sold its business to Congress Wealth.  ECF 135 at 34; *see* ECF 135- 8 (fee schedule); *see also* ECF 147-10 (Hill Dep.) at 20 (Tr. at 153) ("[O]ur fee structure has been published on our website[.]").

Pinnacle counters that the published fee schedule does not capture its "pricing", as "[t]he record in this case reflects that Pinnacle negotiates its rates with clients."  ECF 139 at 35.  And, "[t]hose negotiated rates are memorialized in individual clients' Investment Management Agreement and are not publicly available."  *Id.* at 36.  Thus, according to plaintiff, the pricing information at issue concerns "individualized" rates based, among other things, on each client's "assets under management with Pinnacle, which is not public."  ECF 139 at 36.

Pinnacle's argument might have some force if it had support in the record.  However, plaintiff does not point to any evidence to establish that it negotiated individualized pricing for each client.  Rather, it directs the Court's attention only to portions of Krone's deposition testimony and to the Compliance Manual, neither of which lends credence to plaintiff's claim.  *Id.* at 35-36.  Krone's testimony merely establishes that Krone stated that, after he resigned from Pinnacle, Hill

"had made some representations to clients that if . . . they  would stay with Pinnacle, he would cut their fees."  ECF 147-2 at 63 (Tr. at 243).  But, Krone did not testify that, as a matter of course, Pinnacle negotiated personalized fees with each client.

Plaintiff also points out that Krone noted the precise management fee that Pinnacle charged a particular client, purportedly as evidence for the proposition that each client negotiated the rate the client paid.  ECF 139 at 36.  But, Krone's testimony demonstrates only that he was able to ascertain the management fee a particular client paid to Pinnacle, based on his knowledge of that client's assets under management.  *See* ECF 147-2 at 63 (Tr. at 242-43).  In other words, the fee is a fixed percentage of the assets.  And, the schedule on which Krone relied to make this calculation is the precise information that Pinnacle made available on its public website.  *See* ECF 135-8 (showing how fees were charged in accordance with amount of assets under management).[47]

In addition, Pinnacle maintains that the Manual provides that "negotiated rates are memorialized within each individual clients' Investment Management Agreement and are not publicly available."  ECF 139 at 36 (citing ECF 124-8 at 15).  But, this page of the Compliance Manual does not support the proposition that each client paid a negotiated management fee that departed from the publicly available fee schedule.  Rather, it states that as a part of its "Risk Assessment Procedure," Pinnacle staff "perform audit procedures three times a year over 30 client households . . . to ensure advisory fees are accurately calculated and consistent with the signed Investment Management Agreement, which contains a fee schedule."  ECF 124-8 at 15 (italics omitted).  There is no indication that the fee schedule in each Investment Management Agreement deviated from the fee schedule as displayed on Pinnacle's website.

---

[47] Whether a particular client's assets under management amounts to a trade secret within the meaning of the MUTSA is another matter, discussed below.

In sum, the record is devoid of any indication that Pinnacle's pricing strayed from the fee schedule reflected on its public website.  Because Pinnacle's pricing was publicly available, it does not amount to a trade secret.  *See Optic Graphics*, 87 Md. App. at 787, 591 A.2d at 587 (explaining that pricing information cannot be a trade secret under the MUTSA in the absence of evidence demonstrating that a plaintiff has not made "reasonable efforts to maintain its secrecy"); *Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 814 (D. Md. 1995) (explaining that a realtor association's database was not a "trade secret" because it had been "distributed widely to its realtor members and potential purchasers"), *aff'd*, 91 F.3d 132 (4th Cir. 1996).

I next consider whether summary judgment is warranted as to Pinnacle's MUTSA claim predicated on Pinnacle's investment strategies, client lists, and certain client information.

According to defendants, the record reveals only that Krone provided NWP with client names, phone numbers, and addresses, as well as the type of client account, the account custodian, the assets under management, and whether Krone was assigned the client by Pinnacle or brought to Pinnacle by Krone.  ECF 135 at 36-37; ECF 140 at 19-20.[48]   In their view, there is no indication that they acquired or used the wide array of information that the suit puts at issue, including plaintiff's investment strategies, revenue information, nature of investments, investment allocations, investment fund selections, and client goals.

In evaluating a motion for summary judgment as to a claim for violation of MUTSA, a court must first determine from the record if there is a genuine dispute of material fact as to whether the information in issue amounts to a trade secret.  If so, the court must next determine whether

_____

[48] As mentioned, "assets under management" is also referred to as "AUM."  *See* ECF 147-3 at 23 (Tr. at 85).  Further, "custodian" refers to the institution that held the client's investment. *See id.* at 31 (Tr. at 114-115).

the record, viewed in the light most favorable to the nonmoving party, shows a genuine dispute of material fact as to whether the defendant misappropriated the information.

In the light most favorable to Pinnacle, the record supports Pinnacle's claim that its "investment strategies, client lists, and confidential client information, such as revenue information, assets under management, nature of investments, investment allocations, investment fund selections, and client goals," amount to trade secrets within the ambit of MUTSA.

The parties do not dispute that some of the information is a matter of public record. *See* ECF 147-3 at 29-30 (Tr. at 109-110) (indicating that some public information pulled from the "white pages" was used to create the Excel spreadsheet).[49]  But, it is also undisputed that the identity of Pinnacle clients, assets under management, investment type, custodian, and the source of the client, is not publicly available. *See* ECF 147-2 at 34-35 (Tr. at 129-30) (indicating that Krone assumed the Excel spreadsheet was created using the schedule he sent to Bruneau); ECF 147-3 (Bruneau Dep.) at 30 (Tr. at 111) (stating that this information likely came from Krone's "memory, potentially his cell phone").  Indeed, the record establishes that Pinnacle retained detailed client information in its electronic systems that was not publicly available, but to which Krone had access. *See* ECF 124-4 at 4-5 (Manual); ECF 147-2 (Krone Dep.) at 26 (Tr. at 96-97) (indicating that Krone accessed client information on Pinnacle servers).

For example, the Compliance Manual indicates that Pinnacle collected "Nonpublic Personal Information . . . from clients at the inception of their accounts and occasionally thereafter,

---

[49] The parties did not elicit deposition testimony from either Krone or Bruneau to clarify exactly what "information" was publicly available.  However, both witnesses referenced information pulled from the "white pages." ECF 147-2 (Krone Dep.) at 34-35 (Tr. at 129-30); ECF 147-3 (Bruneau Dep.) at 29-30 (Tr. at 109-10).  Further, Bruneau confirmed that his use of the term "white pages" pertained to a "generic phone directory."  ECF 147-3 at 31 (Tr. at 115).  Thus, the reference to "public information" appears to pertain to client phone numbers.

primarily to determine accounts' investment objectives and financial goals . . . ." ECF 124-4 at 4. Additionally, the Manual provides that the client information that Pinnacle collected included each client's "name(s), address, phone number, email address, Social Security number(s), and other information about [the client's] investing and financial planning needs." *Id.* at 9. The Manual also required each Pinnacle client "to sign an Investment Policy Statement that indicates how the client's assets will be invested." ECF 139 at 37; *see* ECF 124-5 at 1. And, information from each client's "Investment Management Agreement, Investment Policy Statement, or other Pinnacle forms" is entered into Pinnacle's "Portfolio Management system." ECF 124-5 at 1.

Defendants contend that at least a subset of the relevant clients at issue were referred to Pinnacle by Schwab. ECF 135 at 37; *see* ECF 135-13 at 4-5 (identifying clients).[50] And, according to Hill, Pinnacle officials "pull[ed] the data" relevant to Joint Clients "from Schwab," when necessary to do so. ECF 147-10 at 10 (Tr. at 44). Thus, according to defendants, plaintiff "cannot prove that the client information used by Mr. Krone came from Pinnacle's internal database." ECF 135 at 37. They assert: "Much of this information did not belong to Pinnacle, nor was it . . . stored on Pinnacle's systems." *Id.* In support of the contention, they point out that information pertaining to the Joint Clients was "stored on Schwab's systems—not Pinnacle's." *Id.* Moreover, defendants claim that "this information could have been provided by the clients themselves . . . ." *Id.* Therefore, they assert, *id.*: "The undisputed record demonstrates that Pinnacle cannot prove that the alleged information came exclusively from its own systems." *Id.*

To be sure, Hill testified that information relevant to Joint Clients was stored on Schwab's servers. ECF 147-10 at 10 (Tr. at 44). But, Hill did not state that the information was held by

---

[50] It is undisputed that another client was referred to Pinnacle by Fidelity. ECF 135-13 at 4. But, the parties do not present evidence establishing how information pertaining to this client was stored or how it was accessed by Pinnacle employees.

Schwab to Pinnacle's exclusion. *Id.* And, as mentioned, the Compliance Manual establishes that Pinnacle collects information pertaining to a client upon the agreement to become a Pinnacle client. *See* ECF 124-4 at 4. Further, according to the Manual, information from each client's "Investment Management Agreement, Investment Policy Statement, [and] other Pinnacle forms" is entered into Pinnacle's "Portfolio Management system." ECF 124-5 at 1. The Manual does not distinguish clients referred to Pinnacle by third parties such as Schwab and Fidelity.

Moreover, the record suggests that Krone accessed Pinnacle's records, not Schwab's servers, to obtain client information. *See* ECF 147-2 at 26 (Tr. at 96). Defendants' assertion overlooks that Krone testified that he "prepared schedules of Pinnacle's client information by pulling up client records on Pinnacle's server and writing notes by hand." ECF 139 at 38; *see* ECF 147-2 (Krone Dep.) at 26 (Tr. at 26-27). For purposes of summary judgment, this testimony is sufficient to establish that Krone obtained this information from Pinnacle.

However, to show that information amounts to a trade secret, the plaintiff must also "establish that this list would be valuable to competitors." *PADCO Advisors, Inc.*, 179 F. Supp. 2d at 610 (citing *Home Paramount Pest Control v. FMC Corp.*, 107 F. Supp. 2d 684, 693 (D. Md. 2000)). As noted, client lists can be of economic value to the extent that they include detailed information that would enable a business to "undercut the competition's pricing, outbid their vendor contracts, and attract their customers." *Albert S. Smyth Co., Inc.*, 2018 WL 3635024, at *4. In *PADCO Advisors, Inc.*, 179 F. Supp. 2d at 610, Judge Chasanow found that the information at issue, which included "detailed information about the [Registered Investment Advisor's] investment goals, what the RIA likes or dislikes about particular investment products, and what types of new products the RIA would like to see in the future," was economically valuable to competitors because it enabled the plaintiff "to market its funds more efficiently."

Here, the relevant information would plainly be of value to Pinnacle's competitors. As discussed, the fees charged by Pinnacle to each client were determined by the amount of assets under Pinnacle's management. *See* ECF 135-8. Indeed, Krone testified that he could ascertain the precise fee charged to an individual client based on his memory of the amount of a client's assets under Pinnacle's management. ECF 147-2 at 63 (Tr. at 242-43). Accordingly, access to this information would enable a competitor to undercut the fees charged by Pinnacle.

Moreover, Krone obtained information relevant to the investment performance for various Pinnacle clients. For instance, the NWP Letter describes, in some detail, the poor performance of Client C's investments under Pinnacle's management. *See* ECF 1-6. Access to such information would undoubtedly be valuable to Krone and Naples Wealth, as it would enable defendants to contrast Pinnacle's services with those that could be provided by NWP. *Id.*

Further, information relevant to the manner in which Pinnacle manages its investments plainly exceeds the kind of information that might be acquired "simply by talking with prospective purchasers." *Optic Graphics, Inc.*, 87 Md. App. at 788, 591 A.2d at 587. To the contrary, such information appears to be the product of Pinnacle's "personal insights and analysis," *Motor City Bagels*, 50 F. Supp. 2d at 478-79, which generally qualifies as a trade secret.

Defendants point out that where courts have found that client information may qualify as a trade secret, they have done so where the relevant business participates in a highly competitive market, in which a relatively small number of firms compete for a discrete field of potential customers. *See, e.g., LeJeune*; 381 Md. at 309-10, 849 A.2d at 463-64; *PADCO Advisors, Inc.*, 179 F. Supp. 2d at 610; *cf. Behram*, 2019 WL 4573417, at *7 (declining to find that pricing information amounted to a trade secret "[w]here the industry at issue cannot be reduced to a zero-sum battle between only *two* competitors . . . .") (italics in *Behram*); *Philips North America LLC*

*v. Hayes*, ELH-20-1409, 2020 WL 5407796, at *9-10 (D. Md. Sept. 9, 2020) (considering the concentration of the relevant market in determining whether the client list at issue was plausibly of economic value to the business's competitors).  But, defendants have not presented the Court with any evidence demonstrating the number of firms with which Pinnacle competed or whether there was a discrete number of clients for whom Pinnacle could render financial services.

Rather, defendants attempt to paper over the omission by maintaining that "[a] simple Google search using the terms 'Naples, Florida Financial Planner' results in at least twenty different financial planning firms in Naples, Florida alone."  ECF 140 at 13.  Such a naked contention is plainly insufficient to establish the competitiveness or lack thereof of the market in which Pinnacle competed.  Even crediting the assertion as true, defendants do not explain why the number of results generated from a "Google search" can constitute a reliable indicator of the competitiveness of a particular market.  Certainly, the Court cannot rely upon this bare assertion to find, as a matter of law, that the market in which Pinnacle participated was not a competitive one within the meaning of MUTSA.

Concerning the safeguards that Pinnacle implemented to protect its client information, plaintiff directs the Court's attention to various provisions of its Compliance Manual to show that it prohibited its employees, among other things, from "making unauthorized copies of . . . confidential information and/or distributing it to unauthorized people outside of Pinnacle" or "attach[ing] unauthorized devices on their PCs or workstations or download[ing] unauthorized software."  ECF 124-5 at 2.   The Manual also provides: "Access to specific Pinnacle databases and files shall be given only to employees who have a bona fide business need to access such information."  ECF 124-4 at 5.  And, all records are stored on a secure, password-protected server. *See id.* at 9; ECF 124-5 at 3-4.  Moreover, Pinnacle retained the right to "monitor . . . for any

purpose, all communications delivered via Pinnacle's electronic communications resources and all communications, information or materials created or stored on Pinnacle's network computer systems or on an employee's personal computer." ECF 124-7 at 3.

As noted, Krone executed the Form (ECF 124-9 at 2), pursuant to which he consented to the terms set forth in the Manual, but he did so prior to the publication of the version of the Manual that has been submitted as an exhibit. *Compare* ECF 147-2 (Krone Dep.) at 24 (Tr. at 88) (indicating that Krone executed the Form on October 2, 2018) *with* ECF 124-3 at 2 (indicating Manual was last amended on January 31, 2019). The earlier terms are not in evidence. Thus, it is not clear whether Krone agreed to comply with the current terms of the Manual.

Nonetheless, because the Manual was first implemented on November 22, 2004 (ECF 124-3 at 2), some version of the Manual was operative throughout Krone's employment with Pinnacle. *See* ECF 137-1 (indicating Krone was offered a position of employment on June 24, 2009). Moreover, the record reflects that Krone was aware of the electronic limitations that Pinnacle put in place to limit the disclosure of client information and that he "intentionally avoided Pinnacle's technology by handwriting and mailing a copy of Pinnacle's copy of Pinnacle's trade secrets." ECF 139 at 39. Indeed, at Bruneau's deposition, plaintiff's counsel read an email that Krone sent to Bruneau, stating, ECF 147-3 at 28 (Tr. at 104): "I'll mail you a copy since I don't want to scan and e-mail using Pinnacle's technology." At a minimum, the statement could be construed to show that Krone was aware of the confidential nature of the protected information, and was purposely attempting to avoid detection when he disclosed the confidential client information.

Accordingly, in the light most favorable to plaintiff, Pinnacle has presented facts to show that information pertaining to its "investment strategies, client lists and confidential client information" was economically valuable to Pinnacle and it was protected by reasonable

safeguards.[51]   Thus, in my view, plaintiff has made an adequate showing that the aforementioned information amounts to a trade secret, within the ambit of the MUTSA.

As indicated, to establish liability under MUTSA, a plaintiff must also show that the defendant has misappropriated a trade secret.  *AirFacts, Inc.*, 909 F.3d at 95; *Trandes*, 996 F.2d at 660.  A trade secret is misappropriated if it was acquired: (1) by a person who knows that the trade secret was acquired by improper means, or (2) by a person who uses or discloses the trade secret after acquiring it through improper means.  *See* C.L. § 11-1201(c).  Under MUTSA, "improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  C.L. § 11-1201(b).

Moreover, a claim for misappropriation lies "simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret."  *Sys. 4, Inc. v. Landis & Gyr., Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001) (per curiam).  Thus, "acquisition alone is enough to give rise" to a claim for misappropriation.  *Behram*, 2019 WL 4573417, at *5 (emphasis omitted).  Further, and of import here, the use of a trade secret that a former employee has committed to memory can amount to the misappropriation of a trade secret.  *See PADCO Advisors, Inc.*, 179 F. Supp. at 611-12; *see also Brightview Grp. v. Teeters*, 441 F. Supp. 3d 115, 140 (D. Md. 2020) (granting preliminary injunction as to plaintiff's MUTSA claim where defendants deleted all emails containing trade secret material but there was evidence that defendants "committed [the relevant] trade secrets and/or proprietary information from the contested . . . documents to memory," because the "information remains accessible to them, despite the emails' deletion[ ]").

---

[51] Of course, at trial defendants may present evidence that disputes plaintiff's contention.

Defendants insist that the record does not show that Krone ever acquired or otherwise employed the information at issue in the Complaint.  ECF 140 at 19-20.  In particular, they claim that plaintiff has failed to present evidence showing that Krone obtained, disclosed, or otherwise used any information pertaining to Pinnacle's "investment strategies," or its "nature of investments, investment allocations, investment fund selections, and client goals."   ECF 123, ⁋ 82; *see* ECF 140 at 19-20.  However, there is ample evidence that Krone acquired protected information from Pinnacle, disclosed that information to NWP, and, following his departure from Pinnacle, employed that information in communications with Pinnacle clients.

For example, at Bruneau's deposition, he said that Krone sent him an email on June 25, 2019, stating: "I'll be putting together a client list of account numbers and physical addresses[.]" ECF 147-3 (Bruneau Dep.) at 26 (Tr. at 95).  And, in an email dated July 30, 2019, Krone provided Bruneau with information pertaining to Pinnacle's billing cycle.  *Id.* at 28 (Tr. at 102-03). Additionally, Krone sent an email to Bruneau dated July 31, 2019, in which Krone indicated that he had prepared a schedule of client information that included "'Custodian, AUM, and whether the client was assigned to [him] by Pinnacle or brought in by [him] to Pinnacle.'"  ECF 147-3 at 28 (Tr. at 104).  Krone confirmed that he "prepared a list" of client names and sent that list to NWP via "[r]egular mail."  ECF 147-2 (Krone Dep.) at 28 (Tr. at 104).  Notably, Bruneau affirmed that "Krone mailed [him] something around July 31st" that arrived in an envelope.  ECF 147-3 at 34 (Tr. at 128).  Bruneau indicated that he did not learn what was in the envelope because he "destroyed [it] and [he] never opened it and [he] never read it."  *Id.*   But, the court cannot judge Bruneau's veracity.  His credibility must be determined by the factfinder.

The record also shows that Krone memorized data relevant to the investment performance for various Pinnacle clients.  Krone testified, ECF 147-2 at 39 (Tr. at 148-49):  "I made it my

business to remembers these numbers.  I had a month to memorize them . . . . I memorized these numbers for . . . many of the clients . . . ."  And, there is evidence demonstrating that after Krone became an employee of NWP, he employed this memorized information in various communications with Pinnacle clients.

In particular, Krone discussed with several Pinnacle clients the performance of their investments under Pinnacle management. *See id.* at 67 (Tr. at 259-60) (discussing email that Krone sent to a Pinnacle client in which Krone described the performance of the client's investment under Pinnacle management); *see also id.* at 71 (Tr. at 275-76) (indicating that, following Krone's departure, he called a Pinnacle client because he wanted the client "to know . . . that [his investment's] performance wasn't very good and I wanted him to be aware of that"); *id.* at 75 (Tr.at 291-92) (similar).  As discussed, in the NWP Letter that Krone mailed to Client C, he expressly criticized the performance of Client C's investment under Pinnacle's management. *See* ECF 1-6.[52]

Further, the record establishes that when Krone joined Naples Wealth, he provided information that was used to build an Excel spreadsheet containing relevant client information, including client names, addresses, and phone numbers, as well as "the type of investment they had and for each particular customer the amount they had under management, the assets under management[.]"  ECF 147-2 (Krone Dep.) at 34-35 (Tr. at 129-32); *see* ECF 147-3 (Bruneau Dep.) at 29-31 (Tr. at 109-16) (discussing the spreadsheet); ECF 147-12 (Mikulis Dep.) at 13-14 (Tr. at

---

[52] Defendants argue that the NWP Letter "cannot be used as part of Pinnacle's MUTSA claim, as it is undisputed that [Client C] never left Pinnacle, and remained [a Pinnacle] client after Mr. Krone's resignation."  ECF 135 at 26.  But, plaintiff need not demonstrate pecuniary harm to state a claim under MUTSA.  As discussed, "acquisition" of trade secret information is, on its own, "enough to give rise" to a claim arising under the MUTSA. *Behram*, 2019 WL 4573417, at *5 (emphasis omitted).  Indeed, defendants cite to no authority establishing otherwise.

109, 114-15) (similar).  Bruneau testified that the spreadsheet was created by employing the "white pages" as well as "Andy's memory of the clients that he has" and "potentially" information contained in Krone's cell phone.  ECF 147-3 at 30 (Tr. at 110-11).

Notably, in his testimony, Krone maintained that he did not play an active role in the creation of the spreadsheet; rather, the spreadsheet was created using the information in the schedule he previously sent to Bruneau.  ECF 147-2 at 34-35 (Tr. at 129-31).  But, this discrepancy amounts to a dispute of fact that the Court is not entitled to resolve.  And, in any event, it makes no difference whether NWP acquired this information from a physical schedule of Pinnacle's client information or Krone's memory of the same.   The result is identical: NWP acquired information to which it would not otherwise have had access, but for Krone's disclosure of it.

Thus, in the light most favorable to Pinnacle, the record shows that defendants violated MUTSA because Krone acquired, used, and/or disclosed to NWP confidential client information that belonged to Pinnacle.  Accordingly, I shall deny the Cross Motion as to Count Four.

### E.  Count Six: Tortious Interference

Both sides have moved for summary judgment as to plaintiff's claim for tortious interference, as set forth in Count Six of the Amended Complaint.  ECF 124-1 at 27-30; ECF 135 at 39-41.

In particular, Count Six alleges that "Krone was privy to Pinnacle's Confidential Information and Trade Secrets, including its client information, by virtue of his employment."  ECF 123, ¶ 97.  And, plaintiff states: "Krone communicated Pinnacle's Confidential Information and Trade Secrets to third parties in violation of his contractual and statutory obligations to Pinnacle."  *Id.* ¶ 98.   Further, plaintiff claims: "Defendants then used Pinnacle's Confidential Information and Trade Secrets, including its client information, to interfere with Pinnacle's

contractual and business relations with its clients." *Id.* ¶ 99.  Count Six adds: "Defendants, through their intentional acts, have intentionally interfered with the contractual and/or prospective contractual relationships that Pinnacle has with its clients." *Id.* ¶ 101.  And, Pinnacle asserts: "As a direct result of the Defendants' intentional and egregious conduct by tortiously interfering with Pinnacle's contractual and prospective business relationships with its clients, Pinnacle has been damaged . . . ." *Id.* ¶ 102.

The tort of intentional interference with contractual or business relations is "well-established in Maryland." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296, 639 A.2d 112, 116 (1994).  Broadly stated, it provides that "one not privileged to do so who purposely induces or causes a third person not to perform a contract or enter into or continue a business relation with another is liable for the harm caused thereby." *United Rental Equipment Co. v. Potts & Callahan Contracting Co.,* 231 Md. 552, 560, 191 A.2d 570, 574 (1963).

The Maryland Court of Appeals reiterated the elements of the tort in *Blondell v. Littlepage*, 413 Md. 96, 125, 991 A.2d 80, 97 (2010) (quoting *Kaser v. Financial Protection Marketing, Inc.*, 376 Md. 621, 628–29, 831 A.2d 49, 53 (2003)), as follows:

> A claim for intentional interference with contractual or business relations requires the following elements: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

"In any tort action, the plaintiff must establish that the defendant's tortious conduct was a cause in fact of the injury for which compensation is sought." *Med. Mut. Liab. Soc. of Maryland v. B. Dixon Evander & Assocs., Inc.*, 339 Md. 41, 54-55, 660 A.2d 433, 439-40 (1995); *see Peterson v. Underwood,* 258 Md. 9, 16-17, 264 A.2d 851, 855 (1970) (stating that "[c]ausation in fact is concerned with the . . . inquiry of whether defendant's conduct *actually* produced an injury")

(emphasis added); *Abend v. Sieber,* 161 Md. 645, 649, 158 A. 63, 64 (1932). Thus, "the burden is on the plaintiff to prove by a preponderance of the evidence that 'it is more probable than not that defendant's act caused his injury.'" *Med. Mut. Liab. Soc.*, 339 Md. at 55, 660 A.2d at 440 (quoting *Fennell v. Southern Maryland Hosp.,* 320 Md. 776, 580 A.2d 206, 211 (Md. 1990)). In addition, the plaintiff must establish that any damages sought are a "natural, proximate and direct effect of the tortious misconduct." *Jones v. Malinowski,* 299 Md. 257, 269, 473 A.2d 429, 435 (1984).

As for the third element, "any act by defendant which is 'wrongful or unlawful . . . done intentionally without cause or excuse,' which is 'for the indirect purpose of injuring the plaintiff, or of benefitting the defendant at the expense of the plaintiff,' will constitute tortious interference." *Fowler*, at 470, 598 A.2d 794, 802 at 804 (Motz, Diana, J.) (quoting *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 764-65, 511 A.2d 492, 497-98 (1986)) (alterations in *Fowler*). Notably, in *Sharrow*, 306 Md. at 764-76, 511 A.2d at 497-98, the Maryland Court of Appeals stated that it is "not necessary to prove express malice but only that the interference was wrongful and without justification . . . . [M]alice in this form of action means legal malice, not ill will or spite, and need be only a wrongful or unlawful act done intentionally without cause or excuse."); *see also* RESTATEMENT (SECOND) TORTS § 766 (1979).

The tort of tortious interference has "two general manifestations." *Macklin*, 334 Md. at 297, 639 A.2d at 117. The first manifestation is often described as "'inducing the breach of an existing contract,'" and the second, "more broadly, constitutes maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Blondell*, 413 Md. at 125, 991 A.2d at 97 (citation omitted). In other words, under Maryland law, one may

claim tortious interference with a contract or, in the absence of a contract or breach of contract, one may claim tortious interference with business or economic relations.

Notably, liability will only attach to an interference that is either "wrongful or unlawful." *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 90 (1992) (citation omitted); *Gabaldoni v. Wash. Cnty. Hosp. Ass'n.*, 250 F.3d 255, 263 (4th Cir. 2001) (citing *Travelers*, 326 Md. at 343, 605 A.2d at 90)).  The Maryland Court of Appeals has provided an illustrative list of the "types of wrongful or unlawful acts that could form the basis" for the second manifestation of the tort. *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 153, 757 A.2d 108, 113 (2000).  These include "'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'"  *Id.* (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 657, 650 A.2d 260 271 (1994)).  Moreover, "to establish causation in a wrongful interference action, the plaintiff must prove that the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference."  *Med. Mut. Liab. Soc.*, 339 Md. at 54, 660 A.2d at 439.

"In order to sustain a claim for tortious interference with prospective advantage 'plaintiffs must identify a possible future relationship which is likely to occur, absent the interference, with specificity.'"  *Mixter v. Farmer*, 215 Md. App. 536, 549, 81 A.3d 631, 638 (2013) (quoting *Baron Financial Grp. v. Rony Natanzon, et al*, 471 F. Supp. 2d 535, 546 (D. Md. 2006) (citing Maryland law)). "After all, without this showing, it is unclear how any of the following elements could be established: causation, damages, or indeed the defendants' wrongful intent to interfere with the relationship." *Baron*, 471 F. Supp. 2d at 546 (internal citations omitted).

But, Maryland courts have "'refused to adopt any theory of tortious interference with contract or with economic relations that converts a breach of contract into an intentional tort.'" *Hearn Insulation & Improvement Co., Inc. v. Carlos Bonilla*, AW-09-990, 2010 WL 3069953, at *10 (D. Md. Aug. 5, 2010) (quoting *Alexander & Alexander, Inc.*, 336 Md. at 654, 650 A.2d at 269-70); *Spengler v. Sears, Roebuck & Co.*, 163 Md. App. 220, 243, 878 A.2d 628, 642 (2005) (no claim for the tort of interference exists "'when there is merely a breach of contract that has an incidental effect on the plaintiff's business relations with third parties'") (internal citation omitted). "[A]cts of interference with economic relations do not become tortious simply because the defendant carries them out with a wrongful intent." *Alexander & Alexander, Inc.*, 336 Md. at 654, 650 A.2d at 271 (citing *Macklin*, 334 Md. at 305-308, 639 A.2d at 121-122). Plaintiff must allege "'both a tortious intent and improper or wrongful conduct'" to assert a claim for interference with economic relations. *Alexander & Alexander, Inc.*, 336 Md. at 656, 650 A.2d at 271 (quoting *Macklin*, 334 Md. at 301, 639 A.2d at 119).

Further, "[w]hen a business relationship is not codified in a contract, a defendant has a 'broader right to interfere' with it, on the theory that such interference is, from a different perspective, simply competition in the marketplace." *Gorby v. Weiner*, TDC-13-3276, 2014 WL 4825962, at *9 (D. Md. Sept. 23, 2014) (quoting *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663, 676 (1984)). Thus, if a defendant's purpose in interfering with a non-contractual business relationship has even a partial purpose of advancing his interest in competing with one of the parties, then "he is not liable in tort for that interference unless the defendant acts with 'tortious intent.'" *Gorby*, 2014 WL 4825962 at *9 (quoting *Natural Design, Inc.*, 302 Md. at 73, 485 A.2d at 676).

In the Motion, Pinnacle claims that it is entitled to summary judgment on this claim as to NWP because NWP "knew of Mr. Krone's contractual obligations to Pinnacle yet facilitated his breach in a calculated effort to increase their own revenues to Pinnacle's detriment."  ECF 124-1 at 27.  But, according to defendants (ECF 135 at 57-58), plaintiff's argument shifts the focus of Count Six from a claim predicated on the contractual relationships that plaintiff shared with its clients to a claim focusing on NWP's alleged interference with Krone's Employment Agreement with Pinnacle.  *See* ECF 123, ¶¶ 95-102.

Plaintiff counters that defendant's reading of Count Six is unduly narrow, arguing: "While the ultimate damage from Naples Wealth's conduct was the theft of its clients by improper means, Pinnacle's claim clearly reflects Naples Wealth's knowledge of the Agreement and its wrongful encouragement and assistance of Mr. Krone's breach of the Agreement."  ECF 139 at 33.  Pinnacle also points out that the facts pertaining to NWP's inducement of Krone's alleged breach of contract are "explicitly incorporated into Pinnacle's claim for tortious interference against Naples Wealth."  ECF 139 at 33; *see* ECF 123, ¶ 95 (stating that "Pinnacle repeats and hereby alleges each and every preceding paragraph of this Verified Complaint as if fully set forth herein").

In my view, plaintiff's argument is wide of the mark.  Count Six does not allege that NWP interfered with Krone's Employment Agreement.  Rather, it plainly centers on defendants' alleged interference with Pinnacle's contractual relationships with its clients.  Although Count Six incorporates all allegations in the Amended Complaint, plaintiff does not explain how this fact alone put defendants on notice that Count Six lodges a claim for anything other than defendants' alleged interference with "the contractual and/or prospective contractual relationships that Pinnacle has with its clients."  ECF 123, ¶ 101.

It is axiomatic that a plaintiff "cannot amend [its] complaint and add new theories of relief at the summary judgment stage.[ ]" *Foster v. Summer Village Comm. Ass'n, Inc.*, 520 F. Supp. 3d 734, 746 (D. Md. 2021); *see Henderson v. City of Roanoke*, ___F. App'x ___, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 174, 184 (4th Cir. 2013)).  Because the Motion asks the Court to grant summary judgment to Pinnacle based on grounds that were not set forth in the Amended Complaint, I shall deny the Motion as to Count Six.

Accordingly, I turn to the Cross Motion.  Defendants point out that "it is undisputed that Pinnacle's client contracts were terminable at-will."  ECF 135 at 39; *see* ECF 147-12 (Mikulis Dep.) at 19 (Tr. at 204-05); *see also* ECF 139 at 32 (recognizing that Pinnacle clients held at-will contracts).  Further, defendants posit that "there is no evidence showing improper methods were used or the requisite intent by Defendants."  ECF 135 at 40.  And, in their view, "[t]he mere fact that some of Mr. Krone's clients left Pinnacle is not enough to show tortious interference, especially for at-will contracts . . . ."  *Id.*  Moreover, defendants claim: "Ten of the clients at issue did not even go to NWP" and the "unrebutted record demonstrates that the Non-Exempt Clients who eventually moved their accounts from Pinnacle to NWP signed affirmations stating they were not solicited by Defendants and that they made the decision to leave Pinnacle on their own."  *Id.* at 41 (citing ECF 135-12).

Pinnacle rejects this argument, claiming that defendants' conduct cannot be excused on the ground that "Pinnacle's client's contracts are terminable at will."  ECF 139 at 32.  Rather, according to Pinnacle, Maryland law "excuses only legitimate competition."  *Id.* (citing *Macklin*,

334 Md. at 305, 639 A.2d at 120-21).  And, Pinnacle asserts that "there is ample evidence of illegitimate competition and wrongful means."  ECF 139 at 33.  In particular, plaintiff points out that Krone "contact[ed] [its] clients for the purpose of transferring their accounts to Naples Wealth"; "sent a handwritten note soliciting a Pinnacle customer on Naples Wealth's letterhead"; and "use[d] specific performance data from a confidential client portfolio."  *Id.*  (citing ECF 123, ¶¶ 34, 35, 39); *see* ECF 1-6 (NWP Letter).

Plaintiff's invocation of the "handwritten note soliciting a Pinnacle customer on Naples Wealth's letterhead" pertains to the NWP Letter that Krone sent to Client C.  ECF 139 at 33-34.  But, to establish a claim for tortious interference, plaintiff must demonstrate a causal relationship between defendants' actions and the harm that plaintiff allegedly suffered.  *See K&K Mgmt., Inc. v. Lee*, 316 Md. 137, 155, 557 A.2d 965, 973 (1989).  And, as mentioned above, it is undisputed that Client C did not leave Pinnacle after receiving the NWP Letter.  ECF 147-11 (Rosenthal Dep.) at 6 (Tr. at 47-48).  Thus, it is not clear how Krone's actions in this regard could have caused Pinnacle to suffer damages.  Indeed, plaintiff is not asserting damages associated with Client C. ECF 147-11 at 6 (Tr. at 48).[53]

Beyond the NWP Letter, plaintiff has not specifically directed the Court's attention to any other instances of defendants' illegitimate competition with Pinnacle.  *See* ECF 124-1 at 27-31; ECF 139 at 32-33.  And, judges "are not like pigs, hunting for truffles buried in the briefs," nor is it the Court's "job to wade through the record and make arguments for either party."  *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 n.5 (4th Cir. 2017) (internal citations and quotation marks omitted), *cert. denied*, ___U.S.___, 138 S. Ct. 1595 (2018).

---

[53] It does not necessarily follow that the NWP Letter has no bearing on plaintiff's claim for tortious interference, as it could be probative of Krone's intent.

Nonetheless, a review of the record, viewed in the light most favorable to the plaintiff, precludes an award of summary judgment to defendants as to Count Six.  To be sure, Krone stated at his deposition that his communication "was not for purposes of solicitation of clients."  ECF 147-2 at 16 (Tr. at 54).  Moreover, Krone claims that he used a Script to contact Pinnacle's clients.  *See* ECF 135-21.  The Script read, in relevant part: "I am contractually prohibited from soliciting you for your business and this is *not* the reason that I am calling you now. . . .   I am simply reaching out so that you have my current contact information."  *Id.* (emphasis in original).  And, Bruneau testified that NWP required Krone to adhere to the Script.  ECF 147-3 at 43 (Tr. at 165).

But, the record lays bare that Krone's communications with Pinnacle clients were not limited to the terms of the Script.  In particular, Krone's deposition testimony establishes that in communications with various Pinnacle clients, he referenced Pinnacle's management fees and discussed the performance of clients' respective investments under Pinnacle's management.  *See*, *e.g.*, ECF 147-2 at 63 (Tr. at 242) (discussing Pinnacle management fees).  Moreover, Krone admitted that he sent brochures to Pinnacle clients, which highlighted NWP's services.  *See* ECF 147-2 at 40 (Tr. at 151-52).  And, Krone met in person with certain Pinnacle clients during the time period, when they decided whether to move their accounts to NWP or remain with Pinnacle.  *See*, *e.g.*, *id.* at 74, 75 (Tr. at 286, 291).

Defendants also urge the Court to consider that at least the nineteen clients who moved their accounts from Pinnacle to NWP signed Acknowledgments, attesting to the fact that Krone did not solicit their business.  ECF 135 at 41; ECF 135-12.   However, Pinnacle claims that the Court may not consider the Acknowledgments because they amount to inadmissible hearsay, in violation of Rule 802 of the Federal Rules of Evidence.  ECF 139 at 19, ¶ 49.  Further, plaintiff

asserts that the Acknowledgments cannot be considered because they were not authenticated by a supporting affidavit, in violation of Fed. R. Civ. P. 56(c)(4).  *Id.*

As to the latter assertion, "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."  *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993).  And, defendants did not initially provide an affidavit attesting to the authenticity of the Acknowledgments.  However, defendants ultimately provided the Court with a copy of an affidavit from Bruneau, in which he stated that the Acknowledgments "consist[ ] of true and accurate copies of affirmations NWP received from the persons who signed said affirmations . . . ."  ECF 140-2, ¶ 3.  Thus, I am satisfied that the Acknowledgements are appropriately supported by a sworn affidavit, such that I am not precluded from considering them at this juncture for want of authentication.

Regarding plaintiff's hearsay objection, it is readily apparent that the Acknowledgements are hearsay; they are offered to prove that Krone did not solicit Pinnacle clients or, in other words, "to prove the truth of the matter asserted . . . ."  Fed. R. Evid. 801.  Therefore, the documents would be inadmissible at trial unless defendants show that they fall within an exception to the general prohibition against hearsay statements.

Moreover, inadmissible hearsay "cannot create a factual dispute" for purposes of summary judgment.  *Stanton v. Elliot*, 25 F.4th 227, 237 n.7 (4th Cir. 2022); *see Lyons v. City of Alexandria*, 35 F.4th 285, 290 (4th Cir. 2022) ("'[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.'") (quoting *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) (alteration in *Lyons*); *see also Graves v. Lioi*, 930 F.3d 307, 326 n.15 (4th Cir. 2019) (observing that "'hearsay, like other

evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment'") (citation omitted).

Defendants do not attempt to argue that the Acknowledgments, as currently presented, would be admissible at trial. Rather, they claim that, even if the Acknowledgments are inadmissible at trial, "that alone does not discredit the facts therein." ECF 140-1 at 4, ⁋ 49. To that end, they point to a decision from the Court of Appeals for the District of Columbia Circuit, *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000), in which the court said: "While a nonmovant is not required to provide evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." And, defendants assert that "there are multiple avenues for entering the facts within the affirmations into evidence," namely through witness testimony. ECF 140-1 at 4, ⁋ 49.

It is well established that a party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp.*, 477 U.S. at 325. Indeed, the Supreme Court has instructed: "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . ." *Id.* Thus, a "nonmoving party [can] defeat summary judgment with materials capable of being reduced to admissible evidence at trial." *U.S. Dep't of Housing & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Virginia, Inc.*, 64 F.3d 920, 926 n.8 (4th Cir. 1995). But, even if I consider the Acknowledgments, they do not change the outcome.

As an initial matter, at least twenty-nine of Krone's former clients left Pinnacle in the months following Krone's termination, of whom nineteen became NWP clients. ECF 147-11 (Rosenthal Dep.) at 5 (Tr. at 43); *id.* at 8 (Tr. at 111-12). The Acknowledgements pertain only to the nineteen Pinnacle clients who later became NWP clients. *See* ECF 135-12. There is no

evidence as to whether the other ten Pinnacle clients for whom Pinnacle is asserting damages believed that Krone had attempted to solicit their business.   More to the point, whether former Pinnacle clients perceived of Krone's communications with them as a solicitation does not disprove the ample evidence of Krone's disclosure and use of Pinnacle's client information to further his apparent aim of prompting Pinnacle clients to move their business from Pinnacle to NWP.   *See*, *e.g.*, ECF 147-2 at 63 (Tr. at 242-43) (discussing Pinnacle management fees charged to Pinnacle clients); *id.* at 67 (Tr. at 259-60) (indicating Krone praising the performance of client's investment under his management, because he "wanted [the client] to become [his] client at Naples Wealth . . . [i]f [the client] had decided to do that").

In the light most favorable to Pinnacle, the record gives rise to an inference that Krone acted with the intent to harm Pinnacle's financial interests. Specifically, approximately one month after Krone became a NWP employee, he communicated with a Pinnacle client who sent an email to Krone stating, ECF 147-2 at 64 (Tr.at 246): "I hope you stick it in [Pinnacle's] ass."  In response, Krone wrote: "[T]hanks, that's exactly my intention." ECF 147-2 at 64 (Tr. at 246).   The factfinder could conclude from Krone's response that he harbored an intention to harm Pinnacle by seeking to convince its clients to follow him to NWP.

In sum, viewed in the light most favorable to plaintiff, Pinnacle has generated a dispute of material fact as to whether Krone unlawfully misappropriated Pinnacle's client information to attract Pinnacle's clients to NWP, which resulted in various Pinnacle clients discontinuing their use of Pinnacle's services.  Accordingly, defendants are not entitled to summary judgment as to Count Six.

## F.  Count Seven: Unfair Competition

The Cross Motion asks the Court to award summary judgment to defendants as to Count Seven, which states a claim for unfair competition.  ECF 123, ¶¶ 103-107.  In particular, Count Seven alleges that defendants' conduct "has caused (and will continue to cause) damage to Pinnacle's business relationships with its clients and other valuable business interests."  *Id.* ¶ 104.  And, plaintiff claims: "Defendants' conduct has been (and continues to be) willful, intentional and unprivileged and has caused (and will continue to cause) Pinnacle to suffer immediate, irreparable harm, as well as other compensatory damages."  *Id.* ¶ 105.  According to Pinnacle, "[d]efendants' conduct . . . is contrary to honest industrial and commercial practices."  *Id.* ¶ 106.

Maryland's common law tort of unfair competition extends to "'all cases . . . in the field of business.'" *Electronics Store, Inc. v. Cellco Partnership,* 127 Md. App. 385, 407, 732 A.2d 980, 991 (1999) (quoting *Baltimore Bedding Corp. v. Moses,* 182 Md. 229, 236, 34 A.2d 338, 342 (1943)).  Generally, "[u]nfair competition is 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.'"  *Thompson v. UBS Financial Services, Inc.*, 443 Md. 47, 60, 115 A.3d 125, 133 (2015) (quoting *Balt. Bedding Corp,* 182 Md. at 237, 34 A.2d at 342) (internal quotation marks omitted).  "[U]nfair competition makes an individual liable for a deception that results in 'the goods of one dealer [being] passed off as the goods of another, and the seller receiv[ing] the profit which he would not have received except for such deception.'"  *Gorby*, 2014 WL 4825962 at *6 (quoting *Edmondson Village Theatre v. Einbinder,* 208 Md. 38, 44, 116 A.2d 377, 380 (1955)).

However, unfair competition is not limited to "passing off" a competitor's wares as one's own.  *Delmarva Sash & Door Co. of Md., Inc. v. Anderson Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002) (citing *GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.,* 27

Md. App. 172, 189, 340 A.2d 736, 747 (1975)); *Edmondson Village Theatre,* 208 Md. at 42, 116 A.2d at 379.  As Judge Blake noted in *Delmarva*, 218 F. Supp. 2d at 733, the Maryland Court of Appeals "has preserved a high degree of flexibility in the law of unfair competition."  She reiterated, *id.* (quoting *Balt. Bedding,* 182 Md. at 237, 34 A.2d at 342):

> "What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception."

Defendants assert that they are entitled to summary judgment as to Count Seven because "[t]here are no allegations that Defendants used fraud or deceit to obtain any alleged trade secrets or confidential information." ECF 135 at 42.  Nor, in defendants' view, is there any evidence "to show there was some trickery by the Defendants."  *Id.*  In sum, defendants argue: "There is simply no evidence that has been produced or cited by Pinnacle to show there is any genuine issue as to whether unfair competition took place . . . ."  *Id.*

Plaintiff responds: "The evidence clearly reflects that Mr. Krone removed nonpublic personal information from Pinnacle's system."  ECF 139 at 34 (citing ECF 147-2 at 26 (Tr. at 96; ECF 147-3 at 28 (Tr. at 104)).  In Pinnacle's view, "[t]here is ample evidence to sustain [its] claim of unfair competition because Defendants admit to conduct which constitutes violation of securities regulations," specifically 17 C.F.R. § 248.10(a)(1), "as part of their effort to compete with Pinnacle for its clients."  ECF 139 at 34.  And, plaintiff asserts, without citation to authority: "Certainly, competition based upon the violation of federal law can be viewed as unfair."  *Id.*

Generally, "[t]he legal principles which are controlling here are simply the principles of old-fashioned honesty.  One [person] may not reap where another has sown, nor gather where another has strewn."  *GAI Audio,* 27 Md. App. at 192, 340 A.2d at 748 (citation omitted).  Therefore, "in cases of unfair competition, fraudulent intent is not essential . . . ."  *Edmondson*

*Village Theatre,* 208 Md. at 46, 116 A.2d at 381.  On the other hand, and as defendants point out (ECF 135 at 41-42; ECF 140 at 24-25), Maryland courts have said that "unfair competition is not a 'fallback' tort that can save [a plaintiff] from its failure to establish tortious interference . . . ." *Command Tech., Inc. v. Lockheed Martin Corp.*, No. 0469, Sept. Term 2014, 2015 WL 6470277, at *8 (Md. Ct. Spec. App. Oct. 27, 2015).

As mentioned, plaintiff's argument is predicated, in part, on 17 C.F.R. § 248.10(a), which is a federal regulation that was promulgated by the Securities and Exchange Commission ("SEC"), pursuant to the statutory authority conferred on it by the Gramm-Leach-Bliley Act (the "GLBA" or the "Act"), Pub. L. No. 106-102, § 101, 113 Stat. 1338 (1999).  The Act was a "'seminal piece of banking legislation'" that "famously repealed the Depression-era Glass-Steagall Act's 'ban on affiliations between commercial and investment banks.'"  *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 739 (7th Cir. 2016) (quoting *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 29 (2007)).

The GLBA "also enacted multiple safeguards to protect the privacy of customers of financial institutions."  *Stevens*, 830 F.3d at 739.  In particular, the statute states: "It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."  15 U.S.C. § 6801(a).  To that end, the Act conferred authority on the SEC, among other agencies, to "establish appropriate standards for the financial institutions" in furtherance of this policy.  15 U.S.C. § 6801(b); *see id.* § 6805(a).  And, the GLBA vested the SEC with the power to regulate investment advisers, such as the parties in this case.  *Id.* § 6805(a)(5).

In accordance with that statutory authority, the SEC promulgated "Regulation S-P", 17 C.F.R. § 248.3 *et seq.* Relevant here, Regulation S-P prohibits investment advisors from "directly or through any affiliate, disclos[ing] any nonpublic personal information about a consumer to a nonaffiliated third party[.]" *Id.* § 248.10(a). And, an individual is an consumer "if he or she provides nonpublic personal information to [an advisor] in connection with obtaining or seeking to obtain brokerage services or investment advisory services, whether or not [the advisor] provide[s] brokerage services to the individual or establish[es] a continuing relationship with the individual." *Id.* § 248.3(g)(2)(i). Regulation S-P defines a "nonaffiliated third party" as "any person" except an investment advisor's affiliate or joint employee of both the investment advisor and a company that is not the investment advisor's affiliate. *Id.* § 248.3(s)(1). And, an "affiliate" is defined as "any company that controls, is controlled by, or is under common control with the . . . investment adviser." *Id.* § 248.3(a).

Notably, however "the statutory duty to protect a customer's nonpublic information under both Gramm-Leach Bliley and Regulation S-P falls squarely 'on the covered financial institution, not the individual representative.'" *Stevens*, 830 F.3d at 740 (quoting *In re S.W. Bach & Co.*, 435 B.R. 866, 891 (Bankr. S.D.N.Y. 2010); *see* 15 U.S.C. § 6801(a) (noting that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers"). Moreover, GLBA and its promulgating regulations do "not provide for a private right of action." *Rezende v. Citigroup Glob.*, No. 09 Civ. 9392 (HB), 2010 WL 4739952, at *5 (S.D.N.Y. Nov. 18, 2010); *see also Dunmire v. Morgan Stanley DW, Inc.*, 475 F.3d 956, 960 (8th Cir. 2007). Although "[s]everal agencies," including the SEC, "are tasked with enforcing the GLBA's provisions, . . . the statute does not confer on consumers a right to sue for violations of its provisions." *Lyles v.*

*U.S. Retirement & Benefit Partners*, PX-21-1165, 2021 WL 5233751, at *4 (D. Md. Nov. 10, 2021) (internal citation omitted).

I am unaware of any case law that suggests that Pinnacle may predicate a State law claim for unfair competition on a purported violation of Regulation S-P. Indeed, plaintiff does not point to any authority establishing as much. Thus, as I see it, even assuming defendants' conduct amounts to a violation of Regulation S-P, this cannot, on its own, establish defendants' liability as a matter of Maryland law.

Nonetheless, I am persuaded that summary judgment is not warranted. As explained above, plaintiff has produced evidence that Krone serviced former Pinnacle clients, in contravention of the terms of the Noncompete Covenant. *See* ECF 147-4; ECF 135-3, ¶ 9(B). Moreover, there is evidence to suggest that Krone attempted to provide Pinnacle's confidential client information to NWP, in a manner that circumvented Pinnacle's technical safeguards against the disclosure of this client information. ECF 147-3 at 28 (Tr. at 104). And, as discussed, there is evidence showing that Krone leveraged his access to this client information to undercut Pinnacle's pricing and to promote NWP's services, at Pinnacle's expense. *See*, *e.g.*, ECF 147-2 at 63 (Tr. at 242-43). In the light most favorable to Pinnacle, this evidence is sufficient to establish a claim for unfair competition.

Therefore, I shall deny the Cross Motion with respect to Count Seven.

### G. Remaining Counts

Defendants moved for summary judgment as to plaintiff's claims for conversion (Count Five) and unjust enrichment (Count Eight). *See* ECF 135 at 38-39, 42. Pinnacle did not respond or otherwise address defendants' arguments regarding these counts. And, a plaintiff who fails to address a claim in an opposition to a motion for summary judgment is deemed to have abandoned

the claim.  *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997).  Thus, I shall grant summary judgment in favor of defendants as to Count Five and Count Eight.

## IV.    Sealing

Plaintiff moved to seal five exhibits filed in support of its "Motion To Exclude the Expert Report, Opinions, And Testimony Of Michael Terrana" (ECF 126, the "Expert Motion") as well as three exhibits filed in support of the Motion.  ECF 128.[54]  The sealed versions of these documents are docketed at ECF 126-1 to 126-5 and ECF 127-1 to 127-3, respectively.  Defendants oppose plaintiff's motion to seal.  ECF 132.

In particular, plaintiff asked the Court to seal the deposition transcripts of Krone (ECF 127-1) and Bruneau (ECF 127-2) on the ground that "[t]hese transcripts contain specific reference to the identity of clients and indirect reference to their assets under management, investment strategies and preferences."  ECF 128 at 3.  In addition, plaintiff asked the Court to seal ECF 127-3, because it contains a "list of client accounts produced by Defendants in response to the November 8, 2019 Agreed Order," and the list revealed "the identity of all client accounts presently or formerly held by Defendants in November of 2019 for any former client of Pinnacle."  ECF 128 at 3.  And, plaintiff sought to seal the exhibits in support of the Expert Motion, as they "specifically identify client accounts, fees attributable to certain clients, as well as Pinnacle's internal financials."  ECF 128 at 4.

Concerning the Cross Motion, defendants have asked the Court to maintain seven exhibits under seal, docketed at ECF 137-1 to ECF 137-7.  *See* ECF 136-2 at 1-2.  Additionally, defendants

---

[54] By Memorandum Opinion (ECF 144) and Order (ECF 145) of March 22, 2022, I denied the Expert Motion, without prejudice, on the ground that it was premature.

redacted some of the exhibits filed in connection with the Cross Motion, docketed at ECF 137-1; ECF 137-5; ECF 137-6; and ECF 137-7.  According to defendants, "[e]ach of the [exhibits] contains information that Plaintiff has designated as either Confidential or Attorneys' Eyes Only under the Protective Order governing the production of documents in this litigation." ECF 136-2 at 2.[55]  And, defendants assert that Pinnacle did not waive that "designation for the purpose of filing before this Court." *Id.*  Significantly, however, plaintiff did not respond to defendants' sealing motion.

By Memorandum Opinion (ECF 144) and Order (ECF 45) of March 22, 2022, incorporated herein, I granted in part and denied in part the parties' respective motions to seal the relevant exhibits.  ECF 128 (plaintiff); ECF 136 (defendants).  In particular, I observed that these exhibits were replete with information for which sealing was not warranted.  ECF 144 at 14-15.  On the other hand, I noted that the exhibits also include information relevant to Pinnacle's clients, who "may have an interest in protecting their identities and/or their financial information." *Id.* at 14.  Therefore, I ordered the parties to confer and, if possible, to jointly submit redacted versions of the exhibits, fit for filing on the public docket.  *Id.* at 16.  And, as to the redacted exhibits filed under seal by defendants, I instructed plaintiff to advise the Court "as to the grounds that support continued sealing of these exhibits, in light of the redactions that were already made."  ECF 144 at 16.

The parties submitted timely responses to the Court's Order.  ECF 146 (defendants); ECF 147 (plaintiff).  Of import here, plaintiff has submitted redacted versions of all the exhibits that it

---

[55]During discovery, the parties entered a Stipulated Confidentiality Order (the "Protective Order") (ECF 57), which was approved by the Court on August 20, 2020. ECF 58.  The Order permitted a party to designate discovery material as "'CONFIDENTIAL,'" or "'ATTORNEYS' EYES ONLY.'" ECF 57, ¶ 1(a)-(b).  And, pursuant to the Protective Order, any materials so designated were required to be submitted to the Court under seal. *Id.* ¶ 2(a)-(b).

filed under seal.  *See* ECF 147-1 through ECF 147-9.  Further, it has provided redacted versions of five of the seven exhibits that defendants filed under seal.  *See* ECF 147-10 through ECF 147-14.  But, plaintiff did not submit redacted versions of either ECF 137-1 or ECF 137-7.

Pinnacle explains that it redacted the names of various former Pinnacle clients because the redactions are necessary to protect the confidentiality interests of its former clients.  ECF 147 at 2. Further, plaintiff asserts: "Under federal regulations, personally identifiable financial information includes both '[t]he fact that an individual is or has been one of your customers or has obtained a financial product or service from you' and information '[a]bout a consumer resulting from any transaction involving a financial product or service between you and a consumer.'"  *Id.* (quoting 17 C.F.R.§§ 248.3(u)(2)(i)(C), 248.3(u)(1)(ii)) (alterations in ECF 147).

Defendants oppose the redactions that plaintiff has submitted.  They contend that "client names are not confidential" and therefore do not warrant redaction.  ECF 146 at 2.  In particular, they note that plaintiff "does not have a compelling interest warranting the sealing of client names, as Plaintiff no longer services any of the clients in question and is legally precluded from providing services to them due to Plaintiff selling its business to Congress Wealth Management, LLC."  *Id.* Further, they claim that in any event, "client names are not confidential unless they were expensive to develop and have been kept secret."  *Id.*  And, in their view, plaintiff has failed to make such a showing.  *Id.*

Putting aside that defendants previously advocated that plaintiff should file redacted versions of the relevant exhibits, rather than submit them under seal (ECF 132 at 2, 4), defendants' assertion misses the mark because it overlooks that Pinnacle's former clients have their own interest in retaining their privacy.  *See, e.g.*, *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011).  And, as plaintiff points out, federal regulations provide that personally identifiable

information extends to the fact that these individuals were clients of Pinnacle.   17 C.F.R.§ 248.3(u)(2)(i)(C).

The Court is aware that the public record already reveals the names of some former Pinnacle clients   *See* ECF 1-6 at 1; ECF 136 at 2.  But, the exhibits filed under seal provide further information pertaining to these clients that has not yet been made public.  *See*, *e.g.*, ECF 147-4. In any event, as I see it, the fact that a client's name has previously been disclosed does not itself justify the continued publication of the name, let alone in exhibits that supply additional information about the individual.

Moreover, the proposed redactions are relatively modest, limiting the public's access only to the names of the particular clients at issue.  Thus, I am persuaded that maintaining the unredacted versions of these documents under seal would not be unduly burdensome on the public right of access.  Accordingly, I shall allow the unredacted version of the relevant exhibits to remain under seal.  And, I shall deny the Defense Response (ECF 146) and grant the Pinnacle Response.  ECF 147.

As mentioned, however, ECF 137-1 and ECF 137-7 have already been redacted.  And, plaintiff has not proposed any additional redactions to these exhibits, or otherwise explained why these redactions are inadequate.  Therefore, I shall direct the Clerk to lift the seal with respect to the exhibits docketed at ECF 137-1 and ECF 137-7.

## V.     Conclusion

For the reasons set forth above, I shall grant Pinnacle's Motion in part and deny it in part. In particular, I shall deny the Motion as to Count One; Count Two, to the extent it asserts a claim against NWP as well as to the extent it is predicated on Krone's breach of the Nondisclosure

124

Covenant; and Count Six.  But, I shall grant the Motion as to Count Two with respect to Krone's breach of the Noncompete Covenant and the Notice Covenant.

And, I shall grant the Cross Motion in part and deny it in part.  Specifically, defendants are entitled to summary judgment as to Count One, Count Three, Count Five, and Count Eight. Concerning Count Two, defendants are entitled to summary judgment to the extent it is lodged against NWP.  Further, the Cross Motion is granted as to Count Two with respect to Krone, to the extent that it is predicated on the Nondisclosure Covenant.  However, the Cross Motion is denied with respect to Count Two to the extent that it is based on Krone's breach of the Noncompete Covenant and the Notice Covenant.  Further, the Cross Motion is denied as to Count Four, Count Six, and Count Seven.

Moreover, I shall grant the Plaintiff Response and deny the Defense Response. Accordingly, I shall allow the unredacted versions of ECF 126-1 through ECF 126-5 as well as ECF 127-1 through ECF 127-3 to remain under seal.  Moreover, the unredacted versions of ECF 137-2 through ECF 137-6 shall also remain under seal.  However, I shall direct the Clerk to unseal ECF 137-1 and ECF 137-7.

An Order follows, consistent with this Memorandum Opinion.


Date: July 6, 2022                                             _____/s/_____
                                                               Ellen L. Hollander
                                                               United States District Judge